UNITED STATES DISTRICT COURT
For the District of Massachusetts

| | |
|---|---|
| ITV DIRECT, INC., | ) <br> ) <br> ) |
| Plaintiff, | ) <br> ) |
| v. | ) <br> ) |
| HEALTHY SOLUTIONS, LLC, ET. AL., | ) <br> ) |
| Defendants. | ) <br> ) |
| CAPPSEALS, INC., | ) <br> ) |
| Plaintiff-in-Intervention | ) <br> ) |
| v. | ) <br> ) |
| HEALTHY SOLUTIONS, LLC, d/b/a DIRECT BUSINESS CONCEPTS; ITV DIRECT, INC. AND DIRECT FULFILLMENT, LLC. | ) <br> ) <br> ) <br> ) <br> ) |
| Intervenor-Defendants. | ) <br> ) |

C. A. No. 04-CV10421-JLT

**CAPPSEALS, INC.'S MEMORANDUM OF LAW IN SUPPORT OF
ITS MOTION FOR SUMMARY JUDGMENT**

Cappseals, Inc. ("Cappseals") has already obtained a judgment against Healthy Solutions, LLC d/b/a Direct Business Concepts ("Healthy Solutions") for approximately $900,000 (Docket No. 91). Additionally, ITV Direct, Inc. ("ITV") has stipulated to numerous facts demonstrating its debt to Healthy Solutions in the amount of $1,821,864 (Docket No. 113). Accordingly, as detailed herein, Cappseals is entitled to judgment as a matter of law against ITV on its reach and apply claim as, by statute, the undisputed debt owed by ITV to Healthy Solutions can be used to satisfy the judgment debt Healthy Solutions owes to Cappseals.

## I.    INTRODUCTION

There has never been a dispute over the quality of the products manufactured and shipped by Cappseals to ITV on various dates through February 5, 2004.[1] Rather, ITV has cited tangential and – what Cappseals believes to be – pretextual affirmative defenses and claims against Healthy Solutions as a basis for withholding payment from Cappseals. Specifically, ITV claims a fraud perpetuated by Healthy Solutions caused ITV to unnecessarily spend "millions of dollars" on marketing the Supreme Greens product through infomercials. ITV also claims Healthy Solutions must indemnify it against potential liability in a separate lawsuit brought against ITV by the Federal Trade Commission (hereinafter the "FTC") (*FTC vs. Direct Marketing Concepts, Inc.*, Civil Action No. 04-11136-GAO (the "FTC Action")) wherein the FTC maintains ITV and Healthy Solutions are responsible for restitution to consumers for their alleged deceptive marketing of the product.[2] ITV claims the cumulative total of these two categories of unspecified "damages" must be set-off against the amounts owed to Cappseals. This right of "set-off" represents the thrust of ITV's defense against the payment claims of Cappseals.

However, Massachusetts law is unequivocal that the debt owed by ITV for goods "sold and delivered" pursuant to purchase orders is insulated from claims and defenses that arise from a related, but separate, distribution agreement. When determining whether a right to setoff is available under G.L. c. 106, § 2-717, Massachusetts courts have distinguished the obligations created by purchase orders for the delivery of goods from related distribution agreements that provide the general parameters of the parties' relationship. See *Travenol Laboratories, Inc. v.*

---

[1] Between December 29, 2003, and February 5, 2004, Cappseals made six weekly shipments to ITV containing a total of approximately 303,644 bottles of the Product. The details of these shipments are described in the affidavit of Harry Anderson III previously submitted to this Court (Docket No. 43, Ex. 1).

[2] Among other issues, the FTC action concerns claims that both ITV Direct and DBC made false or misleading statements when marketing the product manufactured by Cappseals. Tellingly, Cappseals is not a party to the FTC Proceeding.

*Zotal, Ltd*, 394 Mass. 95, 474 N.E.2d 1070 1073 (1985); *C.R. Bard, Inc. v. Medical Electronics Corp.*, 529 F. Supp. 1382 (D. Mass. 1982).  Because ITV's claims pertain to the parties' distribution agreement and not to the purchase orders that governed the actual sale of the goods at issue, ITV must pay for the goods it ordered and received notwithstanding the claims it may have against Healthy Solutions

Finally, ITV cannot use its fraud claim to create a "cloud" of contested issues when it was on notice of facts preventing reasonable reliance well before it issued the purchase order that resulted in shipment of the product by Cappseals.  For all of these reasons, Cappseals is entitled to judgment as a matter of law on its reach and apply claim and it should not have to participate in unrelated litigation between ITV and Healthy Solutions.[3]

## II.     FACTS[4]

**A.     ITV's Debt For The Shipments Received.**

In early April 2003, ITV and Healthy Solutions entered into a distribution agreement (the "Distribution Agreement") by which ITV was to produce an infomercial for the purpose of marketing a health supplement developed by Healthy Solutions ("Supreme Greens" or the "Product").  CS, ¶¶ 3-4.  The undisputed (and primarily stipulated) facts demonstrate that Healthy Solutions sold ITV 303,643, bottles of Supreme Greens all of which were manufactured and shipped by Cappseals.  CS, ¶¶19-27.  The 303,643 bottles were made up of six separate shipments placed in response to a "standing" purchase order ("Purchase Order 1101") that ITV issued on November 21, 2003 requesting shipments of 50,000 bottles of Supreme Greens per

---

[3] A ruling in Cappseals' favor will likely end this litigation without the need for trial as ITV and Healthy Solutions have represented to the Court that, but for Cappseals objection, they have settled their respective claims against each other.  See Joint Motion to Bifurcate, ¶6 (Docket No. 114)

[4] A more detailed statement of the facts with supporting citations to the record is found in the accompanying Concise Statement of Material Undisputed Facts pursuant to Fed.R.Civ.P. 56 L.R. 56.1.  Citations to Cappseals' Concise Statement of Material Facts shall be referred to as "CS, __."

week.[5]  CS, ¶¶ 15-16.

ITV received the shipments of Supreme Greens pursuant to Purchase Order 1101 and has been invoiced $1,821,864.00 – an amount that remains outstanding to this day.[6] CS, ¶¶ 27-28.

### B.   ITV Ordered The Product Delivered By Cappseals After Warnings From The FTC.

Pursuant to the Distribution Agreement, in April, 2003 ITV Direct shot the first infomercial for Supreme Greens in which defendant Alex Guerrero made claims regarding the Product's ability to cure various chronic illnesses. CS, ¶¶ 3-4.  Thereafter, the infomercial ran on numerous media outlets. CS, ¶ 4.

Later, in June 2003, ITV was contacted by the FTC regarding claims made in different infomercials it produced to market a product called Coral Calcium.  The FTC expressed concern that claims in the infomercial were based on unreliable scientific support.  ITV agreed to immediately pull the Coral Calcium infomercial. CS, ¶ 5.  Thereafter, in August 2003, the FTC's investigation turned to the claims made in the Supreme Greens infomercial.  CS, ¶6.

In the ensuing weeks, ITV was again contacted by the FTC at which time the FTC informed ITV that it believed the claims made in the Supreme Greens infomercial were similarly unsubstantiated. CS, ¶¶ 7-8.  Donald Barrett, ITV's president, co-owner and eventual 30(b)(6) designee, verified these communications:

> During September and October of 2003, ITV Direct's counsel was contacted by the FTC concerning the Supreme Greens infomercial.  In those conversations, the FTC identified several concerns with the content of the infomercial.  ***The FTC claimed that it did not believe that there existed competent and reliable scientific***

---

[5] Purchase Order 1101 specifically set forth the price ($6.50 per bottle), type (capsules or powders), quantity of goods (50,000 per week), and method of cancellation (30 days notice). CS, ¶16.  Purchase Order 1101also contained several terms that were inconsistent with the Distribution Agreement.  The Distribution Agreement required 50% payment while no up front payment was required (nor was it made) pursuant to Purchase Order 1101.  Additionally, within section 14 of the Distribution Agreement it indicates certain language should be included on each purchase order referencing the Distribution Agreement. CS, ¶16 & Ex. 2, (E).  However, this practice was not observed by the parties– the language is conspicuously absent from any of ITV's purchase orders including Purchase Order 1101. CS, 16.

[6] Healthy Solutions asserts that it is without resources to pay Cappseals because of ITV's refusal to pay.

-4-

>*evidence for the claims in the infomercial.* In response to these concerns, ITV Direct both sought additional scientific evidence from Guerrero and Healthy Solutions, and edited the program to address the FTC's concerns. In October 2003, the edited tape was sent to the FTC, and the FTC concluded that the edited tape was a "substantial improvement".

CS, ¶ 8 (Barrett Aff., ¶ 18). Counsel for the FTC has confirmed these conversations took place on October 3, 2003:

>During the Fall of 2003, I participated in numerous conversations with counsel for DMC and Barrett relating to the FTC's investigation of DMC and Barrett generally, and the Supreme Greens infomercial specifically. On or about October 3, 2003, FTC attorneys informed counsel by telephone that we believed many claims made in the Supreme Greens infomercial were false and/or unsubstantiated, and we stated that DMC and Barrett had to cease airing the infomercial if they wanted to continue negotiating a resolution of the FTC's investigation.

CS, ¶ 9 (Young Aff., ¶ 7).

After being notified that the FTC considered Mr. Guerrero's claims to be unsubstantiated, ITV did not void the Distribution Agreement or stop ordering Supreme Greens. Rather, on October 8, 2003 ITV issued a "standing purchase order" to Healthy Solutions requesting shipment of 160,000 bottles of Supreme Greens per month. CS, ¶ 11. On October 24, 2003 ITV shot a second infomercial incorporating the changes suggested by the FTC. CS, ¶ 12. While the FTC acknowledged the new infomercial was an improvement, it still required ITV to substantiate all of their claims even in the new version of the infomercial CS, ¶13 (Young Aff., ¶8).

Despite the FTC's demands, ITV abandoned its effort to obtain substantiation after a damaging conclusion became apparent:

>Q: Did your company…take any steps to research the accuracy of [Mr. Guerrero's] statements?
>
>A: I emailed him for a documentation file, meaning put a list of documents together that can back up the claims you made. (September 10th)
>
>Q: Did he do that?
>
>A: I don't know. Maybe. If he did, he did it...very little. If we needed 10,000 pages, he gave us half a page.

> Q: What do you remember [Eileen Barrett Maihos] saying [about the progress of her effort to substantiate Mr. Guerrero's claims]?
>
> A: Progress was bleak, meaning …we really couldn't back up anything in question.
>
> Q: Do you recall when…she told you that?
>
> A: **I don't think she ever came to that conclusion. She said it's obvious that that he doesn't have a lot of the information to back up the claims that he made**.

CS, ¶ 14 (Barrett Depo. p. 80 & Ex. 1) (emphasis added).

While the FTC's concerns about unsubstantiated claims remained unresolved, on November 21, 2003, ITV issued a replacement "standing" purchase order to Healthy Solutions (Purchase Order 1101), requesting shipments of 50,000 bottles of Supreme Greens per week - a 25% increase over its previous order.  CS, ¶ 15.

The timeline of events leading up to Purchase Order 1101 are highlighted below:

**Chronology of Events**



-6-

**C.     ITV's Claims and Defenses.**

ITV maintains that it does not have to pay for the shipments at issue because of the amounts it anticipates recovering from Healthy Solutions as a result of its affirmative claims. ITV Direct has made claims against Healthy Solutions for:

> Breach of contract, based upon allegations that Healthy Solutions failed to pay royalties for sales by Healthy Solutions through its Web site, that Healthy Solutions failed to withdraw its application for registration of the trademarks "Supreme Greens with MSM, and that Healthy Solutions failed to assign the domain name "supremegreens.com" to ITV Direct (Amended Complaint, ¶¶ 38 –42);
>
> Conversion, based upon the same allegations made in support of ITV Direct's breach of contract claim (Amended Complaint, ¶¶ 43 – 45);
>
> Fraud in the inducement, based upon allegations that Healthy Solutions fraudulently represented that the product spokesman, Mr. Guerrero, was a doctor and OMD, and that Healthy Solutions fraudulently represented that they possessed reliable scientific evidence for the health claims made by Guerrero concerning Supreme Greens (Amended Complaint, ¶¶ 46 – 50);
>
> Misrepresentation, based upon allegations that Healthy Solutions fraudulently represented that ITV Direct would have exclusive rights to the Supreme Greens trademark and domain name and that Healthy Solutions would pay ITV Direct royalties for web site sales (Amended Complaint, ¶¶ 52 – 57);
>
> Indemnification, based upon allegations that Healthy Solutions must hold ITV Direct harmless from the lawsuit filed by the Federal Trade Commission (Amended Complaint, ¶¶ 58 – 63);
>
> Violation of M.G.L. c. 93A (unfair trade practices), based upon the above allegations (Amended Complaint, ¶¶ 64 – 67);
>
> Accounting/appointment of receiver, based upon the allegation that Healthy Solutions had a obligation to pay ITV Direct royalties for web site sales (Amended Complaint, ¶¶ 68 – 71); and
>
> Declaratory relief, based upon the allegation the ITV Direct is the exclusive owner of the Supreme Greens' trademark and domain name (Amended Complaint, ¶¶ 72 – 77).

ITV's claims (that also serve as its "affirmative defenses") contain no allegations that Healthy Solutions or Cappseals acted improperly in any way regarding the actual sale of

Supreme Greens to ITV. No notice of any non-conformity has been provided, rather ITV has conceded that Purchase Order 1101 was sent, the six shipments were received, there was reasonable opportunity to inspect the goods, and ITV never rejected the goods or tendered them back as non-conforming.

### III.    ARGUMENT

**A.    Summary Judgment Standard.**

Summary judgment is proper where there are no genuine issues of material fact. See *Corellas v. Viveiros,* 410 Mass. 314, 317 (1991). A "genuine issue" for summary judgment purposes exists only when there is evidence that "a reasonable jury drawing favorable inferences" could resolve it in favor of the non-moving party. *Ward v. Mass. Health Research Inst., Inc.*, 209 F.3d 29, 32 (1st Cir. 2000) citing *Smith v. F.W. Morsely & Co.*, 76 F.3d 413, 427 (1st Cir. 1996). "One of the principal purposes of the Summary Judgment rule is to isolate and dispose of factually unsupported claims and defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The role of the summary judgment procedure is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Schubert v. Nissan Motor Corp.*, 148 F.3d 25, 32 (1st. Cir. 1999) (quotation and citation omitted). Thus, summary judgment enables parties to avoid an unnecessary trial when only one outcome can ensue. *Vivid Technologies, Inc. v. American Science & Engineering, Inc.*, 200 F.3d 795, 806 (Fed. Cir. (Mass) 1999). The Court should enter summary judgment if the nonmoving party fails to demonstrate through the affirmative production of probative evidence that a genuine issue of material fact remains in dispute. See Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 27. Applying the foregoing to this case, the undisputed facts demonstrate that Cappseals is entitled to summary judgment as a matter of law on its claim for reach and apply.

**B.    ITV Has Satisfied The Elements Of A Reach And Apply Action.**

Pursuant to M.G.L. c. 214, § 3(6), a creditor can reach and apply in payment of the amount owed to it by a debtor, "any property, right, title or interest, legal or equitable," of the debtor "which cannot be reached to be attached or taken on execution … if the value can be ascertained by sale, appraisal or by any means within the ordinary procedure of the court." Under M.G.L. c. 214, § 3(6), the court must undertake a "two-step process to establish (1) the indebtedness of the defendant, and (2) the defendant has property that can be reached by the plaintiffs in satisfaction of the defendant's debt." *Hunter v. Youthstream Media Networks, Inc.*, 241 F. Supp. 2d 52, 57 (D. Mass. 2002) (citing M.G.L. c. 214 §§ 3(6) and (7); *Papamechail v. Holyoke Mut. Ins. Co.*, 397 N.E.2d 1153, 1156 (Mass. App. Ct. 1979)). "The first step, must show the existence of a debt owed the company by [] the principal defendant." *Mass. Electric Co. v. Athol One, Inc.*, 391 Mass. 685, 687 (1984). The second step of the process involves "satisfying the debt out of property held by one who owes a debt to the principal defendant." *Mass. Electric*, 391 Mass. at 687.

Here, Cappseals has established both of the elements necessary to succeed in its reach and apply action. First, Cappseals has established a debt owed by Healthy Solutions to Cappseals in the amount of $890,182.09.[7] Based on the facts stipulated between the parties, ITV has agreed that it accepted but did not pay for the shipments of Supreme Greens in question and owes Healthy Solutions the $1.8 million dollars it was invoiced.[8]

---

[7]    This sum was initially alleged in Cappseals' pleadings and later established by Cappseals' acceptance of Healthy Solution's March 30, 2005 Offer of Judgment in which Healthy Solutions allowed Cappseals to enter judgment against Healthy Solutions in the amount of $890,182.09 together with pre and post-judgment interest (Docket No. 85).

[8]    Under Massachusetts law, a buyer of goods "must pay at the contract rate for all goods accepted." G.L. c. 106, § 2-607(1) (emphasis added). Where the buyer fails to pay the price for accepted goods when it becomes due, the seller's remedy is an action for price. G.L. c. 106, § 2-709(1). There is no dispute that shipments of goods were delivered to and accepted by ITV. Thus, because ITV has failed to pay Healthy Solutions for the goods shipped, Healthy Solution's action for price is appropriate.

**C.    ITV Cannot Claim Set Off.**

The Stipulations of Fact show that there is no dispute about whether ITV accepted but did not pay for goods sold by Healthy Solutions and manufactured by Cappseals. However, ITV claims that it is entitled to reduce or eliminate its debt by subtracting the amount of damages it seeks to recover against Healthy Solutions for issues arising from their Distribution Agreement.

**1.    Purchase Orders are Contracts Separate and Distinct from Related Distribution Agreements.**

According to the Supreme Judicial Court of Massachusetts, it is "well settled" that a buyer's "obligation to pay for goods tendered and accepted does not arise under the 'same contract' as the alleged breach of an exclusive dealing or distributorship arrangement by the seller." *Travenol Laboratories, Inc. v. Zotal, Ltd*, 394 Mass. 95, 98, 474 N.E.2d 1070, 1073 (1985) (citing *Hellendall Distribs., Inc. v. S.B. Thomas, Inc.*, 559 F. Supp. 573, 574-575 (E.D.Pa. 1983); *C.R. Bard, Inc. v. Medical Electronics Corp.*, 529 F. Supp. 1382, 1387 (D. Mass. 1982).[9] That is, even if the basic relationship between a buyer and seller is defined by a distribution agreement, as in this case, it is the specific requests made for specific quantities of goods (purchase orders) that constitute the "contract" giving rise to a buyer's obligation to pay for the goods. The logic of this rule is reflected in the fact that ITV issued Purchase Order 1101 for the six shipments of Supreme Greens it accepted, even though the parties had already executed a Distribution Agreement.

In *Travenol*, the Court was faced with facts strikingly similar to the present case. The parties entered into a distribution agreement under which the seller agreed to supply the distributor with

---

[9] In *C.R. Bard* the buyer asserted a litany of affirmative defenses arising from the a distribution agreement similar to the defenses (and affirmative claims) brought by ITV. This Court held that these disputes did not address the actual sale of goods when granting summary judgment in favor of the seller. *Id*. at 1386-87. The court stated: Even if [the buyer] properly stated facts sufficient to set out each element of those defenses, it still would lack a defense to Bard's claim since those theories, like the good faith defense, address the termination of the distributorship agreement rather than the actual sale of the goods. *Id*. at 1387 (emphasis added).

medical products. *Travenol,* 394 Mass. at 96. After a period of time, the seller terminated their distribution agreement and demanded the buyer pay the outstanding amounts due for goods it had previously accepted. *Id.* In response, the buyer claimed damages as a result of the termination, and in a resulting suit, asserted it could set off the claimed damages against the outstanding balance due for "goods sold and delivered." *Id.* Applying Massachusetts law, the Supreme Judicial Court held that a buyer's "obligation to pay for goods tendered and accepted does not arise under the 'same contract' as the alleged breach of an exclusive dealing or distributorship arrangement by the seller." *Id.* (citing to *Hellendall*, 559 F. Supp. at 574-75.)[10] The court distinguished Massachusetts law from that of foreign jurisdictions when holding the Massachusetts rule "is the better rule" because it protects the expectations of the parties that "goods purchased would be properly paid for." *Travenol,* 394 Mass. at 100.

Cases in other jurisdictions, analyzing similar circumstances and expressly relying on *Travenol* and *C.R. Bard* confirm the proposition that because "sales" result from purchase orders – not a distribution agreement - two separate contracts exist preempting set-off. See *Carlisle Corp. v. Iresco Constr. Materials Inc.*, 823 F. Supp. 271 (M.D. Pa. 1993) (The distribution agreement "created no right to payment; rather it created a potential for future sales…Those sales materialized [when the buyer issued purchase orders]. Each purchase order…created a right to payment…[Therefore], we must conclude that there were separate contracts."); *Schieffelin & Co. v. Valley Liquors*, 823 F.2d 1064, 1067 (7th Cir. 1987) (separate contracts recognized because sales "resulted from accepted purchase orders and not from the distributorship agreement.")[11]

---

[10] In *Hellendall*, the court held that U.C.C. 2-717's set off provision does not apply to distribution agreements. *Hellendall,* 559 F. Supp. at 574-575. The court refused to allow the buyer to reduce the money owed for the goods sold and delivered by intertwining its claim for damages allegedly resulting from the breach of the distribution agreement citing 2-607(1) and stating, "because the goods were accepted, the…[buyer]…has an obligation to pay the contract price for them."

[11] Other Federal courts analyzing the UCC have reached the same conclusion as the *C.R. Bard* and *Travenol* courts. See *ECHO, Inc. v. Whitson Co., Inc.*, 52 F.3d 702, 706 (7th Cir. 1995)(applying Illinois law "distributorship

The Distribution Agreement at issue here did nothing more than contemplate future sales, while the individual purchase orders specifically set forth the price, type, quantity of goods, and method of cancellation.[12] Under these circumstances, Purchase Order 1101 was a separate contract from the Distribution Agreement entered into by ITV and Healthy Solutions and thus ITV cannot use claims relating to the Distribution Agreement as a means to reduce its liability for amounts owed under Purchase Order 1101.

### 2.   ITV's Claims Do Not Go To The Essence of the Purchase Orders.

For a buyer to invoke set-off under § 2-717, the asserted breach must *also* "go to the essence of the transaction under which the seller seeks to recover his price." *Travenol*, 394 Mass. at 97-98 (citing *C.R. Bard,* 529 F. Supp. at 1387). ITV is not entitled to a set-off because its asserted claims do not go to the "essence" of Purchase Order 1101 – the conformity of the goods. *C.R. Bard*, 529 F.Supp. at 1388 (in order or a buyer to invoke U.C.C. § 2-717, the asserted breach must "go to the essence" of the transaction under which the seller seeks to recover his price); See also *Computer Systems Engineering, Inc. v. Qantel Corp.,* 571 F. Supp 1379, 1381 (D. Mass. 1983) (a buyer can't delay payment for goods accepted by asserting "a remote breach of contract" relating largely to termination of the distributorship agreement where "there is no hint that the seller acted improperly in any way regarding the actual sale of the goods"); *McNally Wellman Co., a Div. of Boliden Allis, Inc. v. New York State Elec. & Gas Corp.*, 63 F.3d 1188, 1199-1200 (2d. Cir. 1995)(a contract "fails in its essence … where ordered goods are not

---

agreements and the purchase orders that arise under them are not the same contract for purposes of § 2-717."). *TO-AM Equipment Co., Inc. v. Mitsubishi Caterpillar Forklift America*, 913 F. Supp. 1148, 1155 (N.D. Ill. 1995)(where the buyer accepts goods ordered pursuant to purchase orders, the amount owed on the purchase orders is not subject to set-off for the seller's alleged breach of the distribution agreement); *M/A-Com, Inc. v. C.W. Swift & Assocs.*, 1995 U.S. Dist. LEXIS 22321 (D. Cal., 1995) Aff'd, without op., *M/A-COM, Inc. v. C. W. Swift & Assocs.*, 110 F.3d 68, 1997 U.S. App. LEXIS 10943 (9th Cir. Cal. 1997)("a buyer cannot escape its obligation to pay for goods accepted simply by alleging some remote breach of the broader contractual obligations between the parties.").

[12] If the parties had followed the terms of the Distribution Agreement - requiring 50% payment by ITV upon ordering - there would not be a dispute over ITV's failure to remit the entire purchase price.

delivered at all or are delivered with significant faults rendering them inoperable."). Rather, ITV's allegations claims for breach of contract, conversion, misrepresentation, indemnification, violation of M.G.L. c. 93A, accounting/appointment of receiver, and declaratory relief all relating to disputes regarding the Distribution Agreement, specific terms contained therein as well as claims made within the infomercial filed pursuant to the Distribution Agreement. Under Massachusetts law, U.C.C. § 2-717 "is not a general set-off provision permitting a buyer of goods to adjust its continuing contract obligations according to the equities perceived by the buyer." *C.R. Bard*, 529 F. Supp. at 1388. (emphasis added). Accordingly, despite ITV's perception of the "equities," none of its claims "go to the essence" of Purchase Order 1101 that gives rise to the payment obligation. Thus, ITV's claims can not be used to reduce the amounts it owes for its receipt and acceptance of the Supreme Greens delivered by Cappseals.[13]

### 3. ITV Never Gave the Requisite Notice of Any Non-Conformity Under U.C.C. 2-717.

Pursuant to G.L. c. 106, § 2-717, the "buyer on notifying the seller of his intention to do so may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract." A buyer's failure to provide notice to the seller, within a reasonable time after he discovers or should have discovered any breach, will effectively bar the buyer from exercising his rights under § 2-717. *See* G.L. c. 106, §§ 2-717 and 2-607(3)(a). The determination of "[w]hat constitutes reasonable time depends on the particular circumstances of a case." *M.K. Assoc. v. Stowell Products, Inc.,* 697 F. Supp. 20, 21 (D. Me. 1988). However, ITV has agreed it had a reasonable opportunity to inspect the goods; never

---

[13] Even assuming ITV Direct's claims were valid, under *C.R. Bard*, they are not defenses to DBC's action for price. As the court stated in *C.R. Bard*: "Even if [the buyer] properly stated facts sufficient to set out each element of those defenses, it still would lack a defense to Bard's claim since those theories address the termination of the distributorship agreement rather than the actual sale of the goods." *C.R. Bard,* 529 F. Supp. at 1387.

tendered them back to Healthy Solutions, never rejected them; and, never provided notice of its intent to reject. CS, ¶¶ 20 – 23 (Docket No. 113, ¶¶ 22-29).

    **4.    The Terms Of The Distribution Agreement Were Not Incorporated Into Purchase Order 1101.**

ITV has previously asserted that the terms of the Distribution Agreement were "incorporated" into the purchase orders it issued essentially making them one contract for the purpose of setoff. However, the doctrine of "Incorporation by Reference" does not cure the infirmity of ITV's claim to set-off as Purchase Order 1101 did not contain any language evidencing an intent to incorporate the terms of a previously existing extraneous writing. Even a clear or specific reference to another document does not equate to incorporation. See *Fit Tech, Inc. v. Bally Total Fitness Holding Corp.*, 379 F.3d 1, 10 (1st Cir. 2004). Rather, the doctrine of "Incorporation by Reference" requires an objective and clearly stated demonstration of intent to incorporate rather than just a mere reference to an extraneous writing. *Lowney v. Genrad, Inc.*, 925 F.Supp. 40, 44 (D. Mass. 1995) (citing *Lawrence-Lynch Corp. v. Dept. of Environmental Management*, 392 Mass. 681, 682, 467 N.E.2d 838, 839 (1984)).

While there is no magic language under Massachusetts law necessary to incorporate terms from an extraneous writing, words like "pursuant to" or "in accordance with" are plain language that clearly indicate parties - intent to incorporate the terms of a separate understanding. *United States v. Boston Scientific*, 167 F.Supp.2d 424, 431 – 432 (D. Mass. 2001). Accordingly, Massachusetts courts do require *some* language sufficient to evidence the intent to incorporate – which language is completely absent from Purchase Order 1101. *Id*.

Whatever thought there may have been to incorporate the terms of the Distribution Agreement into the purchase orders was specifically abandoned when the purchase orders (and Purchase Order 1101 in particular) were issued absent any language referencing the Distribution Agreement. *See Fit Tech,* 379 F.3d at 10; *Rosenblum v. Travelbyus.com ltd.*, 299 F.3d 657, 666

(7th Cir. 2002) ("mere reference to another contract or document is not sufficient to incorporate its terms into a contract. There must be an express intent to incorporate.")

The absence of any specific "incorporation" language in Purchase Order 1101 demonstrates the obvious: the purchase orders were separate agreements from the Distribution Agreement. Because the terms of the Distribution Agreement were not incorporated into the purchase orders, U.C.C. 2-717 cannot be used to reduce monies owed on Purchase Order 1101 where the remaining claims are based on breaches of a separate agreement.[14]

### D. ITV's Alleged Reliance Was Unreasonable As A Matter of Law.

Even assuming that set-off was available, which it is not, ITV's fraud claims fail as a matter of law. The reliance that ITV allegedly placed on Healthy Solutions' "puffery" was fatally unreasonable because ITV was informed by the FTC that Mr. Guerrero's claims were unsubstantiated *before* it issued Purchase Order 1101. In Massachusetts, reliance is an essential element of a claim for fraud. *Massachusetts Laborers' Health & Welfare Fund, by and Through its Trustees v. Philip Morris, Inc.*, 62 F. Supp. 2d 236, 242 n.3 (D. Mass., 1999) (original citations omitted). The fact that ITV chose to ignore "storm warnings" from regulatory authorities questioning the claims belies any legitimate reliance on statement by Healthy Solutions and Mr. Guerrero. Without the necessary showing of reasonable reliance, ITV's fraud claims must fail.[15]

ITV Direct has also previously argued that if it succeeds on its claim it would be excused from any obligation to pay Healthy Solutions for the Supreme Greens it has accepted and re-sold

---

[14] The facts of this care are easily distinguishable from those situations where multiple writings are concurrently executed and thus are treated as one agreement between the two parties. *See Donoghue v. IBC USA (Publications), Inc.*, 70 F.3d 206, 212 (1st Circuit 1995). In the present case, the Distribution Agreement (April 4, 2003) and Purchase Order #1101 (November 21, 2003) were "executed" more than seven months apart and addressed vastly different situations.

[15] To succeed on a 93A claim that is based on deception, reliance is also required. *Philip Morris,* 62 F. Supp. 2d at 242 n.3. (Citing *Trifiro*, 845 F.2d at 33 n.1.)

because fraud in the inducement renders a contract "voidable".[16] This argument is a red-herring. As detailed above, ITV never "voided" the contract, rejected the goods or tendered them back to ITV or Cappseals; instead it accepted and sold the products at issue.[17]

### 1. The Contradictory Statements Rendered ITV's Reliance Unreasonable.

Under Massachusetts law, it is well settled that where the recipient of an allegedly fraudulent misrepresentation is faced with two sets of conflicting information, it is unreasonable *as a matter of law* to rely on either statement. *Id.* at 242-43 n.4 ("a person claiming to be misled must not have shut his eyes to obvious facts that countered the fact allegedly misrepresented.") (emphasis added); *Thornburn Kennedy, Trustee et. al v. Josephthal & Co.*, 814 F.2d 798, 803, (1st Cir. 1987)("as a matter of law the exercise of reasonable diligence would require more than merely viewing two sets of statements, one of which logically cannot be true, and choosing one of those sets.")

The logical next step when faced with contradictory information is to investigate and *not* to simply proceed further, ignoring one side of the contradictory information. *Philip Morris*, 62 F. Supp. 2d at 242-43 ("it is not enough that without belief in its truth, he [a party] *proceeds to enter into the transaction* in the expectation that he will be compensated in an action for damages for its falsity.")(emphasis added); see also *Kuwaiti Danish Computer Co. v. Digital Equipment Corp.,* 438 Mass. 459, (2003) (reliance was unreasonable after receiving contradictory statement in price quotation document; "the brightest star in [buyer's] constellation of points on which it relied…was flickering "no deal" by virtue of the qualifying language in the quotation."); *Trifiro,* 845 F.2d 30, 33-34 (1st Cir. 1988) (when faced with conflicting statements,

---

[16] Plaintiff's Opposition to Defendants' Motion for a Temporary Restraining Order, pp. 14-15.
[17] Additionally, in its amended complaint, ITV Direct specifically chose to seek damages resulting from any proven fraud, not rescission of the distribution agreement. Amended Complaint, ¶ 51 ("As a result of the defendants misrepresentations and fraud, ITV has sustained damage[.]")

"a reasonable person does not gamble with the law of the excluded middle, he suspends judgment until further evidence is obtained.")

ITV alleges, on the one hand, that it relied on Alex Guerrero's fraudulent representations that there was reliable scientific evidence for the health claims made concerning Supreme Greens. (Amended Complaint, ¶¶ 46 – 50). However, ITV also admits that in September/October 2003 the FTC contacted ITV and told it that the claims made by Mr. Guerrero in the Supreme Greens infomercial were unsubstantiated. CS, ¶ 8. Thus before it ordered the goods in question on November 21, 2003, ITV was faced with two sets of conflicting information. Having abandoned its investigative efforts, ITV never reconciled the factual inconsistencies it was faced with prior to issuing Purchase Order 1101 and increasing its orders for Supreme Greens. For ITV to issue Purchase Order 1101 in this context was unreasonable as a matter of law. As this Court pointed out in *Philip Morris* supra:

> The point might be illustrated by a fable. A traveler in a strange land approached a fork in the road. One way led safely to the next town; the other led to a dangerous cliff. Looking for guidance, the traveler inquired of each of two local inhabitants which road he should take to get to town. The first, claiming to know the way well, pointed to the right fork. The other, claiming similar knowledge, pointed left. The traveler went left, to his chagrin. *Was he justified in relying on the advice of the one, purportedly knowledgeable, who pointed him in that direction, ignoring the contradictory advice? Under Massachusetts law, the answer is "no."*

*Philip Morris, Inc.*, 62 F. Supp. 2d at 243. (emphasis added).

**E.    ITV Relied On A Contractual Indemnity Provision, Not Mr. Guerrero's Claims.**

ITV's allegation that it relied on representations by Healthy Solutions and Mr. Guerrero is dubious, at best. Instead, by its own admission, ITV ignored the FTC's warnings believing that an indemnification provision in the Distribution Agreement relieved ITV from liability should Mr. Guerrero's claims prove false. The deposition of Donald Barrett is telling on this

point:

> Q: Before you spent millions of dollars on advertising, what step if any did you...take to determine whether any of the statements that Alex Guerrero made in the infomercial were accurate?
>
> A: Well, I believed...that I was indemnified. He held me harmless against the claims he made. How could I be responsible for the claims that he made?

CS, ¶ 10 & Ex. 1 (Barrett Depo. pp. 76-77).

Thus, whether or not his statements were true had little if any bearing on ITV's decision to proceed because ITV believed its contract would operate as "insurance" against any unsubstantiated claims made by Mr. Guerrero. Where a recipient of a statement relies not on the truthfulness of the statement but instead on an indemnification clause to assign liability to the maker of the false statement, there is no fraud. *Trifiro*, 845 F.2d at 34. (citing to the Restatement, Second, Torts § 548.) Because ITV relied on the indemnification clause of the Distribution Agreement, not the veracity of Mr. Guerrero's statements, ITV's claim that it was defrauded must fail as a matter of law.[18]

## IV.    CONCLUSION

As the SJC stated in its *Travenol* opinion, 'it furthers the values of certainty and predictability and is thus consistent with the public interest, that a seller be entitled to the price of goods accepted, regardless of the buyer's claim under some remote transaction." *Travenol, at* 100. ITV's claims of fraud, indemnification and breach of contract all arise from its Distribution Agreement with Healthy Solutions. In sum, no allegation or claim made by ITV go to the

---

[18] ITV's claim for indemnification cannot support a set-off under UCC § 2-717 and, like its fraud claim, is largely a red-herring. First, there is no indemnity language in the distribution agreement making Healthy Solutions liable for claims relating to the marketing and sale of Supreme Greens. In fact, just the opposite is true. According to the express terms of the distribution agreement, ITV Direct must indemnify DBC for "claims . . . arising out of or relating to Distributor's [ITV Direct's] marketing, sales and distribution efforts pertaining to the Product." DBC's potential liability for indemnity relates only to "claims . . . arising out of or relating to the Product as manufactured, its contents or impact of the health of the person." Because the FTC lawsuit is solely related to ITV Direct and DBC's efforts to market Supreme Greens, ITV Direct has no basis to claim indemnity.

essence of Purchase Order 1101.  As a result, ITV Direct has no legal basis to refuse to pay for the goods it has accepted and sold.

For the reasons sets forth herein CAPPSEAL'S Motion for Summary Judgment should be GRANTED.

                        Cappseals, Inc.
                        By its attorneys,

                        /s/ Scott A. Silverman
                        Peter Antonelli, BBO # 661526
                        pantonelli@ghlaw.com
                        Scott A. Silverman, BBO # 638087
                        ssilverman@ghlaw.com
                        Daniel J. Kelly, BBO # 553926
                        dkelly@ghlaw.com
                        Gadsby Hannah LLP
                        225 Franklin Street
                        Boston, MA  02110
                        (617) 345-7000

## CERTIFICATE OF SERVICE

I hereby certify that true and accurate copies of the foregoing <u>Cappseals, Inc.'s Memorandum of Law in Support of Its Motion for Summary Judgment</u> was served on the foregoing attorneys of record pursuant to Fed. R. Civ. P. 5 as follows:

<u>Via electronic notification:</u>

Peter S. Brooks         pbrooks@seyfarth.com

Susan W. Gelwick        sgelwick@seyfarth.com

Dustin F. Hecker        dhecker@pbl.com

Christopher F. Robertson    crobertson@seyfarth.com

Becky Christensen       bvc@ocmiplaw.com


                                    /s/ Scott A. Silverman
                                    Daniel J. Kelly BBO# 553926
                                    dkelly@ghlaw.com
                                    Scott A. Silverman, BBO #638087
                                    ssilverman@ghlaw.com
                                    Gadsby Hannah LLP
                                    225 Franklin Street
                                    Boston, MA 02110
DATED:  June 3, 2005              (617) 345-7000