UNITED STATES DISTRICT COURT
For the District of Massachusetts

| | |
|---|---|
| ITV DIRECT, INC., ) | |
| Plaintiff, ) | |
| v. ) | |
| HEALTHY SOLUTIONS, LLC, ET. AL., ) | |
| Defendants. ) | |
| CAPPSEALS, INC., ) | C. A. No. 04-CV10421-JLT |
| Plaintiff-in-Intervention ) | |
| v. ) | |
| HEALTHY SOLUTIONS, LLC, D/B/A ) DIRECT BUSINESS CONCEPTS; ITV ) DIRECT, INC. AND DIRECT ) FULFILLMENT, LLC. ) | |
| Intervenor-Defendants. ) | |

**EXHIBIT 1**

VOLUME:  I

PAGES:  141

EXHIBITS:  33 - 36

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x

ITV DIRECT, INC.

    Plaintiff

                  CIVIL ACTION

    Vs.              NO. 04-CV-10421-JLT

HEALTHY SOLUTIONS, LLC, ET AL

    Defendants

- - - - - - - - - - - - - - - -x

AND RELATED ACTIONS

- - - - - - - - - - - - - - - -x

       DEPOSITION OF DONALD BARRETT

taken on behalf of the Defendants pursuant to the

Federal Rules of Civil Procedure, before Carole M.

Wallace, Certified Shorthand Reporter and Notary Public,

at the offices of Posternak, Blankstein & Lund, LLP, 800

Boylston Street, Boston, Massachusetts  02210, on

Monday, August 23, 2004, commencing at 9:58 a.m.

    HENNESSEY CORP. D/B/A ROBERT H. LANGE CO.

  50 Congress Street - Boston, Massachusetts  02109

  Tel: (617) 523-1874      Fax: (617) 523-7343

---

1 APPEARANCES:
2
3   Peter S. Brooks, Esq.
    Seyfarth Shaw LLP
4   Two Seaport Lane
    Boston, Massachusetts  02210
5   617 946-4800
    On behalf of the Plaintiff
6
    Michael Sciucco, Esq.
7   100 Cummings Center
    Suite 506E
8   Beverly, Massachusetts  01915
    978 299-2553
9   On behalf of the Plaintiff
10   Becky V. Christensen, Esq.
    Levin & O'Connor
11   384 Forest Avenue - Suite 13
    Laguna Beach, California  92651
12   949 497-7676
    On behalf of the Defendants
13
14 VIDEOGRAPHER:
15   Stephen Hartman, CLVS
    Hennessey Corp. d/b/a Robert H. Lange Co.
16   50 Congress Street
    Boston, Massachusetts  02109
17
18   ATTORNEY CHRISTENSEN RETAINED THE ORIGINAL EXHIBITS
19
20
21
22
23
24

---

1            I N D E X

2 Witness        Direct  Cross  Redirect  Recross

3 DONALD BARRETT     5   137

4

5

6

7           * * * *

8

9

10

11        E X H I B I T S

12 No.    Description            Ident.

13 33   Answer and Crosscomplaint of . . . . .  24
       Direct Marketing Concepts

14

    34   Affidavit of Donald Barrett  . . . . .  26

15

    35   Bates No. ITV 288 - 290, ITV 395 . . .  119

16

    36   Fax and transcript of final version  .  131

17       done 9/10/03

18

19

20

21

22

23

24

---

1        THE VIDEOGRAPHER:  We are now recording

2 and on the record.  My name in Stephen Hartman, a

3 Certified Legal Video Specialist for Hennessey

4 Corp., DBA Robert H. Lange Co.  Our business address

5 is Fifty Congress Street, Suite 525, Boston,

6 Massachusetts  02109.  Today is August 23, 2004.

7 The time is 9:58.

8        This is the deposition of Donald Barrett

9 in the matter of ITV, Direct, Plaintiff Vs. Healthy

10 Solutions, LLC et al, Defendants and Related Cases

11 in the United States District Court, District of

12 Massachusetts, case number 04-CV-10421-JLT.  This

13 deposition is being taken at 800 Boylston Street,

14 Boston, Massachusetts on behalf of the defendants.

15 The court reporter is Carole Wallace.

16        Will counsel please state their

17 appearances and the court reporter will administer

18 the oath.

19        MS. CHRISTENSEN:  Becky Christensen of

20 Levin & O'Connor for defendants Healthy Solutions

21 LLC, Health Solutions, Inc., Alejandro Guerrero,

22 Greg Geremesz and Michael Howell.

23        MR. BROOKS:  I'm Peter Brooks and I

24 represent ITV and Direct Marketing Concepts.

**Page 5**

```
 1                DONALD BARRETT,
 2    having been satisfactorily identified by the
 3    production of his driver's license and duly sworn by
 4    the Notary Public, was examined and testified as
 5    follows:
 6         DIRECT EXAMINATION BY MS. CHRISTENSEN
 7    Q   Please state your full legal name.
 8    A   Full legal name is Donald William Barrett, Jr.
 9    Q   What is your home address?
10    A   It is Nine Tall Tree Drive Beverly, Massachusetts
11        01905.
12    Q   Have you ever had your deposition taken before?
13    A   Yes.
14    Q   How many times, approximately?
15    A   I can't -- Approximately three or four times.
16    Q   You understand that you are giving testimony under
17        oath today, is that right?
18    A   Yes.
19    Q   Even though we are in a conference room, it would be
20        the same as if you were in a courtroom?
21    A   Absolutely.
22    Q   Is there any reason that you can't give your very
23        best testimony today?
24    A   No, I can give my very best testimony today.
```

**Page 7**

```
 1        company that we started.  ITV Direct was a company
 2        that I started to actually produce the infomercials.
 3        Direct Marketing Concepts doesn't produce the
 4        infomercials any more, they are mainly the company
 5        that answers the telephones.
 6    Q   Do you have a title at Direct Marketing Concepts?
 7    A   It would be the same, president and CEO.
 8    Q   Do you own some shares in Direct Marketing Concepts?
 9    A   Exact same as Direct Marketing Concepts.  Same as
10        ITV Direct, rather.
11    Q   So that would be fifty percent ownership for you and
12        fifty percent for Mr. Maihos?
13    A   Correct.
14    Q   You mentioned that you were the host for the
15        infomercials.  Do you have any operational
16        responsibilities?
17    A   I do, but I really don't pay attention to the
18        day-to-day operations.
19    Q   Do you have general oversight duties?
20    A   Yes, I oversee things.
21    Q   Describe for me if you would for ITV Direct the
22        ultimate decision making authority as a general
23        proposition.
24    A   Explain the question.
```

**Page 6**

```
 1    Q   Please tell me whether you are employed.
 2    A   Yes, I am employed.
 3    Q   What do you do?
 4    A   I own a company called ITV Direct and Direct
 5        Marketing Concepts along with my business partner.
 6    Q   What do you do for ITV Direct?
 7    A   I host the infomercial aspect of the direct response
 8        business.
 9    Q   Do you have any title for your work at ITV Direct?
10    A   My title is president and CEO.
11    Q   Are you a shareholder?
12    A   Yes, I am.
13    Q   What percentage of the shares do you own?
14    A   I believe fifty percent.
15    Q   You mentioned a business partner.  Who is that?
16    A   His name is Robert Maihos, M A I H O S.
17    Q   What percentage of shares does he own?
18    A   The other fifty percent.
19    Q   What about Direct Marketing Concepts, what do you do
20        for them?
21    A   The same thing.
22    Q   What you say "the same thing," would you describe
23        your duties for me.
24    A   The Direct Marketing Concepts was the original
```

**Page 8**

```
 1    Q   Ultimately who makes the decisions for ITV Direct,
 2        Inc.?
 3    A   Ultimately me and my partner, Robert Maihos.
 4    Q   How about for Direct Marketing Concepts?
 5    A   That would be the same.
 6    Q   You mentioned a moment ago that Direct Marketing
 7        Concepts was the first of the two companies?
 8    A   Correct.
 9    Q   Would you describe for me when it was founded and
10        how it was built.
11    A   How it was built?
12    Q   Why don't we start with when it was founded.
13    A   I think it was started in 2002.  I'm not a hundred
14        percent sure.  Around that time period.  And it was
15        started out of my mom's house.  I had six telephones
16        in a garage.  There was a little room over the
17        garage and I had six telephones and that's where I
18        started the company.
19    Q   Did you start in the infomercial business or what
20        were you selling?
21    A   Yes, I started in the infomercial business and
22        although I wasn't producing shows at the time, I
23        would get shows from other companies, put my 800
24        number on their shows, buy the product from them
```

**Page 9**

```
 1     wholesale and they would let me use their
 2     infomercial per se.  And I could make those
 3     infomercial work because I didn't have any overhead
 4     so to say.  I worked out of mom's house, I bought my
 5     own media, I answered my own phone calls, so I could
 6     make shows work that frankly other people couldn't
 7     make work.
 8  Q  What was your first product, do you remember?
 9  A  The first product -- And we didn't produce the first
10     shows.  The first show was a program called
11     Dr. Mortar's Dynamic Health.  It was a tape series.
12  Q  What kind of product was that?
13  A  Audio tape series.
14  Q  What other products were you selling from Direct
15     Marketing Concepts in the beginning?
16  A  Ultra Body Toddy.
17  Q  What was that?
18  A  That was a nutritional product.  It was 300
19     nutrients in it.  It was the Ultra Body Toddy.  The
20     name pretty much says it all.  It has everything in
21     it.
22  Q  Who created that nutritional supplement?
23  A  A could company Supra Life out of San Diego,
24     California.  Supra Life.  I'm not sure if they are
```

**Page 11**

```
 1     I liked the ITV name.  It incorporated TV.  I just
 2     liked the name better.  That's frankly why I did it.
 3  Q  When did you form ITV Direct, Inc., if you recall?
 4  A  2003, maybe.  2003, yes, it's 2004 now.
 5  Q  You mentioned that the first show that you produced
 6     was probably the Supreme Greens infomercial, is that
 7     right?
 8  A  Yes, probably.
 9  Q  So was the --
10  A  I think it was the very first slow.
11  Q  Was the studio and the equipment in that for filming
12     the infomercials, was all that new at that time?
13  A  It was new, but we rented some of it.  We didn't own
14     all the equipment, and I'm not sure we own all of it
15     to this day.  But we rented some of the equipment
16     and we had the studio location at that time, yes.
17  Q  Do you know a person by the name of Ted Reed?
18  A  Yes.
19  Q  Who is Ted Reed?
20  A  Ted Reed is someone that we hired to do our, produce
21     or infomercials.  I originally met him when I was
22     doing Direct Marketing Concepts, and he also had a
23  ,  business within the Cummings Center which is the
24     building that I'm in.  It has 500 different
```

**Page 10**

```
 1     still in business.
 2  Q  Who was the owner of Supra Life, if you recall?
 3  A  I don't know.  The president's name was Mike Lewis,
 4     and I'm not sure who owned the company.
 5  Q  What other products do you recall from the beginning
 6     of Direct Marketing Concepts?
 7  A  Those are the basic products that we started with.
 8     I ran the Dr. Mortar show for the first year or two.
 9  Q  You mentioned at that time that you did not actually
10     produce the infomercials yourself.  When, if ever,
11     did Direct Marketing Concepts begin to produce
12     infomercials itself?
13  A  I believe the very first show I did was with Alex
14     Guerrero, the very first show I produced.
15  Q  I want to make sure I understand this.  ITV Direct
16     essentially produces the infomercials, and Direct
17     Marketing Concepts answers the phone, places the
18     orders, that sort of thing, is that a fair
19     statement?
20  A  I really came up with ITV Direct because I liked the
21     name more.  I kind of weaseled, not weaseled but
22     said ITV Direct, we can use that it for the
23     production end of it and we'll use Directing
24     Marketing Concepts for the back end of the business.
```

**Page 12**

```
 1     businesses.  And Ted Reed was with a company called
 2     Counter Productions.  I went over to him and asked
 3     him if he would be interested in producing, helping
 4     me produce infomercials because he had experience,
 5     alleged experience in the industry.
 6  Q  So is he an employee of ITV Direct?
 7  A  Not at first.
 8  Q  Was it originally a contract kind of arrangement?
 9  A  Originally he had his own company, and I just paid
10     him for the project, like I just paid him like a
11     1099.  He had his own company.  I hired his company
12     to do the show.  Then when it became apparent that
13     the only business he had was us, I said, Ted, why
14     don't we take over your company's expenses and you
15     work for our company.
16  Q  When did that change occur, do you recall?
17  A  I would think right around the time when I did the
18     show with Alex Guerrero because that is when we
19     started producing our own infomercials.
20  Q  Does he still work for you?
21  A  No.
22  Q  When did he leave your employ?
23  A  Well, about six months ago I started doing a lot of
24     filming down in Universal Studios, Florida, when I
```

**Page 13**

```
 1    was working with a company called Ideal Health which
 2    I'm sure we'll get into.  They had a studio call UIX
 3    Studios in Universal, Florida, and it was a much
 4    nicer studio.  And we can do a lot, better
 5    production, more protection value out of the studio
 6    than we could out of our little studio in Beverly.
 7    So I basically told Ted, I remember we severed our
 8    relationship.  It was the beginning of the year.
 9 Q  2004?
10 A  Beginning of this year.  I said come this year,
11    because it was a tremendous amount of overhead.  I'm
12    not the numbers guy of the business, but Bob told me
13    it cost about a half million dollars to operate the
14    studio, and I thought it was extremely high.  So we
15    decided just to do our shows at Universal Studios.
16 Q  So Mr. Reed then --
17 A  -- went back to his own company.
18 Q  Is the name of it Counter Productions?
19 A  Yes.
20 Q  So you built the business from six telephones in the
21    garage, and how large is ITV Direct now?
22 A  We have about 200 employees give or takes.
23 Q  Is that ITV Direct, or is that Direct Marketing
24    Concepts?
```

**Page 14**

```
 1 A  Both.  I'm not sure which.  I think everyone is paid
 2    out of Direct Marketing Concepts.
 3 Q  Of that 200, can you give me a sense of roughly how
 4    many of those are people who answer the telephones
 5    in the call center?
 6 A  I would say about 170 of them answer the telephones;
 7    based on the 200, I would say 170 answer the phones.
 8 Q  Give me an idea what the other thirty people do by
 9    position or department, what is more convenient for
10    you?
11 A  We have media buyers, about five media buyers, we
12    have, who answer the phones.  Product fulfillment,
13    so we have probably 15 people in fulfillment, and
14    the rest are management.
15 Q  When you say "product fulfillment," what does that
16    include?
17 A  Shipping the product.
18 Q  Does that include ordering as well?
19 A  No.
20 Q  Who handles the product ordering?
21 A  Eileen Barrett which is now Eileen Maihos.  She
22    married my partner Bob which is a whole other
23    deposition.
24 Q  Eileen Barrett Maihos -- I'm sorry, how do you say
```

**Page 15**

```
 1    the last name?
 2 A  Maihos, M I A -- M A I H O S.
 3 Q  Eileen Barrett Maihos is your sister?
 4 A  Correct.
 5 Q  And she is now the wife of your partner, Robert
 6    Maihos?
 7 A  Correct.
 8 Q  We've talked about product fulfillment and media and
 9    the call center and your sister Eileen Barrett
10    Maihos with product ordering.  Is there any
11    significant divisions there in the company?
12 A  Divisions?
13 Q  Or departments.
14 A  Return department.  We have a customer service, but
15    I incorporated the customer service because those
16    are the people who answer the telephones when I know
17    giving you the number.  We have customer service
18    people.  That's it.
19 Q  How does -- Is customer service separate from people
20    who answer the telephones?
21 A  It's in a separate location, yes.
22 Q  What is it they do as opposed to taking orders?
23 A  They handle -- Well, they do take some orders
24    because some have built up a clientele or built up a
```

**Page 16**

```
 1    rapport with our customers, but they do sell some
 2    product but mostly it's canceling orders if people
 3    want to freeze their order or whatever the case may
 4    be, they handle all the different aspects of
 5    customer service.  Kathy Radcliffe is the manager of
 6    that department.  She handles all the day-to-day
 7    operations there.  I'm hardly ever there.
 8 Q  They were included in the 170 number with the call
 9    center?
10 A  Yes.
11 Q  Just give me a rough idea how many customer service
12    folks there are.
13 A  I'd say twenty.
14 Q  About twenty.  Do you have an accounting department?
15 A  Not a department.  We have someone that writes the
16    checks, and we have a CPA who overlooks that.
17 Q  Who is the CPA?
18 A  Wayne Callahan and Leo Bonarigo.
19 Q  Can you spell that for me?
20 A  I can't.
21 Q  Mr. Bonarigo is also a CPA?
22 A  Mr. Bonarigo is the CPA.  Wayne works for him.  We
23    hired their firm to do our books, I guess.
24 Q  So Mr. Callahan and Mr. Bonarigo are not direct
```

1     employees --

2  A  Correct.

3  Q  -- of your companies?  And there is an internal

4     bookkeeper somewhere?

5  A  Yes.

6  Q  Who is that?

7  A  Kim York.

8  Q  Anybody else who keeps the books?

9  A  No.

10  Q  Give me an idea of what the annual revenues of ITV

11     Direct have been in the year 2003.

12  A  Annual revenues in 2003?  It was last year.  I don't

13     know off the top of my head.

14  Q  Was it more than $100 million?

15  A  No.  Less than $100 million.

16  Q  Less than 50 million?

17  A  I would say less than 50 million.

18  Q  More than 10 million?

19  A  More than 10 million but less than 50.  Maybe 40

20     million, closer to 50 than to 10.  We've got the

21     exact numbers, I'm sure.

22  Q  It would be fair to say somewhere between 40 and 50

23     million is a best estimate?

24  A  It's a basic estimate.  I never do the accounts.  I

---

1     kind of handle the creative aspect of the business.

2     Bob handles the overseeing of the accounting.

3  Q  How is it that you were able to build it from the

4     six phones in your mom's garage all the way up to 40

5     to 50 million dollar a year business?

6  A  Work, a lot of work.

7  Q  You mentioned that you have, you are the creative

8     guy.  What are you talents in that area?

9  A  That's it.

10  Q  Just working?

11  A  Yes.  I just come up with the different things that

12     we are going to come up with on television.  I

13     decide which is going to be a good product or bad

14     product.

15  Q  You must have a knack.

16  A  A knack.  I wouldn't say an expertise, but a knack,

17     yes.

18  Q  Who provided the initial financing for your company?

19  A  I did.  I sold a leather couch for $2000.

20  Q  We are talking about some of the early products for

21     your company.  What's been the most successful

22     product by number of units sold?

23  A  Probably Coral Calcium.

24  Q  How long have you been -- When I say "you," I mean

---

1     your company.

2         MS. CHRISTENSEN:  Before I forget, let me

3     interrupt.  Is Mr. Barrett here as a 30(B)(6)?

4         MR. BROOKS:  Yes, he has been designated

5     by the company.

6  Q  You understand what a 30(B)(6) witness is?

7  A  No.

8  Q  That means you have been designated by your company

9     to speak for the company.

10  A  Okay.

11  Q  So when I say "you," I mean your company.

12  A  Okay.

13  Q  You mentioned that Coral Calcium by the number of

14     units was probably the most successful product you

15     have had.  How long has your company been selling

16     Coral Calcium products?

17  A  Since I think the end of 2002.

18  Q  And are they still selling them?

19  A  Yes.

20  Q  What has been the most, best products for you in

21     terms of gross revenue?

22  A  I would say Coral Calcium, although I don't have all

23     the numbers to confirm that.

24  Q  Can you give me an idea what the approximate

---

1     revenues for Coral Calcium have been?

2  A  I would say over $50 million.

3  Q  Same question in terms of profitability.  What has

4     been the most profitable product for your company?

5  A  I can't speak in terms of profit because the

6     accountants have a different way of calculating

7     profit than I do is always the way.  I couldn't

8     answer that question.

9  Q  How would you define "profit"?

10  A  How would I define "profit"?  By the money I take

11     home.  I really don't know.  I just get my paycheck

12     and that's it.  As far as profits, I don't know

13     which show would be the most profitable show.  I

14     would have to say it would be either Coral Calcium

15     or Supreme Greens because those have been my two

16     bigger shows.

17  Q  Can you rank for me the success of Coral Calcium and

18     Supreme Greens relative to E-8?

19  A  Well, E-8 was not a successful program.  For

20     instance, if I spent $8 million advertising Supreme

21     Greens, I spent $5,000 advertising E-8.

22  Q  Was that advertised by a infomercial on broadcast

23     television or cable television?

24  A  Yes.

1  Q  Was that a product that you, not you personally,
2     your company developed, the E-8 product?
3  A  We don't develop products, no.
4  Q  Who developed E-8?
5  A  Dr. Derrick Dasilva originally developed the
6     products.
7  Q  Where is he?
8  A  Who knows.  Out of New York.  I don't know where he
9     is these days.  He travels all the time.
10 Q  When you worked with him, was he based out of New
11    York?
12 A  New York or New Jersey, right on the line.  Worked
13    in New York, lived in New Jersey, one of those.
14 Q  What about the product Alka-Slim, how did that do
15    compared to Coral Calcium and Supreme Greens?
16 A  It did better then E-8 but worse than Supreme
17    Greens.  Probably, probably I would have to say, my
18    estimate, whatever Supreme Greens did, Alka-Slim
19    probably did 25 percent of what Supreme Greens did.
20    That's just a rough estimate.
21 Q  Who developed the Alka-Slim product?
22 A  Dr. Morter, Dr. Ted Morter.
23 Q  Is that the same doctor with one of your initial
24    products?

1  A  Yes, Alka-Slim.
2  Q  Is that the same Dr. Morter that is related to
3     Dr. Morter's Dynamic Health?
4  A  Yes, that's a good question.  That's actually his
5     son.
6  Q  The Alka-Slim doctor --
7  A  The original guy that had the tape series was the
8     older, his father.  He had the tape series.  Years
9     later I asked the son to do the show and that was
10    the Alka-Slim.  But the father created the product.
11    His son was just on the show to promote it.  And the
12    guy that produced the show was Dr. Tom Morter.
13 Q  Dr. Tom Morter is the son or the father?
14 A  The son.
15 Q  And then the person who actually developed Alka-Slim
16    was?
17 A  Dr. Ted Morter.
18 Q  What about Life Essentials, how did that rank in the
19    overall product lineup?
20 A  Never sold a product call Life Essentials.
21 Q  That's not associated with your company?
22 A  No.
23 Q  Is that a product that any of your companies has
24    sold as far as you are aware?

1  A  Life Essentials?
2  Q  Yes.
3  A  No.
4  Q  Now going back to E-8, Dr. Derrick Dasilva, is he a
5     medical doctor?
6  A  It's tough to tell these days, but he says he is.
7  Q  How about Dr. Ted Morter?
8  A  He is not a medical doctor.
9  Q  What kind of doctor is he?
10 A  He is a chiropractor, I believe.
11 Q  How about Dr. Tom Morter?
12 A  I believe he is also a chiropractor.
13 Q  Are there any other products -- We've talked about
14    Coral Calcium, Supreme Greens, E-8, Alka-Slim.  What
15    other products, if any, were sort of in the top five
16    of the products you have sold over the years?
17 A  You probably have the top five right there.
18 Q  Are you familiar with a person by the name of Becky
19    Brainard?
20 A  Yes.
21 Q  Who is she?
22 A  She owned a company called MXM.  I believe MXM.  I
23    don't know what the rest of it is, but it's MXM and
24    she sold Coral Calcium, or she still sells it.

1  Q  What relationship if any did she have with your
2     company?
3  A  She sold our company product.  She was a vendor.
4  Q  Did you ultimately have a business dispute with MXM?
5  A  We did have a couple of business disputes with MXM.
6     Bob knows a little more in detail of what happened,
7     but we did have a couple of business disputes with
8     them.
9  Q  What was the nature of those disputes?
10 A  I don't remember.
11          MS. CHRISTENSEN:  I'm going to ask the
12    court reporter to mark the next exhibit in order
13    which I believe is 33.  I'm afraid I only have one
14    copy of this.
15          [Exhibit 33 marked for identification]
16 Q  Have you ever seen what has been marked as Exhibit
17    33 before?
18 A  I believe I have.
19 Q  You recognize this as a document that was filed on
20    your company's behalf?
21 A  Yes.
22 Q  Did you review this document prior to its being
23    filed with the court?
24 A  I usually review all documents.  I'm sure I did.  I

1  read a lot of documents. I can't speak on this
2  specific one, but I believe --
3  Q  So it's your practice to review all formal documents
4  of the company, is that right?
5  A  I try to.
6  Q  If you would turn to page 13 and take a look at
7  paragraph ten.
8  A  (The witness complies.) Right.
9  Q  What is your basis for saying that ITV Direct is a
10  leader the infomercial field?
11  A  We've had three infomercials in the top ten in the
12  past two years.
13  Q  What would those three infomercials be?
14  A  Alka-Slim, Coral Calcium and Supreme Greens.
15  Q  Is there any other production company that has had
16  at least three --
17  A  One.
18  Q  I better finish the question. -- at least three
19  programs in the top ten in a two-year period?
20  A  I believe there has only been one other company.
21  Q  Which company is that?
22  A  Gunthy Renker.
23  Q  What kind of product do they work with?
24  A  Pro Active Solution. They also sell Anthony Robbins

1  Get The Edge. They have a lot of different programs
2  out there. They are one of the most successful
3  infomercial companies out there.
4  Q  Do you review the infomercials of your competitors,
5  either while they are being broadcast or through
6  some other forms?
7  A  Yes.
8  Q  Have you seen any of the Anthony Robbins'
9  infomercials?
10  A  Yes.
11     MS. CHRISTENSEN: I'd like to ask the
12  court reporter to mark Exhibit 34.
13     [Exhibit 34 marked for identification]
14  Q  I'll ask you, Mr. Barrett, to read this very
15  carefully and then I'll ask you some questions about
16  it.
17  A  (The witness complies.) Okay.
18  Q  Do you recognize this document?
19  A  Yes.
20  Q  If you look at the page six, there is an electronic
21  indication that you had signed this document, is
22  that right?
23  A  Yes, I've signed.
24  Q  And you remember signing it?

1  A  Yes.
2  Q  And you notice the date is May 19 of 2004?
3  A  Yes, I do.
4  Q  As you sit here today, is there anything in this
5  affidavit that is inaccurate?
6  A  Nothing that stands out at me.
7  Q  Is there anything in this affidavit that as you sit
8  here today you believe to be untrue?
9  A  No, nothing that stands out at me.
10  Q  Prior to your signing this document, you reviewed it
11  quite carefully, is that correct?
12  A  I reviewed it.
13  Q  Did you review it carefully?
14  A  I wouldn't say carefully, but I reviewed it.
15  Q  Taking a look at page three, paragraph nine, would
16  you review that specific paragraph and let me know
17  when you have done so.
18  A  Yes.
19  Q  The last line there states, "the potential losses to
20  ITV in connection with these investigations are many
21  times in excess of amounts claimed by Guerrero." Do
22  you see that?
23  A  Yes.
24  Q  As you sit here today what is your understanding of

1  the losses being claimed or the amounts rather being
2  claimed by Guerrero?
3  A  Well, I believe the FDA has now cleared us but the
4  FTC, they tried to shut us down because of the
5  claims Guerrero made on television. They are still
6  were in court with the FTC, and they are still
7  trying to proceed with the litigation. I don't
8  think the exact term, but they are after us to shut
9  us down because of the claims that Guerrero made.
10  Q  Let's go back to the FDA. You said you believe the
11  FDA has cleared you?
12  A  I believe, we did get a warning letter for some of
13  the, I think it was a pamphlet. I believe my sister
14  would know best, Eileen Barrett Maihos would know
15  best. She dealt with the FDA and the FTC when they
16  came in, and it was about a two-month period where
17  they were evaluating everything and they gave us a
18  warning letter and did follow-up meeting with us and
19  said, you know, we are okay.
20  Q  When was the follow-up meeting where the FDA said
21  you were okay?
22  A  I'd have to say just two months ago, two months ago.
23  Q  I'm sorry?
24  A  Two months ago.

| | | |
|---|---|---|
| 1 | Q | Probably June of this year, 2004? |
| 2 | A | Yes, approximately. |
| 3 | Q | May have been May? |
| 4 | A | Yes. |
| 5 | Q | May have been early July? |
| 6 | A | May have been. |
| 7 | Q | Who was present at that meeting with the FDA? |
| 8 | A | My sister, Eileen Barrett. |
| 9 | Q | Anyone else?  Were you present at that meeting? |
| 10 | A | I was there when she came in, but I wasn't at the |
| 11 | | meeting. |
| 12 | Q | Do you remember the name of the FDA person who was |
| 13 | | at that meeting? |
| 14 | A | Just escaping me right now.  Mike Sciucco was also |
| 15 | | at the meeting. |
| 16 | Q | And Mike Sciucco is your in-house attorney, is that |
| 17 | | right? |
| 18 | A | Correct. |
| 19 | Q | And he is sitting here today, correct? |
| 20 | A | Correct. |
| 21 | | MS. CHRISTENSEN:  I don't believe we put |
| 22 | | Mr. Sciucco's name on the record. |
| 23 | Q | How long has Mr. Sciucco worked for you? |
| 24 | A | Over, I think it's a couple of years, two years. |

| | | |
|---|---|---|
| 1 | Q | Has he been employed by the company for that |
| 2 | | two-year period? |
| 3 | A | Yes. |
| 4 | Q | My question for you relating to paragraph nine |
| 5 | | originally was, as you sit here today, what do you |
| 6 | | understand the amounts Mr. Guerrero is claiming are? |
| 7 | A | I wouldn't know.  I would imagine for the product. |
| 8 | | I'm not sure what that is, but I know we had |
| 9 | | product. |
| 10 | Q | What do you mean, "for the product"? |
| 11 | A | We had Supreme Greens in inventory that we didn't |
| 12 | | pay him for. |
| 13 | Q | Do you have any idea how much product you received |
| 14 | | for which you did not pay? |
| 15 | A | No. |
| 16 | Q | You have no idea by the number of units? |
| 17 | A | No. |
| 18 | Q | You have no idea by the number of dollars? |
| 19 | A | No. |
| 20 | Q | Looking up at paragraph seven, would you take a |
| 21 | | moment to review that paragraph specifically and let |
| 22 | | me know when you are ready. |
| 23 | A | Um-hum. |
| 24 | Q | You stated at the end of paragraph seven that ITV |

| | | |
|---|---|---|
| 1 | | Direct stands to lose millions of dollars in pre- |
| 2 | | paid expenses for the media.  Do you see that? |
| 3 | A | Yes. |
| 4 | Q | Is that accurate, that statement? |
| 5 | A | Yes. |
| 6 | Q | Would you explain for me how the pre-paid expenses |
| 7 | | process works.  How does that work? |
| 8 | A | You buy media by the quarter, so you buy media out |
| 9 | | by the quarter.  If you pull a show down in mid |
| 10 | | quarter and you don't have another show to replace |
| 11 | | it with, you lose media time. |
| 12 | Q | When you say "by the quarter," is that by calendar |
| 13 | | quarter? |
| 14 | A | Yes. |
| 15 | Q | You would buy time from January through March, is |
| 16 | | that right? |
| 17 | A | That would be first quarter. |
| 18 | Q | And then would be April, May and June, is that |
| 19 | | correct? |
| 20 | A | Yes, June, July, August; September through December. |
| 21 | Q | How do you determine what companies you are going to |
| 22 | | buy or what media you are going to buy from? |
| 23 | A | The media department decides on which media they are |
| 24 | | going to buy. |

| | | |
|---|---|---|
| 1 | Q | Do you have any input or influence in that decision? |
| 2 | A | I oversee it, but they basically look at the results |
| 3 | | and decide where they buy.  That is based on |
| 4 | | results. |
| 5 | Q | Describe for me how the media buy goes.  Is it |
| 6 | | channel by channel or are there package arrangements |
| 7 | | out there? |
| 8 | A | Both. |
| 9 | Q | Who makes those decisions? |
| 10 | A | The media buyers. |
| 11 | Q | Who is in charge of the media buyers? |
| 12 | A | We have Katerina Mena and Paul Gaffney. |
| 13 | Q | How long have they been your media buyers? |
| 14 | A | Katerina has been a media buyer for a couple of |
| 15 | | years. |
| 16 | Q | How about Mr. Gaffney? |
| 17 | A | Not too long.  He moved up from customer service. |
| 18 | | Approximately about six months now. |
| 19 | Q | Who is the third person? |
| 20 | A | The third person? |
| 21 | Q | I think you mentioned -- |
| 22 | A | Another lady up there named Becky.  I'm not sure of |
| 23 | | her last name. |
| 24 | Q | How long approximately has she been in that job, if |

1     you know?

2  A  She has only been upstairs about four or five

3     months, also.  And then Meredith.

4  Q  How long has she been a media buyer?

5  A  They are not buyers, they help out with traffic and

6     everything like that.

7  Q  Help me to understand.  The person who actually

8     makes the decisions about which time to buy where

9     would be Katerina?

10 A  Katerina and Paul.

11 Q  And Paul?

12 A  And Paul.

13 Q  And Katerina's last name again?

14 A  M E N A, Mena.

15 Q  So Becky and Meredith would essentially support

16    their work, is that accurate?

17 A  Right.

18 Q  Are you familiar with a person by the name of Scott

19    Sarver?

20 A  Yes, I am.

21 Q  Was he ever a media buyer for ITV Direct?

22 A  Never.

23 Q  Was he ever responsible for buying media for ITV

24    Direct?

1  A  Never.

2  Q  He did work for ITV Direct?

3  A  Unfortunately he did.

4  Q  What was his job?

5  A  His job was telephones.

6  Q  Specifically what was his job?

7  A  Making sure the 800 numbers were working.

8  Q  So he was a telephone technician, is that right?

9  A  Right, just like Ted Reed.  I hired him initially as

10    outside vendor and he weaseled his way into the

11    company.

12 Q  He no longer works for ITV Direct, is that correct?

13 A  That's correct.

14 Q  When did he leave?

15 A  He was fired.

16 Q  When was he fired?

17 A  I'm not sure.  He was found having sexual

18    relationships with an employee and he was caught

19    stealing, so he was immediately terminated.  I was

20    on vacation at the time.

21 Q  Do you know who specifically terminated him?

22 A  It might have been Brad Tuttle who is my call center

23    director or Robert Maihos.  I'm not sure.  I was out

24    of town.

1  Q  Who was he allegedly caught having sex with?

2  A  I have no idea.  One of the other employees.

3  Q  You said he was stealing.  What was he stealing?

4  A  He was stealing our customers.

5  Q  How was he doing that?

6  A  He had his own business, meaning his own network

7     marketing business which he would take the customers

8     coming in off the media that we would buy and ship

9     the product out to his own network marketing

10    business.

11 Q  What was the name of that business?

12 A  Ideal Health.

13 Q  So Scott Sarver worked for or owned a company called

14    Ideal Health?

15 A  No, Scott Sarver worked for ITV after he left Better

16    Business Office Communications.  He originally

17    worked for a company called Business Office

18    Communications.  Then he weaseled his way working

19    for ITV.

20 Q  How did he end up with Ideal Health?

21 A  We had a distributor program, meaning the company,

22    we had allowed people to join the distributor

23    program because we gave Ideal Health the rights to

24    market the Supreme Greens product.  What was totally

1     unethical and why one of reasons Scott Sarver got

2     fired, he was taking of names of the people calling

3     in off the Supreme Greens infomercial and having the

4     product shipped out directly from Ideal Health,

5     meaning it bypassed ITV meaning ITV didn't get the

6     income to go buy more media for the show, so in

7     essence he was stealing.  In black and white he was

8     stealing.

9  Q  Why was he doing that for Ideal Health if he was

10    working for ITV?

11 A  It was his own business.

12 Q  He actually had an ownership interest?

13 A  Ideal Health is a network marketing company kind of

14    like you can join Amway as a distributor and make

15    money as long as you move products.  That's the only

16    way you make money when you are a distributor for

17    Ideal Health.

18 Q  When did you discover that he was allegedly doing

19    that?

20 A  I was either producing shows or out of town, and

21    management told me he was doing it.

22 Q  And approximately when was that?

23 A  I don't know.

24 Q  Was that this year?

**Page 37**

```
1   A   I'm sure it was.
2   Q   We were talking about the purchases of media and,
3       media time, and you were saying they are bought in
4       quarters, by the quarter, is that right?
5   A   Most of the time.
6   Q   And are there particular networks that you work with
7       more often than others?
8   A   I wouldn't know.
9   Q   Who would know that?
10  A   Katerina or Paul.
11  Q   When network time is purchased, is that commemorated
12      by an invoice or some other sort of document?
13  A   I'm not a hundred percent sure.  The media buyers
14      buy the media.  I'm sure an invoice comes in the
15      mail.
16  Q   When you were buying the media back in the beginning
17      of the company, do you recall what you received at
18      that time?  Did you get some kind of invoice?
19  A   You got a letter in the mail that confirmed what you
20      bought.  When I did it, I never even opened the
21      envelopes.
22  Q   Some kind of confirmation letter, would that be
23      accurate?
24  A   Sure, like an invoice so to speak.
```

**Page 38**

```
1   Q   What are the terms of paying for these blocks of
2       time?  Is it something that you pay for in advance?
3       Do you pay for it later?
4   A   You pay for it all in advance.
5   Q   Who at ITV Direct is responsible for keeping records
6       like that?
7   A   Records like what?
8   Q   Like the confirmation letter or invoices, whatever
9       form they come in.
10  A   Katerina or Paul would know.  I'm sure they have
11      them filed.
12  Q   When you buy time in a block and it's pre-paid, can
13      that time be canceled?
14  A   Sometimes.
15  Q   Under what circumstances could you cancel it?
16  A   Depending on the station.  Maybe a lot of rules have
17      changed since the way I bought media, but it was
18      really tough to cancel when I used to buy media.
19  Q   When we talk about a station, most of the media
20      buying is done by network, isn't it?  In other
21      words, one would not go to Cleveland and buy time on
22      the PAX network, you would buy time on the country
23      as a whole, or is that right?
24  A   I don't know.  When I used to buy media, it was all
```

**Page 39**

```
1       local.  I didn't deal with a lot of networks.  It
2       wasn't that big.  We had six phones in my mother's
3       house.  I bought $100 spots, $300 spots.  I didn't
4       run on big, national stations
5   Q   But ITV Direct is now running on big, national
6       stations, isn't it?
7   A   Yes.
8   Q   And you don't know how that is bought?
9   A   With a check, I know that.  I just -- I don't know
10      how -- We buy, call, do you want time on Bravo, you
11      call Bravo.  Who sells the media time?  Oh, great,
12      connect me to that person is basically what they do.
13  Q   If you did buy time on a national network, and I'm
14      including when I say "network," that would then be
15      aired nationwide on all the Bravo channels, wouldn't
16      it?
17  A   Sometimes.
18  Q   Sometimes?
19  A   Sometimes they have local affiliates that mask you
20      out.
21  Q   What do you mean, "mask you out"?
22  A   Well, I run a Travel Channel a lot.  I'll give you a
23      for instance.  Travel Channel just a couple of weeks
24      ago, I was waking up early in the morning, seven
```

**Page 40**

```
1       o'clock in the morning.  I said let me flip on the
2       TV show.  So I did and our show was supposed to come
3       on.  They flashed our show, the show that we were
4       running at the time.  They flashed that show for one
5       second and then they aired another show.  I'm saying
6       something is wrong here.
7           Half an hour later I went to check the
8       sales in the database and sure enough, sales came in
9       so we were masked out on the east coast at seven
10      o'clock in the morning which is the best time at
11      seven o'clock in the morning because on the west
12      coast it is only four o'clock in the morning.  It's
13      a national buy.  I immediately called Travel.
14          That is a for instance.  A lot of times
15      you can buy a national station and get masked out in
16      certain areas, depending on the station's contract
17      with the local affiliates.
18  Q   When you say "masked out," what you mean is that
19      local affiliates may be able to block what the
20      national channel is showing, is that what you mean?
21  A   Or sell the local time to their own person.  A lot
22      of times it's just another infomercial that masks
23      over you.
24  Q   We are now here in August of 2004.  In fact, did ITV
```

1    Direct lose millions of dollars in pre-paid expenses
2    for media with the Supreme Greens show?
3  A  I can't answer that question.  I don't know.
4  Q  You have no knowledge at all whether you have lost
5    millions of dollars for pre-paid media expenses?
6  A  I wouldn't say millions of dollars but I would have
7    to say we lost a lot of money because of shows that
8    we had to cancel out of, no question.  I wouldn't
9    know how to define that or give you the numbers here
10    today, but we lost money, no question.
11  Q  So you lost millions of dollars, is that right?
12  A  I just said I wouldn't say millions, but we lost
13    money.
14  Q  It may have been less than a million?
15  A  Yes, may have been less than a million.  I would say
16    it would be less than a million.
17  Q  Who would know how much you actually lost?
18  A  I would say the accountants.
19  Q  By that you mean, Mr. Callahan and --
20  A  Yes, you never know.  I just looked at the report
21    the other day that I'm sure you probably have
22    somewhere because we all share reports, now, right?
23    We lost $2.5 million on Supreme Greens marketing it.
24    We lost.  I'm sure -- To say we lost millions of

---

1  A  When I say I can see the sales, I can hit a button
2    and see how much sales came in that day.  I can't
3    tell where the sales came from.  Yes.  On the other
4    hand, I did see a report from an independent
5    accounting company that said we lost more than $2.5
6    million.
7  Q  And you don't know how much it was for media
8    expense?
9  A  No.
10  Q  Do you know any of the other items that may have
11    comprised that 2.5 million that you allegedly lost?
12  A  No.
13  Q  Besides media expense, knowing the business as you
14    do, what other items may have been included in that?
15  A  I have no idea.  When they do accounting, it is way
16    above my head.
17  Q  What infomercials is your company running now?
18  A  We are running a show called Dr. Day.
19  Q  Is that Dr. Lorraine Day?
20  A  Yes.
21  Q  Any others?
22  A  No, not that we're running.
23  Q  What products are you currently selling --
24  A  What --

---

1    dollars, we lost $2.5 million marketing Supreme
2    Greens.
3  Q  You had a report saying you lost 2.5 million from
4    Supreme Greens?
5  A  From an independent accounting company.
6  Q  And you saw that report when?
7  A  Friday.
8  Q  It was produced by an independent accounting
9    company, is that right?
10  A  Um-hum.
11  Q  Which independent accounting company was that?
12  A  I'm not sure.  Whoever the FTC asked, I'm not really
13    sure.  I'm not sure if it's millions of dollars
14    because of the media expense.  We wound up losing
15    $2.5 million, and that's not my accountant giving
16    the information.
17  Q  You mentioned that you can check the sales in the
18    database, is that right?
19  A  Yes.
20  Q  And you have access from your house?
21  A  Yes.
22  Q  So you can check the sales and you have seen a
23    specific accounting report relating to the losses
24    for Supreme Greens?

---

1  Q  As opposed to the infomercials, what products are
2    you actually selling?
3  A  Reorders and all?  We still sell Supreme Greens to
4    some extent, we sell Coral Calcium.  We sell a
5    product called Vitamin E-8, we sell videotapes.
6    With the Dr. Day show we only sell videos and the
7    book.
8  Q  Anything else that you can think of?
9  A  Not off hand.  Very little Alka-Slim we sell, very
10    little.
11  Q  Are you still actually selling Alka-Slim?
12  A  Very little.
13  Q  Do you have any idea how much Supreme Greens
14    inventory the company has on hand now?
15  A  No, I don't
16  Q  Turning to page four of what has been marked as
17    Exhibit 34, if you would review please paragraph 11.
18  A  Which number is this?  This?
19  Q  Yes.  You will check the blue tag there on the
20    front.
21  A  33?
22  Q  No, we want to look at Exhibit 34.
23  A  Exhibit 34, page 11.
24  Q  It's your affidavit.

1  A   I only have -- I don't have.

2  Q   I'm sorry, page four, paragraph four.

3  A   Okay, thank you.  Okay.

4  Q   You mention there in paragraph 11 that ITV Direct

5      has the raw, unedited footage of the infomercial.

6      Do you see that?

7  A   Yes.

8  Q   Who has possession, who specifically has possession

9      of those, of that unedited footage, if you know?

10 A   I'm not sure.  It's probably down in the studio.

11 Q   Who would be responsible for keeping that footage?

12 A   The person I would call to get that footage would be

13     Luke.  His name is Luke Golan, I believe, G O L A N.

14 Q   You actually personally reviewed that footage,

15     didn't you?

16 A   What footage?

17 Q   The footage of the Supreme Greens infomercials.

18 A   No, I didn't.  The whole show, the raw infomercial?

19 Q   Right.

20 A   No.

21 Q   In the last six months have you taken the

22     opportunity to review any of the raw, unedited

23     footage from the infomercial for Supreme Greens, any

24     versions?

1  A   Maybe a little, but I never watched the whole thing

2      from the beginning to end.  I maybe did see a little

3      bit of the raw footage.

4  Q   Give me a sense of how much you saw in terms of

5      time.  Are we talking ten minutes?  Two hours?

6  A   I really don't know how much footage was actually

7      there or how much footage -- I really don't know.

8  Q   How much time did you spend in looking at the raw

9      footage, if any?

10 A   The raw footage, very little time looking at the raw

11     footage because when I get the show, it's already

12     edited.  They edit the show in the studio.  By the

13     time I get the show, there has already been a rough

14     edit on the show.

15 Q   So let's go back.  In the last six months have you

16     looked at any raw footage of the Supreme Greens

17     infomercial?

18 A   I wouldn't be able to tell you if it was raw or not.

19     I don't know.

20 Q   Have you looked at footage of the Supreme Greens

21     infomercial in the last six months?

22 A   Yes.

23 Q   How much time did you spend doing that,

24     approximately?

1  A   I don't know, maybe twenty minutes.

2  Q   Twenty minutes.  As you sit here today, you are not

3      sure whether it was raw, unedited footage or not?

4  A   Not a hundred percent sure, no.  It could have been

5      raw footage.  I have a bunch of different tapes.  It

6      could have been raw footage, edited footage, I

7      really don't know.  I have seen the show in bits and

8      pieces hundreds of times.

9  Q   Okay.  So if there is -- Let me make sure I

10     understand this.  If there is unedited, raw footage

11     just the way it came out of the cameras, that would

12     most likely be in the possession of Luke Golan?

13 A   Right.  Our shows are not scripted.  I just sit down

14     just like you are sitting down and asking me

15     questions.  You know, I mean there is no like fancy

16     editing or there's no, you know, scripting at all.

17 Q   As you sit here today, you have no reason to believe

18     that the raw videotape as it came out of the camera

19     is completely unedited has been destroyed as far as

20     you know?

21 A   I have no idea.  I don't believe so.  I wouldn't

22     think so.

23 Q   I'd like to turn now to the Supreme Greens project

24     specifically.  How is it that Supreme Greens came to

1      your attention?

2  A   Jason Bernabei brought it into my office.

3  Q   When, approximately, was that?

4  A   I really don't know the date.

5  Q   Was it -- Let me put it this way:  Approximately

6      what year was it?

7  A   2003.

8  Q   Do you recall whether it was early or late in the

9      year?

10 A   I believe it was later in the year.

11 Q   What do you remember Jason Bernabei saying about

12     Supreme Greens?

13 A   He said that he had someone that he was talking to

14     that was interested in doing an infomercial.  That's

15     what he said.  And I asked him who.  He said his

16     name is Dr. Alex Guerrero.  And I, it sparked my

17     interest because I'm a big -- I listen to a lot of

18     motivational tapes, Anthony Robbins.  Like I told

19     you, I watch his show.  I heard Anthony Robbins talk

20     and edify Dr. Alex Guerrero as a doctor.  I like

21     Anthony Robbins, I think he is a very credible

22     person, and what Anthony Robbins said was pretty

23     powerful.  He said almost the same study that Alex

24     said in the infomercial but he said there was 400

1    patients and only eight, eight survived.  So it was
2    just -- I believe Anthony Robbins and I was excited
3    about doing the infomercial.  I said, gee, we have
4    somebody who is very credible, Anthony Robbins
5    believes in the guy, I would be interested in
6    sitting down and doing an interview with the guy.  I
7    believe it was the first show I have actually sat
8    down and did.  I wanted to sit down with someone
9    that I could actually get a winner with.  I thought,
10   gee, it would be neat because the first time I do a
11   show, we can get a winner if this guy is good.
12 Q  You used a word that I don't really know.  You said
13   "edify."  What did you mean by that?
14 A  Talk good about, praise, edify.
15 Q  Do you remember whether you had heard that on
16   multiple Anthony Robbins tapes, or was it a single
17   one?
18 A  Even the infomercial with Gunthy Renker produced
19   called Get The Edge.  The tape series came out in
20   the year 2000.
21 Q  It's a whole series of tapes?
22 A  It's a whole series of tapes.  One tape specifically
23   talks about alkalinity, and he talks about all these
24   people who believe in alkalinity.  Then Anthony

1    at ITV, why I think we have a greater likelihood of
2    getting the show to work.
3 Q  Why was that, do you remember?
4 A  Because we do everything in house.  We buy our own
5    media, answer our own phones, ship our own products,
6    where other companies including Gunthy Renker
7    outsource most everything.  So I believe that's what
8    I said to him.  I believe after that talk he was
9    interested in doing a show.  I really didn't talk to
10   him much more up until the shoot date.
11 Q  Do you remember anything that Alex Guerrero said
12   during that conference call?
13 A  No, not specifically.
14 Q  Do you remember any discussions you had with him
15   about his qualifications or his background?
16 A  No.  I didn't feel, you know, to ask him, you know.
17   It says "doctor" everywhere, "doctor" on his web
18   site, "doctor" from Anthony Robbins.  I believe he
19   wasn't a doctor at that time.  It never even crossed
20   my mind.
21 Q  Give me a sense, if you would, what at that time you
22   anticipated investing to make this infomercial a
23   success.
24 A  What I anticipated investing?

1    Robbins goes "and doctors like Dr. Alex Guerrero"
2    and he called him a genius on the tapes.  We have
3    the transcripts somewhere.  I thought it was -- I
4    thought we had -- I thought it was a great success
5    because Anthony Robbins believes in this guy.  I
6    said I would love to interview this guy, maybe we
7    can get a winning show, and I was very excited about
8    doing the show.
9 Q  Anthony Robbins and the production company for him,
10   they are some of the most successful infomercial
11   producers, aren't they?
12 A  The company he hired to do his infomercial, yes.
13 Q  And you mentioned them a few moments ago --
14 A  Gunthy Renker.
15 Q  -- as being at the very top?
16 A  Yes, they are the best in the industry.
17 Q  So Mr. Bernabei mentioned this to you.  What
18   happened next?
19 A  What I remember is getting on the telephone and
20   talking, I believe talking to Alex Guerrero about
21   it.
22 Q  Was that a conference call or do you recall?
23 A  I believe it was conference call and I told him
24   pretty much what I tell everybody, what we do here

1 Q  Yes.
2 A  I anticipating investing the time and money it takes
3    to produce an infomercial and the money that it took
4    to test the infomercial.
5 Q  How much of an investment in dollars did you think
6    that was going to be?
7 A  Maybe $20,000 investment, maybe 30.
8 Q  And that would include producing the infomercial?
9 A  Flight, hotels, everything.
10 Q  You mentioned testing the infomercial.
11 A  Correct.
12 Q  How would you go about or better yet with respect to
13   specifically to Supreme Greens, how did you test
14   that infomercial?
15 A  Same way we test all our shows.
16 Q  How is that?
17 A  We buy around 5 to 10 thousand dollars in media, we
18   send the tape out to the stations, and we find out
19   what the response is after the show runs.
20 Q  Give me a sense of what 5 to 10 thousand in media
21   expenditures buys.
22 A  Okay.  In this industry you go buy a term called
23   calls per thousand, how many calls per thousand
24   dollars you are getting.  So for instance, if you

1   have a thousand dollar media spot and you get 50
2   calls, you get 50 calls per thousand.  In turn if
3   you spend a $100 on a media spot and you get five
4   calls, you still get 50 calls per thousand.  See how
5   the math work out?
6   Q   Right.
7   A   So when we test an infomercial, we try to test on as
8       many stations as we can because you can test media
9       for $50 all the way up to 50 grand.  We try to test
10      as many spots as we can for that 5 to 10 thousand
11      dollars and find out the average calls per thousand.
12  Q   So with respect to the Supreme Greens infomercial,
13      that infomercial was 28 1/2 minutes, is that right?
14  A   Yes.
15  Q   And was that true of all the different versions of
16      it?
17  A   Yes.  They have to be 28 minutes and 30 seconds when
18      they go to the station.  They won't accept them any
19      other way.
20  Q   So you think you spent for the Supreme Greens test
21      about 5 to 10 thousand dollars, is that right?
22  A   Yes.
23  Q   How many spots, approximately, did you buy for that?
24  A   You know, it was only, it was a couple of years ago

1       now the first time it ran.  I really don't know.
2       Typically we test maybe 15 spots or ten, you know.
3   Q   Do you recall what the calls per thousand were as a
4       result of those tests?
5   A   No, but they were good enough to warrant buying more
6       media.  I don't recall what the exact number was,
7       but it was good enough to warrant to buy more media.
8   Q   Do you recall when that testing was done?
9   A   I don't.  I remember, what I do remember is after
10      the show was produced, I didn't do anything with it
11      for like three or four months.
12  Q   Now, we were talking a few minutes ago about a
13      conference call that you had with Alex Guerrero.  Do
14      you recall who else was in on that conference call,
15      if anyone?
16  A   I believe Jason was.
17  Q   Anybody else that you can think of?
18  A   No.
19  Q   After that particular conference call was over, what
20      direction or instruction, if any, did you give to
21      anyone at ITV Direct regarding the Supreme Greens
22      project?
23  A   I told Jason I'm interested in doing the show with
24      him, and let's get a contract together.

1   Q   Was Jason responsible for putting the contract
2       together?
3   A   No.
4   Q   Who was responsible?
5   A   At that time we had an accountant working for us
6       named Bill Tarmey who put the contract together.
7   Q   Did you discuss with Mr. Tarmey what you intended
8       the terms of the contract to be?
9   A   No.
10  Q   How did you give him instruction to go out and do
11      that?
12  A   I mean I told him typically what we do is we pay
13      people a royalty, we pay them a royalty typically
14      maximum of a dollar a bottle.
15  Q   Now you are talking about what you told Mr. Tarmey?
16  A   Yes.
17  Q   So you told Mr. Tarmey --
18  A   Well, he knew based on our past deal with Coral
19      Calcium I usually pay a dollar royalty per bottle.
20      That is the only thing I had told Mr. Tarmey about.
21      Unfortunately, he didn't follow my directions and it
22      cost me a lot more, but that's the bottom line.
23      That's the only thing I told him about, we usually
24      pay a dollar a bottle, and I'm not sure if he was

1       sold that price was only a dollar a bottle, I'm not
2       sure.
3   Q   Was Mr. Tarmey also involved in the Coral Calcium
4       contract negotiations?
5   A   No, but he had seen them.  He had the copies of
6       them.
7   Q   He was familiar with the terms for the Coral Calcium
8       project?
9   A   I would think so.
10  Q   So you instructed Mr. Tarmey to go out and make the
11      contract based on his best judgment, essentially?
12  A   Correct.
13  Q   While he was negotiating that, did he check in with
14      you about the progress of those negotiations?
15  A   Not really, no.
16  Q   Did you have any discussions with him about those
17      negotiations that you can remember?
18  A   No.  No.
19  Q   At what point were you aware that a contract was
20      about to be signed?
21  A   I believe that the contract was signed the day of
22      the infomercial, and I don't know when that
23      infomercial was, but we could probably look at the
24      contract.  I believe Mike Howell signed the contract

1     if I'm correct.

2  Q  I believe we will produce the contract for you to

3     take a look at.

4          I'm going to hand the witness what was

5     previously been marked as Exhibit 6.

6  A  Yes, me and Mike Howell, right.

7  Q  Looking at Exhibit 6, does that refresh your memory

8     about when that contract was signed?

9  A  Is there a date on this contract?

10  Q  There may be an indication on the fax heading on the

11     top or maybe not.

12  A  Or they were at the office.

13  Q  So this contract was signed in person?

14  A  Yes, they were in Beverly.  This is what I believe.

15     Unless they just got the final draft in Beverly.

16  Q  Is that your signature on the very last page there?

17  A  Yes, it is.

18  Q  Prior to signing this contract, did you review it?

19  A  Briefly.

20  Q  You didn't read it carefully?

21  A  No.

22  Q  You just skimmed through it?

23  A  We were shooting that day.  I mean I trusted Bill at

24     that time, Tarmey.  He told me he had two years in

---

1     law school and I was just, I trusted him and I was

2     focused on the show and I said, great, sign it and

3     do it.

4  Q  You understood it to be a binding agreement, did you

5     not?

6  A  Yes.

7          MS. CHRISTENSEN:  May I suggest a break?

8          MR. BROOKS:  Sure.

9          THE VIDEOGRAPHER:  The time is 11:08 and

10     we are off the record.

11          [Recess]

12          THE VIDEOGRAPHER:  The time is 11:16, we

13     are back on.

14  Q  Now, we were talking right before the break that you

15     believe that what has been marked as Exhibit 6, the

16     distribution agreement, was actually signed very

17     close to the time the first infomercial was shot, is

18     that right?

19  A  I believe so.

20  Q  And let's talk a little bit about the actual

21     physical shooting of the infomercial.  I understand

22     that you had no script, is that right?

23  A  Correct.

24  Q  Did you even have notes with you while the

---

1     infomercial was being shot?

2  A  Don't remember having notes.

3  Q  Do you have an understanding about how many cameras

4     were actually filming during the infomercial?

5  A  Three.

6  Q  Again the raw footage if that still exists would be

7     with Luke Golan?

8  A  Yes.

9  Q  From all three of those cameras?

10  A  Yes.

11  Q  Do you have any reason to believe that Mr. Reed may

12     have taken some of that raw footage with him when he

13     left the employ of ITV Direct?

14  A  No.

15  Q  As you sit here today you have no reason to believe

16     that videotape was destroyed?

17  A  No.

18  Q  Describe for me once the actual raw footage is

19     created, what the editing process for the Supreme

20     Greens infomercial was.

21  A  What the edit processing is, I don't edit the shows.

22     I know they take the three cameras and somehow merge

23     it into one show.

24  Q  Who in the company determines what gets cut and what

---

1     doesn't?

2  A  The editors, Luke.

3  Q  Who was it for the Supreme Greens infomercial, was

4     Mr. Reed or Luke Golan?

5  A  I'm not sure.

6  Q  So the decision to remove or not remove content for

7     the infomercial would have rested with either Mr.

8     Reed or Mr. Golan?

9  A  Correct, yes.

10  Q  Did they see input from you as they moved through

11     the editing process?

12  A  No.  Hardly ever do.

13  Q  Who reviews the progress of their work, if anyone?

14     When I say "their," I mean Mr. Golan and Mr. Reed.

15  A  No one.  I review, I review the final tape or one of

16     the tapes that are less to being the final, but --

17  Q  With the Supreme Greens infomercial, do you recall

18     seeing a, for lack of a better word, close to final

19     tape?

20  A  Yes.

21  Q  What comments, if any, did you have about that tape?

22  A  I thought it looked great.

23  Q  Did you suggest any changes?

24  A  No.

8/23/2004 Barrett, Donald

1  Q  Who did you talk to about that tape?
2  A  I don't remember.  I just remember after watching
3     it, it looked great, let's get it into a format
4     where we can send to stations.
5  Q  Was that, was that tape provided to anyone for
6     Supreme Greens, if you recall?
7  A  Was that -- I don't understand the question.
8  Q  You have a final version --
9  A  Yes.
10 Q  -- as far as you are concerned of the Supreme Greens
11    infomercial?
12 A  Right.
13 Q  Was that given to anyone at Supreme Greens?
14 A  Who at Supreme Greens?
15 Q  Was it given to Mr. Guerrero as far as you know?
16 A  No.
17 Q  Was it --
18 A  I don't know.
19 Q  Was it --
20 A  Might have been.
21 Q  Was it given to Mr. Howell?
22 A  No idea.
23 Q  Was it given to Mr. Geremesz?
24 A  May have been.  If they requested it, they got it;

8/23/2004 Barrett, Donald

1     if they didn't, they didn't.
2  Q  We had talked before the break about test marketing
3     an infomercial.  When you say you now have a final
4     version of the infomercial, when was it test
5     marketed if you recall?  Was it test marketed?  Let
6     me ask that first.
7  A  Yes, I think we already covered that earlier, but,
8     yes, it was test marketed.
9  Q  Do you recall when that was?
10 A  No.
11 Q  You recall that the results were good enough to buy
12    further media time?
13 A  Right.
14 Q  Was there a lag between the test marketing and the
15    first purchases or major purchases of marketing
16    time -- I'm sorry, media time?
17 A  There may have been, I don't know.  I think we went
18    right into running the shows.  Sometimes there is a
19    lag with shows.  There might have been with this one
20    based on product availability, but I'm not sure on
21    this particular show.
22 Q  We had talked a little bit about what the initial
23    investment was for the test marketing and the
24    infomercial production.  Once the Supreme Greens

8/23/2004 Barrett, Donald

1     infomercial passed the test marketing hurdle, if you
2     will, then what was the investment, initial
3     investment for the first round of major media buys?
4  A  I don't know.  We don't really look at it like that,
5     how much media we are going to buy.  We start
6     gradually ramping up the media.  If we are buying --
7     If we did a 5,000 to $10,000 test for the media,
8     we'll say let's buy that every week and start
9     increasing it every week, increasing the media
10    budget every week.
11 Q  What is your memory of what happened specifically
12    with Supreme Greens once the test market results
13    came in?
14 A  The tests were good.  The show looked like it was
15    going to be successful.  I told the media buyers,
16    let's go into rollout, let's keep buying more media
17    on this particular show.
18 Q  Did you give them a budget for the month or week?
19 A  I may have at the time.  I may have said 50,000 a
20    week.
21 Q  You don't remember as you sit here today?
22 A  I don't remember as I sit here today.
23 Q  Would 50,000 a week be typical?
24 A  Yes, after a test, 25 to 50 after we do an initial

8/23/2004 Barrett, Donald

1     test.
2  Q  I'd like you to think back to the period right after
3     the test results came in and you were the media
4     department to start making buys.  Who was in the
5     media department at that time?
6  A  Michael Barrett my brother, a girl named Sarah.
7  Q  Do you remember Sarah's last name?
8  A  I don't know.  Callahan, I'm not sure of her last
9     name.  I believe Katerina.
10 Q  I'm sorry, I forgot Katerina's last name.
11 A  Mena, M E N A.
12 Q  Anyone else you can think of?
13 A  No.
14 Q  So would be fair to say that typically you would
15    order 25 to 50 thousand dollars per week for a
16    successfully test marketed infomercial, so at that
17    point you are looking at an investment somewhere
18    between 100 and 200 thousand dollars a week for
19    media time?
20 A  Yes, for media time.
21 Q  At that point did you stop and take any time to
22    review what has been marked as Exhibit 6 which is
23    the distribution agreement?
24 A  No.

1  Q   You mentioned that you scanned it the day that you
2      signed Exhibit 6?
3  A   Right.
4  Q   Did there come a time when you reviewed Exhibit 6
5      more carefully?
6  A   I'm sure there was, you know.  I'm sure it was, yes.
7      I have seen it more carefully when we talked about
8      the price because we negotiated the price from 6.50
9      down to $6.
10 Q   When did that occur, if you recall?
11 A   I don't recall.  It was well into the program.
12 Q   Was that in the year 2003?
13 A   Yes.
14 Q   Prior to making the large media buys after the
15     successful test market, what steps if any are you
16     aware of that ITV Direct made to research the
17     credentials of Alex Guerrero?
18 A   We made no attempt to research the credentials of
19     Alex Guerrero.  He listed himself as a doctor, he
20     came in and presented himself as a doctor, he looked
21     like a doctor, he walked like a doctor.
22 Q   What does a doctor look like?
23 A   I mean that's a tough question to answer and that's
24     why you asked it.  What does a doctor look like.  If

1      you talk to Dr. Guerrero, he sounds educated enough
2      to be a doctor.  He is a good imposter is what I'm
3      saying.
4  Q   He is an imposter according to you?
5  A   He is an imposter.
6  Q   What research, if any, did your company do to
7      determine whether anything that Mr. Guerrero said
8      was true?
9  A   We relied upon him.  I'm not a doctor.  I'm not the
10     expert.  I ask the questions, he answers them.
11 Q   You relied solely on the representations of Dr.
12     Guerrero?
13 A   Correct.
14 Q   At what point, if any, did you discover that some of
15     those representations were not true?
16 A   Well, the first time I learned he wasn't a doctor it
17     was with Ideal Health.  Ideal Health had a lunch
18     meeting with me and Bob Maihos.  They called us up
19     and said they wanted to meet us about something very
20     serious.  And they were also promoting Dr. Alex
21     Guerrero to their company, but they have been in
22     business a long time, longer than I have.  They have
23     procedures where they check up on people like you
24     are asking me if I check up on people.  I didn't

1      have the procedures.  But when I started doing
2      business with Ideal Health, I believe her name was
3      Denise and she was the person who followed up on all
4      the things they were doing.
5  Q   When was that?
6  A   When was what?
7  Q   The lunch meeting with Ideal Health.
8  A   March, April this year.  Right before we started to
9      take the show down, so March or April.
10 Q   March or April of 2004?
11 A   Yes.
12 Q   During this lunch meeting, what did you find out?
13 A   Well, they told us, they said are you sure you want
14     me to tell you, because they also notified me if
15     they told me that, I would have to take the show off
16     the air immediately if I knew this.  They said Dr.
17     Guerrero was a fraud.
18 Q   What did they mean by that?  What did you understand
19     that to mean?
20 A   He had no right to call himself any type of doctor.
21 Q   This was news to you at that time?
22 A   Startling news.
23 Q   Was there anything else that they said made Alex
24     Guerrero a fraud?

1  A   They said their person called the school where Alex
2      Guerrero claimed he had his doctorate in, and they
3      didn't have a doctorate.  And they said he is not
4      calling himself a doctor, is he?  That is what the
5      school said, which I thought was pretty interesting.
6  Q   Who was telling you this?
7  A   His name was Todd Stanwood and Scott Stanwood.  They
8      are the owners of Ideal Health.
9  Q   Was anyone else present at that lunch meeting that
10     you can remember?
11 A   Robert Maihos and Lou Decaprio.
12 Q   Who is Lou Decapario?
13 A   One of the officers of Ideal Health also with the
14     Stanwoods.  Three owners, I believe.
15 Q   This meeting occurred where?
16 A   Some restaurant on the north shore.  I don't know
17     the name of it.
18 Q   North shore of Boston?
19 A   Yes.
20 Q   I'm sorry, where is Ideal Health based?
21 A   They are in southern New Hampshire somewhere.  I'm
22     not sure of the town.  I think maybe Manchester or
23     Nashua, but they live in West Newbury,
24     Massachusetts, which is just twenty minutes from

1       Beverly.

2   Q   Now, you received this information from Ideal

3       Health.  Do you remember specifically who was

4       telling you this among Todd Stanwood, Scott Stanwood

5       and Lou Decaprio?

6   A   I believe it was Scott Stanwood that told me.

7   Q   What did you do, if anything, after that lunch

8       meeting?

9   A   I lost my lunch.  I was sick, disgusted because they

10      said you have to take your show off the air.  It's

11      the only show I had on the air and I couldn't

12      believe this guy would call himself, you know, it

13      was not necessary.

14  Q   Did you in fact take the show off the air at that

15      time?

16  A   Like I told you, media is bought by the quarter, so

17      I began to take steps to take the show off the air.

18  Q   What specifically did you do?

19  A   I told the media buyers to cancel all future media

20      purchases and wind down the purchases on Supreme

21      Greens.

22  Q   Who specifically did you tell this to?

23  A   I don't know.  Whoever was in the media department.

24  Q   Do you recall whether it was Sarah that you told

1       that to?

2   A   I don't know.

3   Q   Katerina?

4   A   Might have been Katerina.  I don't know.  If I knew,

5       I'd say.

6   Q   You don't remember?

7   A   If I knew, I'd say.

8   Q   How long did it take to cancel the shows, if you

9       recall?

10  A   I don't know, maybe a month, month and a half to

11      cancel all of them.  Best guess.

12  Q   Prior to this lunch meeting you think on the north

13      shore of Boston with the Ideal Health folks, Todd

14      Stanwood, Scott Stanwood, Lou Decaprio and

15      Mr. Robert Maihos, did you have any reason to

16      believe at all that Alex Guerrero was not a

17      traditional western medical doctor?

18  A   I had no reason to believe before that meeting with

19      Ideal Health.  I don't believe anybody knew that he

20      wasn't a doctor.

21  Q   So no one at ITV had any knowledge that would have

22      indicated that Alex Guerrero was anything other than

23      a traditional medical doctor?

24          MR. BROOKS:  Objection.

1   A   No, one person.

2   Q   As a fifty-percent shareholder of the company and

3       the president and CEO of the company, you are

4       responsible for what goes on at your company, is

5       that right?

6   A   Yes, I try to be.

7   Q   And you built that company from the ground up,

8       didn't you?

9   A   I tried to, yes, I did.

10  Q   So if matters are critically important, you do your

11      very best to pay attention to what is going on,

12      isn't that right?

13  A   That's right.

14  Q   And do your very best to be well informed about

15      subjects important to your company, isn't that

16      right?

17  A   I try, yes.

18  Q   Let's go back to the airing of the Supreme Greens

19      commercial.  I'm sorry, I'll call it an infomercial.

20      How was the response when you left the December

21      marketing period for Supreme Greens and moved into

22      full-fledged media buys?

23  A   It was okay.  It was good enough to roll out.  We

24      weren't making huge money on the show.  I think we

1       were breaking even on the show.  Come to find out we

2       actually lost money, but I thought we were breaking

3       even on the show.  So break even is good because it

4       has a continuity, it has a back end, a product that

5       people keep taking which is a good thing.  You don't

6       mind breaking even on your infomercial or coming

7       close, especially if it's a consumable when people

8       keep taking, especially when the infomercial is not

9       running any more.

10  Q   And that is a situation as we sit here today with

11      Supreme Greens, people are still buying it from your

12      company?

13  A   Yes, a little bit.

14  Q   Is that mostly through auto ship programs?

15  A   Re-orders, auto ship.

16  Q   Do you have any idea what the level of sales is

17      averaging for the last few weeks?

18  A   On Supreme Greens, no.  I don't keep track of it.  I

19      just try to keep track of the show that is on the

20      air.

21  Q   Do you have any understanding what the average

22      revenues have been over the last few weeks for the

23      Supreme Greens sales?

24  A   No, I don't.

1　Q　Who if anyone tracks that sort of thing, what
2　　　company?
3　A　The FTC tracks it pretty good.
4　Q　Who for the company tracks it?
5　A　The sales, the amount of sales?
6　Q　Right.
7　A　Wayne Callahan.
8　Q　Are you reporting your sales of Supreme Greens
9　　　directly to the FTC?
10　A　FTC has everything. They came in and downloaded
11　　　every hard drive that we have. There is nothing
12　　　they don't know. And we constantly keep them
13　　　updated, yes.
14　Q　How often are you updating the FTC?
15　A　I don't know if it's weekly or monthly, I'm not
16　　　sure. They tried to close us down because of the
17　　　claim that Alex made on the show.
18　Q　When it comes to the purchases of air time, who if
19　　　anyone at the company actually keeps records of
20　　　exactly what stations air any given infomercial?
21　A　Who keeps track of? Ask the question again.
22　Q　Let me try it a different way. The company goes out
23　　　and buys media time for the infomercial, correct?
24　A　Right.

1　Q　And who specifically keeps track of what time is
2　　　bought and used?
3　A　What time is bought and used?
4　Q　Right.
5　A　Well, downstairs they get a media schedule and the
6　　　manager looks at what ran that day.
7　Q　So when you say "the manager," are you talking about
8　　　who, Katerina?
9　A　Brad Tuttle, the manager in the call center, Brad
10　　　Tuttle, maybe Simon Mena who is Katerina's brother.
11　　　Same name, same spelling.
12　Q　It's very much a family company?
13　A　We try.
14　Q　They get a daily media schedule down there?
15　A　Yes.
16　Q　Do they keep those, or do they throw those out
17　　　after --
18　A　They are in the computer. They are all logged in
19　　　the computer. They can throw out a piece of paper,
20　　　but it's --
21　Q　If you wanted to find out whether a particular
22　　　infomercial ran on any given day, you could simply
23　　　check the computer and see that?
24　A　Correct.

1　Q　They would go back and cover the period until the
2　　　infomercial first started airing, is that right?
3　A　Right. If I asked my database guy, that probably
4　　　takes him three weeks to get it. I say can I get
5　　　that information. He says, yeah, it will take me a
6　　　month.
7　Q　Who is your database person?
8　A　Brian Middendorf. We just brought on someone new.
9　　　He just started.
10　Q　I understand that Brian Middendorf left a week or so
11　　　ago?
12　A　Something like that, yes.
13　Q　The Supreme Greens, I want to go back, all the way
14　　　back to that conference call, the first conference
15　　　called you with Jason and Alex Guerrero. Were you
16　　　referring to the product as Supreme Greens at that
17　　　time, if you recall?
18　A　I don't remember.
19　Q　We have -- I'm moving forward in time now. We've
20　　　done the test marketing. Supreme Greens
21　　　infomercials were running. Were those running
22　　　nationwide?
23　A　The infomercials?
24　Q　Yes.

1　A　Yes.
2　Q　Do you know what some of the channels were that were
3　　　airing the Supreme Greens infomercial?
4　A　Women's Entertainment, Bravo, maybe Lifetime, Fox
5　　　Sports. Those are the ones just off the top of my
6　　　head that I knew we ran on.
7　Q　Were there others?
8　A　Oh, yes. I don't know how many millions, but I
9　　　think eight or nine million dollars we spent in
10　　　media.
11　Q　I'm sorry, I missed that?
12　A　Eight or nine million dollars we spent on media, so
13　　　there were a lot of stations. A good majority of
14　　　the stations we were on with the show.
15　Q　Prior to investing several millions of dollars in
16　　　media time, we had talked about you discovering in a
17　　　restaurant on the north shore of Boston that Alex
18　　　Guerrero was not a traditional western medical
19　　　doctor.
20　A　We found out that he had no right to call himself
21　　　any type of doctor.
22　Q　When did you find that out?
23　A　At that meeting they said he has no right --
24　Q　With Ideal Health?

1   A   Because in this industry we are very familiar with
2       other types of doctors and we know there is
3       chiropractors, we know there are other people,
4       optometrists.  This guy had no right to call himself
5       a doctor.  That's what I found out at that meeting,
6       not just he wasn't a traditional medical doctor.
7       That was the first question I asked him on a
8       medical, infomercial.  I said are you a medical
9       doctor.  He said no.  Everyone knows he is not a
10      medical doctor, but you can still call yourself a
11      doctor if you are not a medical doctor if you have a
12      doctorate degree, which he doesn't have.
13  Q   So you relied completely on what he had told you, is
14      that right?
15  A   And I relied on Anthony Robbins because I believe
16      Anthony Robbins called him a doctor.  Anthony
17      Robbins, as you said, dealt with the best
18      infomercial.  Before they put out the information,
19      they didn't check if he wasn't a doctor.
20  Q   Did you call Anthony Robbins' company to see what
21      their research had been?
22  A   No.
23  Q   Before you spent millions of dollars on advertising,
24      what steps if any did you or your -- again when I

1       say "you," I mean your company -- take to determine
2       whether any of the statements that Alex Guerrero
3       made in the infomercial were accurate?
4   A   Well, I believed, like I said I didn't review it in
5       detail, but I believed that I was indemnified.  He
6       held me harmless against the claims he made.  How
7       could I be responsible for the claim that he made?
8       I didn't make the claims, he made the claims.
9   Q   You believed that it really didn't matter what he
10      said, you weren't responsible no matter what he
11      said?
12  A   I believed he would back up what he said.
13  Q   Why did you believe that?
14  A   Unless he was lying to me or making things up when I
15      interviewed him.  I mean, I don't know.
16  Q   When you say "when you interviewed him," what are
17      you referring to?
18  A   The infomercial.
19  Q   Okay.  So you are saying that you relied on what he
20      said to you during the filming of the infomercial,
21      is that correct?
22  A   Correct.
23  Q   My next question is subsequent to the filming of the
24      infomercial, did your company make any steps or take

1       any steps to research the accuracy of those
2       statements?
3   A   I believe at one time I e-mailed him for a
4       documentation file, meaning put a list of documents
5       together that can back up the claims that you made.
6   Q   Did he do that?
7   A   I don't know.  Maybe.  If he did, he did it, you
8       know, very little, just a little bit of backup.  If
9       we needed 10,000 pages, he gave us a half a page.
10      He screwed us.
11  Q   So you have a memory of --
12  A   -- him giving something.  And he did attempt to back
13      up his 200-person study at one time, I believe.
14  Q   I'm going to hand the witness what has been
15      previously marked as Exhibit 10.  Mr. Barrett, if
16      you would review Exhibit 10.
17  A   Yes.
18  Q   Does that refresh your memory about asking Alex
19      Guerrero for documentation?
20  A   Yes.
21  Q   What is the date that you asked based on Exhibit 10?
22  A   It says I e-mailed him on September 17.
23  Q   After September 17 you mentioned you think you
24      received something from the Supreme Greens folks, is

1       that right?
2   A   Yes.
3   Q   What steps, if any, did your company take to follow
4       up with further requests as far as you are aware?
5   A   We went back and forth, and Eileen would know more
6       about this.  This is to Eileen.
7   Q   Did Eileen Barrett Maihos tell you what the progress
8       of her efforts was?
9   A   Yes.
10  Q   What do you remember her saying?
11  A   Progress was bleak, meaning we weren't moving
12      forward with progress and we really couldn't back up
13      anything in question.
14  Q   Do you recall when she came to that conclusion or
15      told you that?
16  A   I don't think she ever came to that conclusion.  She
17      said it's obvious that he doesn't have a lot of the
18      information to back up the claims that he made.  I
19      don't know when that, I don't know exactly when that
20      happened, when.
21  Q   Can you place it in times within days, weeks or
22      months of the Exhibit 10?
23  A   I think they went back and forth for months.
24  Q   At some point after the infomercial began airing,

1 did you become aware that the United States Federal

2 Trade Commission had some problems with the first

3 infomercial as it was being shown?

4 A Yes.

5 Q How did that come to your attention?

6 A Through Eileen who obviously heard it from the

7 attorneys or what have you.

8 Q What did Eileen Barrett Maihos tell you?

9 A They had some questions about the infomercial.

10 Q "They" being the Federal Trade Commission?

11 A "They" being the FTC.

12 Q When did he tell you that, if you recall?

13 A I don't recall the exact date.

14 Q Can you place it in time after the infomercial

15 started airing?

16 A No.

17 Q Do you recall whether it was prior to say the

18 Christmas holidays of 2003?

19 A I don't know. I'm really bad with dates, I just

20 don't know.

21 Q What if anything did your company do to respond to

22 the questions from the FTC?

23 A Eileen would know more than I. I know we made some

24 edits to the existing infomercial, but it was my

---

1 conclusion that we should do another infomercial

2 with Guerrero.

3 Q Did you subsequently do that?

4 A Yes.

5 Q How did you go about arranging that?

6 A I don't know if Jason called him or I called him.

7 We called him back out to Boston to shoot another

8 show.

9 Q And that's specifically done to address the FTC

10 concerns, is that right?

11 A Yes, and to do a new show, yes. Do a new show to

12 address the FTC concerns and also sell the Coral

13 Calcium tea bags.

14 Q Do you know when it was you shot the second version?

15 A I believe I shot it on my birthday which is

16 October 24. Again I'm not a hundred percent sure,

17 but I think it was my birthday.

18 Q It was very close to your birthday anyway?

19 A It was either on my birthday or it wasn't, I don't

20 know.

21 Q And that would have been --

22 A I really don't.

23 Q That would have been late in October of 2003?

24 A October 24, yes.

---

1 Q The first infomercial had a night backdrop, is that

2 correct?

3 A Yes.

4 Q And the second one had a day backdrop, is that

5 right?

6 A Correct.

7 Q So with the second version which I sometimes call

8 the day version, that subsequently used to

9 replace the first version, the night version?

10 A Well, we test shows before we replace them.

11 Q You tested the day version?

12 A It was a big test, it wasn't just your average 5 to

13 10 thousand dollar test. I think we tested for

14 three months because we were really trying to get

15 the show to work.

16 Q How much did you spend on that rolling three-month

17 test?

18 A I don't know.

19 Q Ballpark?

20 A I think I moved probably seventy percent of my media

21 over there at the time. How much we were spending

22 on the media at that time, maybe 50,000 a week.

23 Q So of the roughly $50,000 a week, you were doing

24 about seventy percent of that on the second day

---

1 version?

2 A Right. If we didn't switch it all to the day

3 version. We might have switched it all out to the

4 day version at one point.

5 Q What were the results of using the day version, the

6 second version?

7 A That the calls per thousand weren't great enough to

8 keep the rollout going so to speak. We were, it

9 wasn't a regular test where we tested it for a week

10 or two weeks. We tested it for three months and

11 decided it didn't work.

12 Q So then what did the company do? Did it begin

13 airing the first version?

14 A Then the Dr. Day show really started to work at the

15 time. So what I did is even though some stations

16 had the older version and some stations had the

17 newer version of the show, I stopped sending out the

18 version and I let the media that I bought for the

19 quarter play out, but I also started running the

20 Dr. Day show. So after the day show didn't work,

21 not the Dr. Day show but the daytime --

22 Q The daytime version of the Supreme Greens version?

23 A Right. After that didn't work, it was my

24 determination to bring the Supreme Greens show off

8/23/2004 Barrett, Donald

1    the air, so I gradually took steps on doing that.
2    If you look at the media, you can see it go from
3    200,000 all the way down to nothing right after
4    that.
5  Q Let me make sure I understand that.  The day version
6    was not pulling or drawing as much sales as the
7    night version had?
8  A Correct.
9  Q So when the Dr. Lorraine Day show which is a
10   separate show began, you started to scale down on
11   the Supreme Greens?
12 A And ramp up Dr. Day.
13 Q And that was in response to the slower sales from
14   the day version of the Supreme Greens?
15 A Correct.
16 Q Did you ever tell anyone for Supreme Greens, that
17   would be Alex Guerrero, Mike Howell or Greg
18   Geremesz, that the FTC had approved the day version
19   of the infomercial?
20 A No.
21 Q You never said that, right?
22 A No.
23 Q And nobody ever said it on your behalf, right?
24 A No, the FTC doesn't approve shows, A.  I know that,

8/23/2004 Barrett, Donald

1    so I would never say that.  I wish they had an
2    approval department.
3  Q At some point a dispute arose, didn't it, between
4    ITV Direct and Supreme Greens, specifically Healthy
5    Solutions?
6  A Yes.
7  Q What happened?
8  A What dispute are you referring to, about the web
9    site?
10 Q What was the first one?
11 A I think it was the web site, I'm not sure.
12 Q What was that dispute about?
13 A Well, Alex told us and we were using the web site
14   SupremeGreens.com.  I put it on all the bottles that
15   we were shipping out.  He redirected the web site
16   back to HS now, Healthy Solutions now or whatever
17   the case may be.  And I called him and he said,
18   well, Bob still owes me $7500 for the web site and I
19   just want Bob to know that I'm not messing around.
20   I said, hey, we are not messing around, either.
21   I'll overnight you a check for 7500, but I want the
22   ownership for that web site.  He said okay.  So I
23   hung up the phone and I said, Eileen, write a check
24   to Alex Guerrero for $7500.  Or Kim, because Kim was

8/23/2004 Barrett, Donald

1    right outside my desk, Kim, write a check to Alex
2    Guerrero for $7500 and write on the check
3    specifically for the ownership of this web site.
4    That's what happened.
5  Q When did that conversation take place between you
6    and Mr. Guerrero?
7  A I don't know.
8  Q Let me hand you what has previously been marked as
9    Exhibit 12.
10 A Yes, this is it.
11 Q Does that refresh your memory about when --
12 A January 9.
13 Q -- about when you had that conversation with Alex
14   Guerrero?
15 A Right.
16 Q At the time that you had this conversation with Alex
17   Guerrero about the web site SupremeGreens.com, was
18   this before or after you had learned that the FTC
19   had some issues with the first version of the
20   Supreme Greens infomercial?
21 A It may have been after.  I think it was after to the
22   best of my recollections.
23 Q Was the SupremeGreens.com web site subsequently
24   redirected to --

8/23/2004 Barrett, Donald

1  A No.
2  Q -- ITV Direct?
3  A No.
4  Q It wasn't?
5  A No.
6  Q What happened next?
7  A They kept the web site and all the sales.
8  Q Prior to the web site being directed away from ITV
9    Direct, what were the sales that your company was
10   making through that web site?
11 A I don't know off hand.
12 Q You have no idea what it was in terms of number of
13   units?
14 A No, but I know it was going to substantially
15   increase because we -- See, we don't advertise the
16   web site on the infomercial itself.  But when I ship
17   the product, I had a hundred thousand labels made
18   with the name SupremeGreens.com on it so when people
19   went to reorder, they would be reordering through
20   his web site.  Today if someone went to order
21   Supreme Greens off their web site, off their bottle,
22   they are going to their web site.  Even though I
23   paid for the media to gain that customer, they get
24   the sale and paid for the web site.

| | |
|---|---|
| 1 | Q  You paid for the media? |
| 2 | A  And the web site. |
| 3 | Q  And the web site? |
| 4 | A  Paid for everything. |
| 5 | Q  Yes.  And how did that entitle you to have all the |
| 6 | internet sales, if it did? |
| 7 | A  How did that entitle me? |
| 8 | Q  Right. |
| 9 | A  That was the deal I had with those guys.  We got the |
| 10 | web site and the name Supreme Greens. |
| 11 | Q  When did you make that deal? |
| 12 | A  I'm not sure of the date. |
| 13 | Q  Approximately when was it? |
| 14 | A  If you give me something to refresh my memory, I |
| 15 | don't know. |
| 16 | Q  Was it prior to this letter that has been marked as |
| 17 | Exhibit 12? |
| 18 | A  Yes, I believe it would be. |
| 19 | Q  Tell me what you can recall of exactly how it was |
| 20 | that ITV Direct made a deal for the web site and the |
| 21 | name Supreme Greens? |
| 22 | A  Very simple. |
| 23 | Q  Healthy Solutions? |
| 24 | A  Very simple.  I told them, "them" meaning Healthy |

| | |
|---|---|
| 1 | Solutions, whatever company they want to go under, I |
| 2 | don't want to compete in the marketplace.  We are |
| 3 | causing confusion in the marketplace.  Someone |
| 4 | orders Supreme Greens, it's from you and then it's |
| 5 | from us.  I don't want to cause confusion in the |
| 6 | marketplace.  I want to handle all the sales and |
| 7 | send you guys a royalty.  That's how it came about. |
| 8 | Q  Who did you have that conversation with? |
| 9 | A  I had it with Greg and Alex. |
| 10 | Q  Tell me about those conversations. |
| 11 | A  I just did. |
| 12 | Q  Did you have it separately with Geremesz and Mr. |
| 13 | Guerrero, or was it at the same time? |
| 14 | A  Separately. |
| 15 | Q  Which conversation if you can recall occurred first? |
| 16 | A  The one with Greg because Greg got Alex on the |
| 17 | telephone and then I talked to Alex.  Greg was not |
| 18 | on the phone when I talked to Alex. |
| 19 | Q  So you started with a phone call and all three of |
| 20 | you were in on that phone call? |
| 21 | A  I originally talked to Greg.  Greg told me he would |
| 22 | have Alex call me.  And then Alex called me.  I |
| 23 | talked to Greg and Alex separately, not together. |
| 24 | Q  Tell me the substance of what you can recall with |

| | |
|---|---|
| 1 | your phone call with just Greg. |
| 2 | A  Greg and Mike always refer everything back to Alex. |
| 3 | Q  But you had a conversation with Greg. |
| 4 | A  I told him that I don't want to compete in the |
| 5 | marketplace. |
| 6 | Q  What else was included during that conversation? |
| 7 | A  That I had, you know, the web, I think the web site |
| 8 | was included in the conversation that we wanted to |
| 9 | handle all the sales off the web site and I don't |
| 10 | want to compete in the marketplace.  I don't want |
| 11 | them selling the name Supreme Greens MS to anybody |
| 12 | besides our company. |
| 13 | Q  Now was it your understanding this was an existing |
| 14 | arrangement or a new arrangement? |
| 15 | A  New arrangement. |
| 16 | Q  What did Greg Geremesz say, if anything? |
| 17 | A  Greg didn't say anything. |
| 18 | Q  Do you remember the substance of anything else of |
| 19 | that conversation? |
| 20 | A  They were in complete agreement.  We don't want to |
| 21 | compete in the marketplace, either.  We decided that |
| 22 | we don't want to be in the retailing business.  I |
| 23 | think I have a voice message of Alex saying that to |
| 24 | me, he doesn't want to be in the retail business. |

| | |
|---|---|
| 1 | Q  You are telling -- I'm sill focused on the one phone |
| 2 | call with Greg Geremesz, right, and you are telling |
| 3 | him you don't want to compete, you want all the web |
| 4 | sales and you want the exclusive right to the |
| 5 | Supreme Greens name and handle all the sales to |
| 6 | Guerrero? |
| 7 | A  Right.  Well, initially when we did the infomercial, |
| 8 | although they used the name Supreme Greens, they |
| 9 | never trademarked the name Supreme Greens.  So I |
| 10 | said since you guys never trademarked the name |
| 11 | Supreme Greens, I have the right to rename and |
| 12 | relabel my product, I'll just use the name Supreme |
| 13 | Greens.  And they go, yes, that's a great idea.  I |
| 14 | said, okay, that's why we used it on the |
| 15 | infomercial, not -- I would have said another name |
| 16 | on the infomercial that we owned. |
| 17 | Q  So going back to your conversation specifically with |
| 18 | Greg Geremesz and you told him what you wanted, what |
| 19 | did he say? |
| 20 | A  We'll get Alex on the phone, I agree with you, |
| 21 | Donald, we'll talk to Alex.  That was it with Greg. |
| 22 | We can go back to the conversation all day, but that |
| 23 | was it. |
| 24 | Q  He agreed with you but he said you had to talk with |

1     Alex?

2  A  Right.

3  Q  Anything else about that conversation you can

4     recall?

5  A  Yes.  It struck me funny because Mike and Greg were

6     partners and Alex had nothing to do with their

7     company, it struck me funny that was, Alex was like

8     running their company for them, but that is beside

9     the point, I guess.

10 Q  Did you ask Greg Geremesz about it?

11 A  Yes.  Mike and Greg were lying to Alex about how

12    much we were paying for product and Alex I guess was

13    only getting eighty cents.  And this -- We made

14    this -- I mean I guess Alex found out about this

15    somehow and he actually turned the tables.  Somehow

16    we wound up owning their company.  I don't know

17    exactly what happened, but that is what happened.

18    Alex wound up owning Greg and Mike's company.

19 Q  Now subsequent to your conversation with Greg

20    Geremesz, you spoke to Alex Guerrero, is that right?

21 A  Correct.

22 Q  When did that conversation take place?

23 A  The same day.

24 Q  Do you remember was there anyone else involved in

---

1     that phone call?

2  A  No.

3  Q  What do you remember about that conversation?

4  A  What I remember is that he was in complete

5     agreement, we can get the web site and we can do

6     everything.

7  Q  At that point did you feel that the agreement had

8     been made?

9  A  At least verbally, yes.

10 Q  What did the two of you decide would be the next

11    step, if anything?

12 A  Let's get it in writing.

13 Q  Who was going to get a writing made?

14 A  I'm not sure.  Maybe Bob would know.

15 Q  Was Bob present during the conversation?

16 A  No.

17 Q  How would Bob know if he wasn't present?

18 A  Because I talked to Bob, he is my partner.

19 Q  So you had some understanding at the end of that

20    phone call as to who was going to prepare the

21    writing, didn't you?

22 A  I'm not sure who prepared the writing.  I said you

23    can ask Bob, he might know who prepared the writing.

24    I'm not sure who prepared the writing.

---

1  Q  At the termination of that phone call you had the

2     understanding that a writing would be prepared, is

3     that right?

4  A  That's correct.

5        THE VIDEOGRAPHER:  Counsel, I have about

6     five minutes left on this tape.

7  Q  As far as you know, was a writing ever prepared by

8     anyone?

9  A  I believe it was prepared but never signed, but who,

10    I don't know.

11 Q  Did you actually see personally a copy of this

12    writing?

13 A  Yes, I have seen a copy, but I didn't go through it

14    in detail.

15 Q  What memory if any do you have of when it was that

16    you actually saw a writing to commemorate this

17    verbal agreement that you allegedly made with Mr.

18    Guerrero?

19 A  I don't know.  It was right near, you know, let me

20    see, March, April.

21 Q  Is that March or April of 2004?

22 A  Yes, this year.

23 Q  That writing if I understand correctly was never

24    signed, is that right?

---

1  A  I do not believe so.

2  Q  At the time that you made this alleged oral

3     agreement with Mr. Guerrero, what was the status of

4     the FTC investigation as far as you knew?

5  A  I don't know.

6  Q  You weren't tracking that carefully?

7  A  No, I don't know at that time what the status was

8     with the FTC.

9  Q  At the time that you allegedly made this verbal

10    agreement with Alex Guerrero, had you or someone at

11    your company as far as you knew communicated what

12    the FTC concerns were?

13 A  Ask the question again?

14 Q  At the time that you allegedly made this agreement

15    with Alex Guerrero --

16 A  Okay.

17 Q  -- had anyone at your company communicated to the

18    Supreme Greens people what the FTC concerns about

19    the infomercial were?

20 A  I believe they knew what the concerns were because

21    this was after the second show was produced and he

22    knew we produced the second show because the first

23    one had issues, so they were fully aware of what the

24    challenges with the FTC were, and the FTC really

1    only has one challenge, the claim he made on the

2    phone.

3 Q   At the time that you claim you made a verbal

4    agreement with Alex Guerrero, at that point you were

5    aware that ITV Direct in fact did not own the

6    Supreme Greens trademark, is that right?

7 A   I was aware of this: I was aware the week we went

8    to trademark the product when it wasn't trademarked,

9    Eileen called Alex Guerrero or Greg Geremesz, I'm

10    not sure, you can depose her. She asked them a

11    specific question she needed to trademark the

12    product. Four days later when she went back to

13    trademark the product, much to her chagrin, they

14    already trademarked it. They jumped the gun because

15    they knew we were going to trademark the product.

16 Q   So is your testimony that as far as you understood,

17    ITV Direct had the right and the ownership to the

18    trademark Supreme Greens at the time that Eileen

19    Barrett now Eileen Barrett Maihos attempted to file

20    a federal registration, is that right?

21 A   Correct.

22 Q   Based on what you know of your company, the

23    ownership of that trademark was, belonged to ITV

24    Direct because of what facts?

---

1 A   Well, first let me say the deal was we own the name

2    and he can own the formula. I didn't want part of

3    this, I didn't want to know his formula.

4 Q   When was that deal made?

5 A   That was on the telephone with Alex that we own the

6    name and he would own the formula along with the web

7    site. We would own the web site and all that.

8 Q   Prior to that time did you understand that ITV

9    Direct owned the name Supreme Greens?

10 A   It was my belief and understanding that we were

11    going to own the name Supreme Greens with MSM.

12 Q   And it was based on what?

13 A   That was based on my conversations with Greg and

14    Alex.

15 Q   Now we've discussed two different conversations, one

16    with Greg and one with Alex. Was it based on those

17    two specific conversations?

18 A   Yes.

19 Q   Was it based on any other conversations?

20 A   It may have been just based on talks when he was in

21    the office and we were talking back and forth after

22    the shows or before the shows.

23 Q   Do you recall that?

24 A   Not off hand, not the exactly.

---

1       THE VIDEOGRAPHER: Counsel. The time is

2    12:06 and this is the end of cassette number one and

3    we are off the record.

4       [Lunch Recess]

5       THE VIDEOGRAPHER: The time is 1:03.

6    This is the beginning of cassette number two in the

7    deposition of Donald Barrett and we are on the

8    record.

9 Q   Before the lunch break we were talking about a

10    conversation that you had with Alex Guerrero which

11    substantially changed the functioning agreement

12    between ITV Direct and Healthy Solutions, correct?

13 A   I believe so, yes.

14 Q   After you all had, after you and Mr. Guerrero had

15    this telephone conversation, how did ITV Direct

16    change the way it was doing business with respect to

17    the Supreme Greens project, if at all?

18 A   I don't think we changed doing business, the way we

19    were doing it. I don't believe we changed the

20    business the way we were doing it. Sorry, I

21    apologize.

22 Q   How did the Supreme Greens folks change what they

23    were doing?

24 A   I don't know. I don't --

---

1 Q   Were you aware of anything they did that was

2    different from before this telephone conversation

3    with Mr. Guerrero?

4 A   No.

5 Q   Other than this one phone call with Mr. Guerrero,

6    was there any other time that you made an agreement

7    which changed the ownership of the mark Supreme

8    Greens other than that one phone call?

9 A   No, not me personally.

10 Q   Did someone else for ITV Direct?

11 A   I believe Robert Maihos did.

12 Q   Did he tell you what he had done to transfer

13    ownership of the mark to ITV Direct?

14 A   You had the some words that, did he -- Say that

15    again.

16 Q   Did you -- You indicated that Robert Maihos did

17    something, had some conversations relating to the

18    transfer of the mark?

19 A   He had a conversation with Alex Guerrero at some

20    restaurant. I was away on business or something,

21    but he met Alex Guerrero for a lunch meeting also I

22    believe it was confirmed there.

23 Q   And this was after your telephone conversation with

24    Mr. Guerrero?

```
 1   A   I believe maybe after, maybe before, I don't know.
 2       I know it was confirmed on several locations what
 3       was supposed to happen.
 4   Q   When you say "it was confirmed," what are you
 5       referring to?
 6   A   That we would own the web site and own the product
 7       name.
 8   Q   Your understanding was that they could still sell
 9       Supreme Greens, the Health Solution folks could
10       still sell Supreme Greens or not?
11   A   After this new agreement it was, all the business
12       was supposed to come through us.  My statement that
13       I said earlier is I do not want to compete in the
14       marketplace.  That means he would not be able to
15       sell Supreme Greens.
16   Q   What other occasions, if any, was the agreement
17       confirmed that you are aware of?
18   A   I don't know off hand.
19   Q   The only two instances that you can think of today
20       would be Mr. Maihos' lunch meeting and your
21       telephone conversation with Mr. Guerrero?
22   A   Correct.  Also I believe I got a voice mail from
23       Alex confirming everything, too, and you must have
24       that.
```

```
 1   Q   Let me show you what has been previously marked as
 2       Exhibit 14.  If you would take a moment to review
 3       that.
 4   A   I didn't realize that they confirmed here that
 5       Supreme Greens' site was ours.
 6   Q   With Exhibit 14, the first thing I would like to ask
 7       you is do you see a date there on the alleged
 8       transcript of the voice mail?
 9   A   February 17.
10   Q   Does that refresh your memory about when you had
11       your phone conversation with Alex Guerrero relating
12       to the ownership of the web site and the Supreme
13       Greens mark?
14   A   I'm not sure if the phone call was in conjunction
15       with this letter or this letter was different, you
16       know, he went back and forth on a bunch of issues,
17       not a bunch of issues.  I'll give you the web site
18       and they hesitate, they don't redirect the web site.
19       Then they will give us the web site but they are
20       going to redirect it.  They were going to give us
21       the ownership of it.  I'm not sure if this was in
22       the same time frame as the phone call.
23   Q   So in other words, you never really did have an
24       agreement, did you?
```

```
 1   A   I don't believe that to be a true statement.  I
 2       believe I did have an agreement.
 3   Q   But they indicated that the terms were constantly
 4       changing, isn't that what you just said?
 5   A   Yes, but the fact remained that we were not going to
 6       compete in the marketplace, that the web site would
 7       be ours just as he says here on the letter.  Again,
 8       I'll be directing -- Hold on.  Let me get it.  Again
 9       I'll be -- hold on.  And I will be directing
10       everybody to your Supreme Greens web site.  He
11       called the web site mine, yours.  That's possessive,
12       yours to mine.  It's not his, it's mine.  But, yes,
13       okay.
14   Q   Well, basically terms kept changing, correct, first
15       it was yours then it wasn't yours, then it was
16       yours, then it wasn't yours, is that right?
17   A   After the web site was completely mine I believe
18       after we made the arrangement that we were going to
19       take over all business, he confirmed it on this.
20   Q   You can't really place in time when this
21       conversation theoretically took place?
22   A   No, but does it matter, because it took place.
23   Q   When looking at what has been marked as Exhibit 14,
24       you still don't have a clear memory of when in time
```

```
 1       you say you made this agreement?
 2   A   The phone call in this letter I'm not sure might
 3       have been the date after, might have been a month,
 4       might have been two months, I have no idea.  It was
 5       a long time ago.
 6   Q   On the basis of this agreement you claim that you
 7       invested millions of dollars in advertising expenses
 8       in buying media time, is that correct?
 9   A   On this agreement.
10   Q   Based on the arrangement that you had made with Alex
11       Guerrero by telephone.
12   A   No, I spent millions of dollars based on the
13       original distribution agreement.  The show was
14       already on the air before this.
15   Q   So based on the agreement with the phone call with
16       Alex Guerrero, you did not invest millions of
17       dollars on media time, is that fair?
18   A   Based on that phone call?
19   Q   That's correct.
20   A   Based on all of my phone calls with Alex I decided
21       to spend money based on the relationship, the shows
22       that we had.  It's not like I made a conscious
23       decision let's spend millions of dollars based on
24       what he just said.  That is not how it happens.
```

| | | |
|---|---|---|
| 1 | Q | As a matter of fact, it was your choice to invest |
| 2 | | that money on the media time regardless of what |
| 3 | | Mr. Guerrero agreed to, isn't that right? |
| 4 | A | I didn't know he was a fraud. |
| 5 | Q | And the basis for your saying that he is a fraud is |
| 6 | | that he didn't have a doctorate degree? |
| 7 | A | He has no right to call himself a doctor.  He has no |
| 8 | | diploma saying "doctor" on it. |
| 9 | Q | Is there any other basis for your saying he is a |
| 10 | | fraud besides the doctorate degree? |
| 11 | A | Besides his school telling not only Ideal Health but |
| 12 | | my people that he doesn't have a doctorate, he has |
| 13 | | no right to call himself a doctor. |
| 14 | Q | Yes.  What other basis? |
| 15 | A | I didn't ask you if he was a lawyer today.  I mean I |
| 16 | | didn't ask him if he was a doctor, no. |
| 17 | Q | That's the sole basis of your statement that he was |
| 18 | | a fraud, is that right? |
| 19 | A | And an imposter. |
| 20 | Q | And an imposter.  Based on the fact that he does or |
| 21 | | does not have a doctorate degree, is that right? |
| 22 | A | That's correct. |
| 23 | Q | Is there anything else? |
| 24 | A | He told my staff he had a doctorate. |

| | | |
|---|---|---|
| 1 | Q | Is there anything in addition to that? |
| 2 | A | Probably.  Not off the top of my head, but he has |
| 3 | | always called him and held himself to be a doctor. |
| 4 | Q | We had mentioned before the lunch break you believe |
| 5 | | there was some kind of writing to commemorate this |
| 6 | | agreement that you say you made with Alex Guerrero |
| 7 | | over the telephone? |
| 8 | A | Some type of what? |
| 9 | Q | Some kind of writing to commemorate. |
| 10 | A | I never wrote it, but, yes, Bob and Eileen were |
| 11 | | working on an agreement with Ideal Health because |
| 12 | | Ideal Health was also selling Supreme Greens at the |
| 13 | | time and they wanted very much for the deal to go |
| 14 | | forward.  So, yes, there was another document that |
| 15 | | was being devised.  I don't believe it was even |
| 16 | | finalized. |
| 17 | Q | It was never signed, was it? |
| 18 | A | That's what I mean by "finalized," yes. |
| 19 | Q | It was never signed? |
| 20 | A | Correct. |
| 21 | Q | In fact, the terms were never agreed upon, were |
| 22 | | they? |
| 23 | A | Verbally, yes, they were.  I just said they were |
| 24 | | five minutes ago. |

| | | |
|---|---|---|
| 1 | Q | Going back now to the Federal United Stated Food and |
| 2 | | Drug Administration, when were you first aware that |
| 3 | | the United States Federal Food and Drug |
| 4 | | Administration had some concerns about the Supreme |
| 5 | | Greens products? |
| 6 | A | When they walked into my office, and I'm not sure of |
| 7 | | the date. |
| 8 | Q | Approximately when was that? |
| 9 | A | I don't know.  If you give me some to -- It was this |
| 10 | | year, how is that?  I know that it was this year. |
| 11 | Q | And who was it that came to see you from the Federal |
| 12 | | Food and Drug Administration? |
| 13 | A | As I stated before, I can't remember her name. |
| 14 | Q | It was a woman? |
| 15 | A | Yes. |
| 16 | Q | Do you remember what her title was? |
| 17 | A | FDA investigator. |
| 18 | Q | What did she say to you, if anything? |
| 19 | A | She wanted to take a tour and looked at our |
| 20 | | facility. |
| 21 | Q | Did you do that for her? |
| 22 | A | I did not personally. |
| 23 | Q | Who did? |
| 24 | A | Eileen Barrett. |

| | | |
|---|---|---|
| 1 | Q | Did she come back after that first day? |
| 2 | A | I think she spent two, maybe two days there, maybe |
| 3 | | three days. |
| 4 | Q | Was all of the Supreme Greens inventory located in |
| 5 | | the Cummings Center warehouse at that time? |
| 6 | A | Yes, sir.  Yes, ma'am, I believe so. |
| 7 | Q | Was any of it moved at or about that time to a |
| 8 | | different location? |
| 9 | A | I do not believe so. |
| 10 | Q | As long as your company has been selling Supreme |
| 11 | | Greens, has the entire inventory remained in the |
| 12 | | warehouse at the Cummings Center address? |
| 13 | A | I believe so. |
| 14 | Q | Has Supreme Greens ever been put and loaded into |
| 15 | | trailers for transport or storage? |
| 16 | A | I do not think so.  I do not believe so.  I wouldn't |
| 17 | | know. |
| 18 | Q | Who would know that? |
| 19 | A | Maybe Robert Maihos or Eileen or someone in |
| 20 | | shipping, but I believe so. |
| 21 | Q | As far as you are aware, Supreme Greens product has |
| 22 | | never been loaded into tractor trailers at any time? |
| 23 | A | I do not believe so.  I'm not sure.  I don't know. |
| 24 | Q | Did the Federal Food and Drug Administration |

1    inventory the amount of Supreme Greens product on
2    your premises when it visited in these two days that
3    we've been discussing?
4    A    I don't know.
5    Q    How is inventory tracked at ITV Direct?
6    A    I don't know.
7    Q    You have no idea at all?
8    A    I get an inventory report, but it's nothing --
9    Someone counts everything downstairs.  I'm not sure
10   if they even count it or estimate it every week.  I
11   really don't know.  It's not a sophisticated
12   program.
13   Q    Is the inventory report computer generated?
14   A    No.
15   Q    How is it generated?  Is it something somebody types
16   up?
17   A    Yes.
18   Q    Who types it up?
19   A    Someone in shipping.  I don't handle the shipping
20   department.
21   Q    Who is in charge of shipping?
22   A    Mike Liacos.
23   Q    Do you know how to spell that?
24   A    No.  L I A C O S.

1    Q    Is it Mike's office that gives you the inventory
2    report?
3    A    Someone down there.  I don't think it's Mike, but
4    someone gives me the inventory report.
5    Q    Do you get it weekly or monthly or some other time?
6    A    I don't know.  I don't even open it half the time,
7    so I'm not sure.
8    Q    You don't know?
9    A    No.  I don't handle the POs.  I try to stay out of
10   the day-to-day operations.
11   Q    We were talking about this agreement that you claim
12   you made with Alex Guerrero.  What if anything did
13   you give for the ownership of the mark and ownership
14   of the web site?
15   A    What did I give?
16   Q    Yes.  What did you give them?
17   A    Money.
18   Q    How much money did you give them?
19   A    A lot.
20   Q    How much?
21   A    I don't know off hand.
22   Q    This was money that you didn't already owe them at
23   the time?
24   A    I know they are making approximately $3 a bottle.

1    So if they are making $80,000 a week, a $100,000 a
2    week, I think that would be suffice enough to get
3    the title.
4    Q    But my question is --
5    A    What did I give them.
6    Q    -- what did you give them as part of this new
7    agreement that you allegedly made on the phone with
8    Mr. Guerrero?
9    A    What did I give them?
10   Q    Yes.
11   A    Nothing.
12   Q    You gave them nothing?
13   A    I gave them everything that I was giving them in the
14   past.
15   Q    You gave them nothing new, is that right?
16   A    I don't believe so.
17   Q    Let's move into again focusing on this time when the
18   Federal Food and Drug Administration came to the ITV
19   Direct facilities, and at that time --
20   A    Can I go back?
21   Q    Sure.
22   A    $3 a bottle on the web site he was supposed to get.
23   That was the only difference.
24   Q    So you were supposed to pay --

1    A    -- on the web site sales an additional $3 a bottle.
2    Q    To the Healthy Solutions folks?
3    A    Correct.
4    Q    Now at the time that the FDA came to your
5    facilities, were you still actively doing business
6    with the Supreme Greens folks?
7    A    Yes.
8    Q    At some point you stopped paying them, isn't that
9    right?
10   A    Yes, I believe it was right after the FDA came in.
11   Q    Why did you stop paying them?
12   A    The FDA came in and had some questions about the
13   product and the label, and I really didn't know, I
14   really didn't know where the FDA was going with it.
15   They wouldn't tell us.  It was just an
16   investigation.  We were scared, frankly, scared
17   because we didn't know what he put in the bottle.
18   For all I know he could have put crushed-up broccoli
19   in the bottle.
20   Q    You had never investigated it prior to that time,
21   had you?
22   A    No.
23   Q    So you did not, in fact, have any idea, is that
24   right?

1    MR. BROOKS:  Objection.

2  Q  Any idea to what?

3  Q  Any idea as to what was in those bottles that you

4     had been selling for several months.

5  A  I had no idea after the FDA came in and started

6     asking questions because I did not put it in the

7     capsule myself.

8  Q  So you were so scared that you stopped doing

9     business with Supreme Greens at that point, is that

10    right?

11 A  I didn't stop.  I stopped sending them checks

12    because at that time I already had about 40 to 50

13    thousand bottles.  That's an estimate.  I'm not

14    really sure, but, that were already paid for that

15    were on my floor.

16 Q  But in fact you had an additional 300,000 bottles

17    that you hadn't paid for, isn't that right?

18 A  Right.  You have to understand something.  Hold on.

19    If I'm spending --

20 Q  I'm asking the question here.

21    MR. BROOKS:  Let him finish the answer.

22    You ask a question and he gets to finish his answer.

23    MS. CHRISTENSEN:  I'm going to ask the

24    next question.  You can go back and ask him on

1     cross.

2  Q  You had 300,000 bottles of Supreme Greens that you

3     had not paid for, is that right, approximately?

4  A  I don't know.

5  Q  And you did not stop selling them at that time, did

6     you?

7  A  Did I stop selling them?

8  Q  Did you stop selling them at the time the FDA came

9     in?

10 A  I was selling the 40,000 bottles at that time that I

11    already paid for.  Paid, P A I D, paid for.

12 Q  What about the 300,000 bottles of Supreme Greens

13    that you hadn't paid for?

14 A  Well, he stocked us up with inventory where Bob

15    Maihos at the same meeting where he sat down with

16    him, one of the reasons Bob went to sit down with

17    him was to tell him we don't need 50,000 bottles a

18    week.  He said, I've got to keep sending you $50,000

19    a week, 50,000 bottles a week because the raws are

20    already ordered.  So I have to keep sending you

21    50,000 bottles a week even though you are selling

22    20.  So if you can ever understand if you were ever

23    in business, you would run into a cash flow crunch.

24    Do you understand?

1  Q  No.

2  A  If you are selling twenty -- hold on.  If you are

3     selling 20 and you are getting 50, at the end of the

4     30 days he wants to get paid for the 50, he doesn't

5     want to get paid for the 20 that you sold.

6     So when the FDA came in, on my floor

7     there might have been more, but there were at least

8     50,000 bottles paid for prepaid that were sitting

9     but didn't have an order.  So I in essence prepaid

10    50,000 bottles times $6 a bottle is a lot of money.

11    And the FDA is coming in questioning, possibly at

12    that time maybe taking our product.  I didn't know

13    what was going on at that time.  So at that time I

14    stopped sending him a check, and you can probably

15    pull up a document where I said, Eileen, send them,

16    due to the FDA we are going to stop sending you

17    payment.

18 Q  So you found $6 times 50,000 bottles very upsetting,

19    didn't you?

20 A  When the FDA came in, absolutely, especially when I

21    cannot verify what Alex put in the bottles.

22 Q  And you were deeply frightened, weren't you?

23 A  I was scared.

24 Q  You were really scared?

1  A  I was scared.  You can use adjectives all you want.

2     Whatever you want to say, I was scared, yes.

3     Wouldn't you be?

4  Q  At that point you had no idea what was in those

5     bottles, isn't that right?

6  A  I was just going off Alex's, what he told me was in

7     the bottles.

8  Q  So you immediately stopped selling Supreme Greens,

9     didn't you?

10 A  No, I did not say that.  I immediately stopped

11    paying him.

12 Q  In fact, --

13    MR. BROOKS:  Would you let him finish.

14 A  I stopped paying him.

15    MR. BROOKS:  Excuse me.  If you ask a

16    question, the witness has the right to answer.  We

17    are not going to go forward with you interrupting

18    him when you hear something you don't like.  Please

19    let the witness finish his answer.

20    MS. CHRISTENSEN:  Are you finished?

21    THE WITNESS:  No.

22    MS. CHRISTENSEN:  Please complete your

23    answer.

24 A  Thank you.  I stopped paying Alex, but I continued

1    to sell the product.

2  Q  You had no idea what was in those bottles and you

3     claim that you are buying them from an imposter and

4     a fraud, and yet you continued selling those bottles

5     to the public, isn't that right?

6         MR. BROOKS:  Objection.

7  A  I don't believe you stated what I said right, but --

8  Q  How would you state it?

9  A  I was concerned to a degree about what was in the

10    bottles and I stopped paying Alex for the product

11    until he could confirm to me what was in those

12    bottles.  I had orders already from customers,

13    right.  I had already orders from customers.  They

14    had to keep being shipped out.  I had media prepaid

15    for.  If I didn't do that, I would have lost more

16    than the 2.5 million I lost on the program, I might

17    have lost 4.5 million.

18 Q  You were so nervous about the safety of that product

19    that you stopped paying the supplier?

20 A  My father, my father has cancer.  He takes the

21    product.  I take the product.  I like the product.

22    I believe in the product.  But I didn't know for

23    sure what he put in the capsules, and I'm not even

24    sure if at that time I knew he was a fraud yet.

1  Q  As a matter of fact, you are still selling Supreme

2     Greens to this date, aren't you?

3  A  I still take it, too.

4  Q  So in fact, you weren't so worried about the safety

5     of the that product, isn't that right?

6  A  No, I was worried.  I was worried.  There was no

7     question I was worried.  But I was taking the

8     product.  If there are ninety ingredients in there

9     and he decided not to put in one, and I'm not saying

10    he did that, I could be held liable.  Who knows?  I

11    didn't know.  The FDA comes in and says it's an

12    investigation, they go through all of my stuff.  I

13    already have hundreds of thousands of dollars

14    pre-paid on my floor.  It's either go bankrupt or --

15    There is no way I would do that.  I couldn't do it.

16 Q  Now you testified earlier, did you not, that the FDA

17    in fact has cleared the product, hasn't it?

18 A  Months later.

19 Q  Have you subsequently, now that you now the FDA is

20    no longer a factor, paid your supplier for the

21    300,000 bottles plus that you never paid for?

22 A  No, because in that time I found out that our

23    supplier is a fraud, imposter.

24 Q  And that's your sole excuse for not paying for

1    the --

2  A  In the claims that he made on television, the claims

3     --

4  Q  Please let me finish, sir.

5  A  Let me answer.

6  Q  My question was not complete.  I will give you the

7     courtesy of an answer if you will give me the

8     courtesy of the question.

9         MR. BROOKS:  Let's go off the record for

10    a second.

11        THE VIDEOGRAPHER:  Time is 1:25.  We are

12    off the record.

13 [The witness and counsel confer outside the room.]

14        THE VIDEOGRAPHER:  The time is 1:28 and

15    we are back on.

16        MS. CHRISTENSEN:  I'd like to hand the

17    witness the next exhibit in order which I believe is

18    35.

19        [Exhibit 35 marked for identification]

20        MS. CHRISTENSEN:  For the record what

21    we've marked as Exhibit 35 is Bates ITV288 through

22    290, and attached to it is ITV395.

23        MR. BROOKS:  I'd like to note for the

24    record these documents have been stamped

1    confidential; therefore, any questions asked about

2    the document should be deemed confidential.  I don't

3    know whether you want to have the reporter put the

4    section of the transcript into a separate

5    transcript, but each page ought to the stamped

6    confidential.

7         MS. CHRISTENSEN:  Mr. Robertson and I had

8    a conversation in which we agreed that to the extent

9    that material had not been designated confidential

10   and in accord with the protective order, it could be

11   done within ten days of receiving the transcript.

12   We had decided not to put it in a separate booklet,

13   but I'm amenable to any system you want to adopt.

14        MR. BROOKS:  As long as we understand

15   that our clients are not supposed to be receiving

16   confidential information.

17        MS. CHRISTENSEN:  That is understood.

18 Q  Mr. Barrett, when you have had a chance to review

19   what's been marked as Exhibit 35, please let me

20   know.

21 A  I have read it.

22 Q  If you would turn to the third page of Exhibit 35,

23   have you seen this document before?

24 A  Never.

| | | |
|---|---|---|
| 1 | Q | Do you know who prepared it? |
| 2 | A | No. |
| 3 | Q | If you would take a few moments to look at the |
| 4 | | material, do you see where it indicates that Direct |
| 5 | | Marketing Concepts had received more than 737,000 |
| 6 | | units of Supreme Greens? |
| 7 | A | No, I didn't see that. |
| 8 | Q | Do you see what says "total units received"? |
| 9 | A | What page are you on? |
| 10 | Q | Bates ITV290. |
| 11 | A | No, I can't see it. |
| 12 | Q | Is it so small that you can't read it? |
| 13 | A | Oh, I can see it.  "Total units receive per calc |
| 14 | | above, 737,135"? |
| 15 | Q | Yes. |
| 16 | A | I see it. |
| 17 | Q | Then it says "the total units on hand."  Can you |
| 18 | | read that one? |
| 19 | A | 333. |
| 20 | Q | Right. |
| 21 | A | 910. |
| 22 | Q | That's what it appears to be, is that right? |
| 23 | A | Yes. |
| 24 | Q | Up at the top do you see the date says January 1, |

| | | |
|---|---|---|
| 1 | | 2003 through February 14, 2004? |
| 2 | A | Um-hum. |
| 3 | Q | And we are now at the end of August of 2004. |
| 4 | A | Yes. |
| 5 | Q | And you are still selling Supreme Greens, is that |
| 6 | | right? |
| 7 | A | Um-hum. |
| 8 | Q | How much do you have left? |
| 9 | A | I don't know. |
| 10 | Q | So you have in fact been selling, have you sold more |
| 11 | | than 37,915 units since February of 2004? |
| 12 | A | I don't know. |
| 13 | Q | You have no idea at all? |
| 14 | A | I know we have still product in inventory. |
| 15 | Q | Do you have the rough idea how much? |
| 16 | A | No. |
| 17 | Q | Are you talking a hundred thousand units? |
| 18 | A | Less than a hundred thousand units -- |
| 19 | Q | Less than a hundred thousand? |
| 20 | A | -- but I don't know how much less. |
| 21 | Q | The units on hand as of February 13, 2004 was 330 |
| 22 | | something thousand, correct? |
| 23 | A | May have been. |
| 24 | Q | And you have less than a hundred thousand now? |

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | So between February 13, 2004, and today you have |
| 3 | | sold more than 200,000 units, isn't that right? |
| 4 | A | If your math is correct.  I don't know. |
| 5 | Q | Have you ever directed anyone at your company to |
| 6 | | stop selling the Supreme Greens product? |
| 7 | A | No. |
| 8 | Q | Did you ever issue a written memoranda to that |
| 9 | | effect? |
| 10 | A | No. |
| 11 | Q | Did you ever send an e-mail to your company |
| 12 | | employees not to sell Supreme Greens? |
| 13 | A | No. |
| 14 | Q | In fact, you have been selling it continuously since |
| 15 | | the visit from the FDA, isn't that right? |
| 16 | A | Yes, I have. |
| 17 | Q | Do you recall any conversations with Mr. Guerrero in |
| 18 | | which you demanded that they transfer the trademark |
| 19 | | Supreme Greens to you or you would stop selling |
| 20 | | their product? |
| 21 | A | No. |
| 22 | Q | Do you remember any conversations in which you |
| 23 | | threatened to change your conduct if they did not |
| 24 | | transfer the mark to you, the mark Supreme Greens? |

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | You never made any such statement, is that right? |
| 3 | A | Right.  I don't remember. |
| 4 | Q | If you would take a moment, did you have your -- In |
| 5 | | response to this lawsuit -- Let me start over.  In |
| 6 | | response to this lawsuit -- |
| 7 | A | Which lawsuit? |
| 8 | Q | This lawsuit for which you are giving testimony |
| 9 | | today, the lawsuit which is ITV Direct Vs. Healthy |
| 10 | | Solutions et al, did you instruct anyone on your |
| 11 | | staff to retrieve all the documents they could find |
| 12 | | related to this lawsuit? |
| 13 | A | I didn't personally, but -- |
| 14 | Q | Do you know if anyone did? |
| 15 | A | I'm not sure. |
| 16 | Q | You are not aware whether such a request was made? |
| 17 | A | I'm sure it was made.  I don't know who, when, why |
| 18 | | or how.  I'm sure we put all the documents together |
| 19 | | for our case, so -- |
| 20 | Q | So any documents that have not been produced in this |
| 21 | | lawsuit are no longer in your custody or control, I |
| 22 | | mean the custody or control of ITV Direct, is that |
| 23 | | correct? |
| 24 | A | That's what I would assume. |

8/23/2004 Barrett, Donald

1   Q   Do you know whether anyone made a request of your
2       in-house attorney, Mr. Sciucco, to look for a draft
3       contracts?
4   A   Mr. Sciucco?
5   Q   Yes.
6   A   Did anybody --
7   Q   -- ask him to look for drafts of various agreements?
8   A   I don't know.
9   Q   Do you know whether he did so?
10  A   I don't know.
11  Q   As you sit here today, are you aware of the value of
12      Supreme Greens product for which Healthy Solutions
13      was not paid?
14  A   No.
15  Q   You have no idea?
16  A   No idea.
17  Q   You have no idea whether it was several million
18      dollars?
19  A   No idea.
20  Q   Do you know whether it was more than a million
21      dollars?
22  A   I don't know.
23  Q   You have no idea whatever?
24  A   I have no idea.  I don't know what accounting you

1       are going off of.  Don't even know what accounting,
2       I wouldn't know.  That is my answer.
3   Q   Was it your understanding under the terms of what
4       has been marked as Exhibit 6 -- You may want to find
5       it in the pile.
6   A   34, 33, 35.
7   Q   Exhibit 6 is entitled Distribution Agreement.
8   A   Here it is, hiding on me.  Okay.  Got it.
9   Q   Under the terms of that agreement was it your
10      understanding that you only had to pay Healthy
11      Solutions for product if your company made a profit?
12  A   Like I said, I didn't read the agreement in full,
13      but I don't believe it was the case.  I believe we
14      bought it per bottle from them.
15  Q   At any time did you make an agreement with Healthy
16      Solutions, LLC that you would pay them only if you
17      made a profit?
18  A   No.
19  Q   That was not your agreement with them?
20  A   I don't believe so.  I didn't write the agreement, I
21      just signed it, but I don't believe so.
22  Q   I want to be sure I state your testimony accurately
23      from earlier today.  Is it your testimony that ITV
24      Direct relied on Alex Guerrero to provide all

8/23/2004 Barrett, Donald

1       substantiation for any claims that were made in the
2       infomercial for Supreme Greens?
3   A   100 percent.
4   Q   100 percent, and you weren't relying on anyone
5       else --
6   A   No.
7   Q   -- for that information?
8   A   I was relying on Alex Guerrero, at that time
9       Dr. Alex.
10  Q   Is it your testimony that all of your difficulties
11      and problems with the FTC were in fact caused by the
12      statements made during the infomercial by Dr. Alex
13      Guerrero?
14  A   All the problems that I had with the FTC were
15      because of statements that Alex Guerrero made on the
16      infomercial exactly, if that's what you are saying.
17  Q   I'd like you to take a look at what has been
18      previously marked as Exhibit 34 which is your
19      declaration.  I'm sorry, your affidavit.
20  A   Yes.
21  Q   If you would turn to page four, paragraph 12, if you
22      would take a moment to review that and let me know
23      when you are ready.
24  A   Okay.

1   Q   Do you see there about the middle of paragraph 12
2       where it says, "ITV Direct expended millions of
3       dollars on media and promotions for Supreme Greens?"
4   A   Yes.  It's after a comma.  Let's get the statement
5       in full.
6   Q   Okay.  Do you see where it says that ITV Direct was
7       forced to lay off 50 employees?
8   A   Yes.
9   Q   Can you give me an idea of exactly when that
10      occurred?
11  A   When we had to pull down the show.
12  Q   When was that?
13  A   It was after my meeting with Ideal Health and they
14      told me Alex Guerrero was an imposter.
15  Q   Prior to that time you had no reason to believe that
16      he was not a doctor, is that right?
17  A   That's right.  I think even Greg and Mark as
18      partners thought he was a doctor.
19  Q   I'd like to hand you what has been previously marked
20      as Exhibit 1.
21  A   This?
22  Q   Yes.  Have you ever seen that document before?
23  A   Just lying around lately in the last couple of days,
24      that's it, like when I saw it on the desk earlier,

1       but that's it.

2   Q  Do you know when those documents were first

3       presented to ITV Direct?

4   A  No.

5   Q  Do you see the fax stamp on the top of that

6       document?

7   A  May 6.

8   Q  When ITV Direct received that document, those

9       documents, if ever they did, did anyone tell you

10      about it?

11   A  No.

12   Q  As far as you are aware did ITV Direct ask any

13      questions as a result of receiving these documents?

14   A  I don't know. I have never seen the document, so

15      how would I know.

16   Q  Prior to your seeing this recently -- Would you

17      define "recently" for me?

18   A  Today.

19   Q  I believe you mentioned that you had seen those

20      documents before today?

21   A  I don't know if I did. I might have seen it the

22      other day, but I'm not sure.

23   Q  When you say "the other day," you mean within the

24      last week or so?

1   A  Last week, potentially, all these depositions were

2      going on.

3   Q  Prior to that as far as you are aware you weren't,

4      you personally were not aware of what has been

5      marked as Exhibit 1?

6   A  No.

7   Q  I'd like you to take a look at what has been

8      previously marked as Exhibit 10.

9   A  What one was that? Okay.

10   Q  Looking at Exhibit 10, does that refresh your memory

11      as to the time when anyone on your staff tried to

12      identify what the backup was for Alex Guerrero's

13      claims on the infomercials?

14   A  Yes. First we were just looking at the claims. We

15      didn't realize -- We thought he was just a doctor

16      that made false claims. We didn't realize he was a

17      false doctor that made false claims, if that makes

18      sense.

19          MS. CHRISTENSEN: I would like to ask the

20      court reporter to mark Exhibit 36.

21      [Exhibit 36 marked for identification]

22   Q  If you could take few moments to review that and let

23      me know when you are ready.

24   A  (The witness complies.) Okay, ready.

1   Q  Have you ever seen what has been marked as Exhibit

2      36 before?

3   A  No.

4   Q  Do you recall ever seeing a document like this?

5   A  I remember seeing documents like this, but I never

6      really looked at them in detail. It's a transcript

7      of the show.

8   Q  As you take a look at what has been marked as

9      Exhibit 26, do you see there are handwritten remarks

10      or notes on Exhibit 36?

11   A  Um-hum.

12   Q  Do you know whose handwriting that is?

13   A  I do not. I could speculate based on the e-mail and

14      based on the front page it was sent by Peter.

15   Q  If you could turn to page three which is Bates

16      number SH-097 -- Do you know what a Bates number is?

17   A  No.

18   Q  If you look in the lower right-hand corners of those

19      pages you will see numbers. In that case it's S -.

20      Those are numbers that we attorneys put on pages to

21      identify each page. They are all different. When I

22      refer to a Bates number, that's what I'm referring

23      to as opposed to page number on the document itself.

24      Do you have page three of the documents which is

1      Bates number SH-097?

2   A  Yes.

3   Q  Do you see down toward the bottom there is a portion

4      of the text that is circled?

5   A  Yes.

6   Q  It says "out"?

7   A  Right.

8   Q  Are you aware that ITV Direct was advised to take

9      that phrase out of the infomercial?

10   A  Yes, it was a false claim originally made by Alex

11      Guerrero that we had to take out of the show because

12      he could not back up the claim.

13   Q  Who advised you to take it out?

14   A  Based on the e-mail I would say Peter.

15   Q  That would be Mr. Brooks?

16   A  Right.

17   Q  One of your attorneys?

18   A  Correct.

19   Q  If you turn to page five of the document Bates

20      SH-099 --

21   A  Right.

22   Q  -- do you see where it says "get me names, need to

23      see" --

24   A  "Backup."

1  Q  -- "backup or take it out"?

2  A  Right.  It was another statement that Alex Guerrero

3      made, a fraudulent statement that he made, so we had

4      to take it out.

5  Q  Again on page six --

6  A  We decided to do a whole new show.  But keep going.

7      Yes.

8  Q  On page six you see similar remarks?

9  A  Yes, I see marks all over it.

10  Q  Based on this advice, is this part of what you

11      filmed the second infomercial and made changes to

12      reflect?

13  A  Yes, but I didn't make changes like these changes,

14      we just did a whole new show.  I didn't say we have

15      to change this word.  When we do the show, change

16      the words, we just did a whole new show.

17  Q  You did a whole new show and you stopped running the

18      first one, correct?

19  A  Yes, we stopped running the first show on some

20      stations.

21  Q  But you continued to run it on other stations, is

22      that right?

23  A  Well, like I told you, we buy media by the quarter

24      and when the new show came out, we started up

---

1      running the new show but not on all the stations.

2  Q  You continued to run the old version at least until

3      the end of the quarter, is that right?

4  A  Maybe.

5  Q  And the quarter would have been over March 31, 2004,

6      is that right?

7  A  Yes, I would say.  I'm not sure on the dates,

8      though.

9  Q  So you did not run the first version, the night

10      version, in April 2004?

11  A  I don't know for sure.  Stations, it happens all the

12      time.  And people, you know, go how can that happen.

13      Well, it was actually 14 different versions of the

14      original Supreme Greens show, 14 different versions.

15      So when the media buyers call and say plug in

16      Supreme Greens and the guy goes to the station on

17      Saturday morning at seven o'clock in the morning, he

18      could potentially grab the wrong tape.  And I think

19      that's what a lot of times people say I saw the

20      original show running, but you would never be able

21      to tell the original show from the edited show.  You

22      wouldn't even be able to tell unless you had the

23      transcript right there when you were reading the

24      words.

---

1  Q  You would be able to tell the day version from the

2      night version by the backdrop, couldn't you?

3  A  Yes, but that is not what I'm talking about.

4  Q  So every time that the original --

5  A  Like night and day.

6  Q  Every time the original night version ran in April

7      of 2004, that would have been an error on the part

8      of the station, is that right?

9  A  No, no, no, no.  See, we had a -- The FTC doesn't

10      approve shows, but they went through the Supreme

11      Greens show and they gave us recommendations.  That

12      is what they did, gave us recommendations.  We made

13      those recommendations and we continued to air the

14      show with the black backdrop, the nighttime

15      backdrop.  We continued to air that show even while

16      we were testing the new show, the new show being the

17      day background.

18  Q  So that was based on recommendations from the

19      Federal Trade Commission, that you were still

20      running versions of the night backdrop?

21  A  They don't recommend that you run shows, so -- They

22      don't make us recommendations, but they do give you

23      recommendations on maybe what might be considered --

24      What is a better word I can use?  Compliant.  If

---

1      it's not compliant, they might ask you to take it

2      out, but they would never say this is approved.  The

3      FTC doesn't do that.  They came back and made

4      recommendations to us, and we implemented those

5      recommendations, and the show with the black

6      backdrop, the nighttime backdrop continued to run

7      even while we ran the daytime show.

8  Q  So as a matter of fact, you made a business decision

9      to run various versions of the show long after you

10      had been contacted by the FTC, is that right?

11  A  I made a decision to do a brand new infomercial, and

12      I also agreed to only run the infomercial that the

13      FTC made recommendations on.

14  Q  Are you still in fact running part of the

15      infomercial?

16  A  No.

17  Q  And there in fact have not been web casts over the

18      internet in the last three weeks?

19  A  What is a web cast?

20  Q  Have parts the infomercial video been broadcast over

21      the internet in the past three weeks?

22  A  I wouldn't know.  Not from us for sure.

23  Q  Are you certain of that?

24  A  I'm certain of that.

8/23/2004 Barrett, Donald

```
1              MS. CHRISTENSEN:  Thank you.  I have no
2    further questions.
3              MR. BROOKS:  I have just a couple of
4    follow-up questions with you, Mr. Barrett.
5              CROSS EXAMINATION BY MR. BROOKS
6    Q   You were asked on direct examination whether you
7        gave anything new in return for the assignment of
8        trademark and the assignment of the web site.  Is it
9        not true that you did pay an additional $7500 in
10       consideration for the transfer of the web site?
11   A   That's true, $7500 and $3 extra a bottle, that's
12       right.
13   Q   You were also asked some questions about the
14       continuing sales of Supreme Greens after the FDA
15       started their investigation.  Do you recall those
16       questions?
17   A   Yes.
18   Q   Did the FDA ask you at any point in time to halt the
19       sale of Supreme Greens product?
20   A   No.
21             MR. BROOKS:  That's all I have.
22             MS. CHRISTENSEN:  Thank you.  Off the
23   record.
24             THE VIDEOGRAPHER:  It is 1:52 and this is
```

6/2/2005 4:20 PM                                                    137

---

8/23/2004 Barrett, Donald

```
1    the end of cassette number two and the deposition is
2    concluded and we are off the record.
3
4                        * * * *
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

6/2/2005 4:20 PM                                                    138

---

8/23/2004 Barrett, Donald

```
1              WITNESS' CERTIFICATE
2         I, DONALD BARRETT, certify that I have read
     the foregoing transcript of my testimony and certify
3    that, to the best of my knowledge, said transcript is
     true and accurate (with the exception of the following
4    corrections):
5    Page     Line      Corrections
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23
24   _____    _____
         DONALD BARRETT                    Date
```

6/2/2005 4:20 PM                                                    139

---

8/23/2004 Barrett, Donald

```
1                    J U R A T
2         On this _____ day of _____ 2004, before
3    me, the undersigned notary public, personally appeared
4    _____, proved to me through
5    satisfactory evidence of identification which was
6    _____, to be the person whose name
7    is signed on the preceding or attached document, and who
8    swore or affirmed to me that the contents of the
9    document are truthful and accurate to the best of _____
10   knowledge and belief.
11                        _____
                                 Notary Public
12
13
14
15
16
17
18
19
20
21
22
23
24
```

6/2/2005 4:20 PM                                                    140

8/23/2004  Barrett, Donald

```
 1   COMMONWEALTH OF MASSACHUSETTS)
                                 )
 2   COUNTY OF SUFFOLK           )

 3

 4          I, Carole M. Wallace, Certified Shorthand

 5   Reporter within and for the Commonwealth of

 6   Massachusetts, do hereby certify that I took the

 7   deposition of DONALD BARRETT at the offices of

 8   Posternak, Blankstein & Lund, LLP, 800 Boylston Street,

 9   Boston, Massachusetts  02210, on Monday, August 23,

10   2004, commencing at 9:58 a.m.

11          I further certify that said witness was by me

12   duly sworn to testify to the truth, the whole truth,

13   and nothing but the truth, and that the foregoing

14   testimony was taken by me stenographically and is, to

15   the best of my skill and ability, a true record of the

16   testimony of the witness.

17          I further certify that I am not related to any

18   of the parties hereto or their counsel, and that I am

19   in no way interested in the outcome of said cause.

20          Dated this third day of September 2004.

21

22

                    _____

23                  Carole M. Wallace
                    Certified Shorthand Reporter
```

6/2/2005  4:20 PM