UNITED STATES DISTRICT COURT
For the District of Massachusetts

ITV DIRECT, INC.,                            )
                                             )
                    Plaintiff,               )
                                             )
          v.                                 )
                                             )
HEALTHY SOLUTIONS, LLC, ET. AL.,             )
                                             )
                    Defendants.              )
                                             )
_____        )
                                             )
CAPPSEALS, INC.,                             )
                                             )        C. A. No. 04-CV10421-JLT
              Plaintiff-in-Intervention      )
                                             )
          v.                                 )
                                             )
HEALTHY SOLUTIONS, LLC, D/B/A                )
DIRECT BUSINESS CONCEPTS; ITV                )
DIRECT, INC. AND DIRECT                      )
FULFILLMENT, LLC.                            )
                                             )
              Intervenor-Defendants.         )
                                             )
                                             )
                                             )
_____        )

**EXHIBIT 2**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>        Plaintiff,<br><br>v.<br><br>DIRECT MARKETING CONCEPTS, INC., et al.,<br><br>        Defendants. | CIVIL ACTION NO. 04-CV-11136GAO |

### AFFIDAVIT OF DONALD BARRETT

I, DONALD BARRETT, under oath, declare as follows:

1.    I am a principal shareholder of defendants Direct Marketing Concepts ("DMC") and ITV Direct, Inc. ("ITV Direct"), and am responsible for the management and operations of each company. I make this affidavit on the basis of my own personal knowledge of the facts set forth herein and could testify competently thereto if called to do so.

2.    DMC and ITV Direct, located in Beverly, Massachusetts, are media and marketing companies that collectively employ over 140 individuals in Massachusetts. DMC's and ITV Direct's business includes the production of infomercials, in which an individual is provided the opportunity to advertise an existing product to a larger audience through wider media, including television and radio. Neither DMC nor ITV itself manufactures any products.

3.    I am the primary person responsible for identifying business opportunities for DMC and ITV Direct. This responsibility includes meeting with numerous individuals who believe that they have products that will experience enhanced distribution and sales through infomercial marketing. Before agreeing to commit to an infomercial for a particular product, I will meet personally with the representatives of the company manufacturing and selling the product, and attempt to ascertain the credibility of the spokesperson concerning their own credentials and the merits of the product that he or she is seeking to sell through direct marketing.

4.     In connection with any agreement to produce an infomercial for a third party, DMC and ITV Direct make clear that the individual advertising the product is responsible for each and every representation he makes about a product, including confirming that he has competent and reliable scientific support for any claims made about the product. In each case, DMC and ITV Direct require that the individual provide specific representations about their support for their claims, and to provide indemnification to DMC and ITV Direct for any claims made by the individual that are later challenged by any governmental agency.

5.     In 2001, I was introduced to Robert Barefoot and his company Deonna Enterprises, which was producing a dietary supplement known as coral calcium, and distributing a book written by Barefoot called "The Calcium Factor". Barefoot claimed that coral calcium had substantial health benefits, and claimed that he had significant research, studies, documentation, testimonials and other scientific information to support the benefits he claimed in his books. After reading Barefoot's book and engaging in several discussions with Barefoot personally, I introduced Barefoot to Kevin Trudeau, a well-known host of infomercials for a number of products. DMC agreed to produce an infomercial for Barefoot, featuring Mr. Trudeau as the interviewer. This infomercial, which runs 30 minutes, is titled "A Closer Look". As is common practice, the infomercial was shot in one take on a single day, and the filming was entirely unscripted. Set in a interview format, Barefoot discussed the benefits of coral calcium and encouraged viewers to read his book "The Calcium Factor". No specific product was discussed in the infomercial.

6.     After filming of A Closer Look, Barefoot confirmed that he possessed support for the claims made in the infomercial, in the form of studies and research, and on February 18, 2002 signed a distribution agreement in which he agreed to provide DMC with all research, studies and documentation, and agreed to fully indemnify DMC in connection with all of the statements and claims he had made in the infomercial. A true and accurate copy of the Distribution Agreement is attached as Exhibit A.

2

7.     From early 2002 through June 2003, "A Closer Look" was aired on various media outlets. In connection with the airing of the infomercial, DMC agreed to sell Barefoot's books and coral calcium products to consumers. However, because DMC was a new company and did not have the resources to establish merchant accounts to process credit cards, all processing of credit cards was done by the defendant Triad ML Marketing, Inc. of Swedesboro, Pennsylvania. I have no ownership interest in Triad and there was no written agreement between DMC and Triad concerning how the money collected by Triad would be distributed to DMC. Because all the money from the sales of coral calcium was flowing to Triad, I relied upon Triad and its president Allen Stern to provide me and DMC with an accounting. No such accounting has ever been provided, and Triad has retained the vast majority of the revenues generated from the sales of coral calcium products and Barefoot's books sold through the airing of the infomercial.

8.     Shortly after A Closer Look began airing, Kevin Trudeau sought to change the terms of his original agreement with DMC and a dispute arose. Trudeau then filmed a second infomercial, entitled "the Debbie and Kevin Show" in which Trudeau conducted a second filmed interview with Barefoot and Barefoot made many of the same claims he had made in "A Closer Look." Also, unknown to me at the time, Trudeau began a campaign with the Federal Trade Commission seeking to convince the FTC to halt the running of "A Closer Look" while allowing the "Debbie and Kevin Show" to continue airing. For example, I subsequently became aware of a letter written by counsel for Trudeau to the FTC on April 24, 2002, in which Trudeau confirms that the FTC has been provide a copy of A Closer Look and identifying all of the areas that Trudeau contends the infomercial violates the law. The letter, a true and accurate copy of which is attached as Exhibit B, specifically requested that the FTC enjoin the airing of "A Closer Look" because the claims in the infomercial could harm consumers.

9.     Despite receiving the tape and transcript of "A Closer Look" at least as early as April 2002, the FTC did nothing to stop the airing of the infomercial and never notified me or DMC that it had any issues or concerns over the content of the infomercial, until June 2003, over a year after the FTC had received a copy of the tape.

3

10.     Specifically, on June 9, 2003, the FTC filed an action against Kevin Trudeau in the United States District Court for the Northern District of Illinois, seeking to enjoin the running of the "Debbie and Kevin Show" and seeking to hold Trudeau in contempt of a FTC injunction order issued by that Court in 1998. It was only when this action was filed that I then learned that Trudeau had been subject to a prior FTC consent decree and injunction. A few days after the FTC filed its action against Trudeau, DMC was contacted for the first time by the FTC concerning the "Closer Look" show. The FTC raised concerns that Barefoot did not possess the level of competent and reliable scientific support for his claims in the infomercial that would satisfy the FTC's dietary supplement guidelines.

11.     In response to the FTC's concerns over the "Closer Look" show, DMC sought to obtain copies of the studies, articles and other support that Barefoot had assured DMC existed. DMC then obtained a copy of the materials that were submitted in connection with the Trudeau action, including numerous articles, documents and testimonials. These supporting materials are attached as Exhibit C.

12.     Notwithstanding that there did appear to be support for the claims made in the "Closer Look" show, and Barefoot's continued defense of his book and his claims, DMC nonetheless agreed to immediately pull the show and cease any future airings. On June 19, 2003, DMC sent letters to each of its distributors in possession of the "Closer Look" show and notified them that they should immediately cease airing the show. Copies of these letters are attached as Exhibit D. The "Closer Look" show has not been aired by DMC since June 2003.

13.     In late 2002, defendant Gregory Geremesz contacted representatives of ITV Direct and stated that he knew a Dr. Alejandro Guerrero, who had developed a greens product that Mr. Geremesz believed would likely be successful if marketed through an infomercial. ITV Direct reviewed the materials provided by Geremesz and Guerrero, including testimonials by fitness celebrity Tony Robbins, and decided to pursue additional discussions. At all times, Geremesz and Guerrero represented that Guerrero was a doctor and OMD, and operated a clinic in California with regular patients. Geremesz and Guerrero also represented that the greens

4

product developed by Guerrero had been clinically tested on patients in California and had shown tremendous results.

14.     On April 4, 2003, ITV Direct entered into a "Distribution Agreement" with Healthy Solutions for the production of an infomercial for Guerrero's greens product, called "Supreme Greens with MSM", a copy of which is attached as Exhibit E.  In connection with agreeing to produce an infomercial featuring Guerrero, Guerrero confirmed that he had competent and reliable scientific evidence and studies for the health benefits of Supreme Greens. In several direct conversations, as well as a presentation to the ITV Direct employees, Guerrero confirmed the results of his patient studies.  Attached hereto as Exhibit F is a transcript of the sales presentation where Guerrero confirmed that he had conducted a study, and the results of that study.  I never encouraged Guerrero to fabricate any facts about the study or the existence of the study, but relied entirely on Guerrero's affirmation of the study and its results.

15.     In the Distribution Agreement, Guerrero provided complete indemnification to ITV Direct, its officers, directors, employees and affiliates in the event that any of his health claims were later challenged by the FTC or any other federal agency.

16.     On April 11, 2003, Guerrero traveled to ITV Direct's studios in Beverly, Massachusetts to film the infomercial.  Prior to filming, Guerrero once again identified himself as a doctor, and stated that he had received his doctorate in Traditional Chinese Medicine in California.  As is standard practice, the infomercial filming was unscripted and ITV Direct, Inc. did not dictate any of the statements by Guerrero, including his statements regarding his credentials, his clinical practice in California or the scientific support for the Supreme Greens with MSM product.  All I ever did in connection with the infomercial was pose questions to Guerrero and elicited his responses.  At no time did I ever make any affirmative representation concerning Supreme Greens with MSM or any of the health benefits of the product espoused by Guerrero.

17.     ITV Direct has never manufactured any of the Supreme Greens with MSM product.  Rather, all of the product has been manufactured and sold to ITV Direct by Healthy

5

Solutions. Despite numerous requests made to Healthy Solutions and Guerrero for the formula for the product, he has repeatedly refused, asserting that the formula is proprietary. Thus, neither I nor ITV Direct has ever been provided the formula for the product.

18.     During September and October 2003, ITV Direct's counsel was contacted by the FTC concerning the Supreme Greens infomercial. In those conversations, the FTC identified several concerns with the content of the infomercial. The FTC claimed that it did not believe that there existed competent and reliable scientific evidence for the claims in the infomercial. In response to these concerns, ITV Direct both sought additional scientific evidence from Guerrero and Healthy Solutions, and edited the program to address the FTC's concerns. In October 2003, the edited tape was sent to the FTC, and the FTC concluded that the edited tape was a "substantial improvement."

19.     Based upon the FTC's concerns, the edited tape was rolled out first in national markets, with local markets to follow. Because media time is often purchased months in advance, particularly in local markets, it takes substantial time to substitute master tapes at each station. Nonetheless, ITV Direct sought to substitute the edited tape for the original tape as quickly as feasible. In the meantime, ITV Direct also received additional materials from Guerrero which appeared to provide some support for the claims he had made in the infomercial, including articles and studies. These materials are attached hereto as Exhibit F. We also requested additional details about Guerrero's study, but were told that the specific patient results and data were confidential. Instead, we were provided a summary of the study, attached hereto as Exhibit G.

20.     On February 11, 2004 an investigator from the United States Food and Drug Administration ("FDA") conducted an inspection of ITV Direct's existing inventory of Supreme Greens with MSM. The FDA's inspection continued over the next several months, and ITV Direct provided the FTC with samples of all its products, access to all of its records and a comprehensive tour of its facilities. There was never any effort to hide anything from the FDA, and the investigator was provided complete answers to all of her questions. After months of

6

investigation, the FDA issued a Warning Letter on April 19, 2004, which identified certain advertising and labeling issues, but did not identify any health problems with the product. ITV Direct subsequently addressed all of the FDA's concerns and responded by letter dated May 10, 2004. On May 12, 2004, the FDA responded by stating that ITV Direct's proposed corrective action "appears to be adequate." A copy of the FDA's May 12, 2004 letter, which is nowhere mentioned by the FTC, is attached hereto as Exhibit H.

21.    I have reviewed the Declaration of Christina Turner, who is apparently an investigator with the Federal Trade Commission. According to her declaration, she ordered products from ITV Direct in October 2003, and was involuntarily charged for additional products by ITV Direct. While I cannot deny that this incident may have occurred, it is ITV Direct's stated policy to fully disclose, both orally and in written materials, its return policy and the right for a customer to receive a refund at any time. It is also the policy of ITV Direct to provide notice to customers and receive specific confirmation from the customer approving inclusion in its autoship program. If a sales representative is discovered violating these policies, it is the company's policy to immediately fire the employee. In addition, the incident discussed by Ms. Turner occurred prior to the implementation by ITV Direct of the Contract Genie in late 2003. The Contract Genie is a computerized system for use with every sales order with a re-supply component. The system records each conversation and confirms that the terms of the autoship program are clearly communicated and affirmative assent is obtained. We are prepared to provide all of the information concerning the Contract Genie to the FTC, which will demonstrate that the FTC's contention that unauthorized autoships are occurring is simply untrue. Finally, Ms. Turner would have been notified in writing with her first shipment that she was on autoship, and could have called at any time to remove herself from the program without charge.

22.    In the Fall of 2003, DMC and I provided the FTC with complete statements of our respective financial conditions. I am fully prepared to provide updated financial statements in whatever form the FTC deems sufficient, and DMC, ITV and Direct Fulfillment are prepared to provide comprehensive financial statements.

7

23.     Demonstrating my continued willingness to cooperate with the FTC, on December 22, 2003, I was deposed by the FTC in Boston in connection with its pending litigation against Kevin Trudeau and Robert Barefoot. I agreed to accept service of a subpoena and did not refuse to answer any question posed by the FTC Staff. I also produced responsive documents. A copy of the FTC subpoena is attached as Exhibit I. I remain willing and able to cooperate with the FTC staff in its investigation of both coral calcium and Supreme Greens, particularly if it will assist in validating the ITV Direct's indemnification rights against Guerrero and Healthy Solutions.

24.     Between December 2003 and April 2004, the FTC had no communications with DMC, ITV Direct or its counsel. Then, beginning in March 2004, ITV Direct began reducing its media purchases for Supreme Greens with MSM, with the intention of pulling the infomercial completely by Summer 2004. On April 7, 2004, the FTC called to state that it continued to have concerns over the Supreme Greens with MSM infomercial and that it believed that the original infomercial was running in certain media markets. We then investigated the matter, determined that certain stations were airing the original infomercial, and immediately notified all media outlets to cease running any of the Supreme Greens versions. ITV Direct has halted all media for Supreme Greens with MSM, and has no intention of running the infomercial in the future. I do not believe that the infomercial is currently running, and, if it is, it is not being run by ITV Direct, DMC or any other company associated with ITV Direct or DMC.

25.     In addition, in connection with the FDA and FTC investigations, ITV Direct conducted its own investigation of Guerrero, who represented to me, my employees, his own employees, the public and the Court that he is a doctor and an OMD. Neither claim appears to be true. Rather, it appears that Guerrero received only a Masters Degree from SAMRA University in Los Angeles, and has never received a doctorate of any kind at any time. I believe that Guerrero lied to me and defrauded ITV Direct in connection with his true background, as the FTC now contends. On this basis, ITV Direct has sought indemnification from Guerrero in connection with the FTC's investigation and any possible remedies it may seek in this action.

8

However, at no time prior to April 2004 was I or any other employee aware that Guerrero's prior claims regarding his background and the support for his products might be false. As soon as we discovered these facts, we immediately stopped running the infomercial.

26.    All of the books and records of ITV Direct, DMC and Direct Fulfillment are still in existence an available to the FTC. No entries in any of the books and records of ITV Direct, DMC and Direct Fulfillment have been altered, and all transactions engaged in by these companies are reflected on the books and records of the business. As we have told the FTC, and as we were prepared to agree at a meeting in Washington, D.C. on Friday May 28, 2004, we have had discussions with an independent auditing firm and are prepared to engage that firm to review the books and records of the business and provide the FTC with a complete accounting of the business and subject products.

27.    I have reviewed the declaration of Scot Sarver submitted by the FTC in this action. Mr. Sarver, a former employee of ITV Direct, was fired by ITV Direct because he was caught stealing from the company and attempting to establish a competing business while employed by ITV Direct. He is currently under a non-compete agreement and has received a demand letter from the company regarding his competing business. A copy of the demand letter sent to Mr. Sarver is attached as Exhibit J. He has acknowledged to other employees that he shredded his employment agreement, and was required to break into a locked desk to do so. A copy of the affidavit of John Maihos describing this incident is attached as Exhibit K. His competing business would likely greatly benefit from any damage caused to ITV Direct by the FTC, including the appointment of a receiver and an asset freeze.   I am also aware that he attempted to defraud the Massachusetts unemployment office by claiming that he was unemployed when he had an existing business. He was very upset when ITV Direct would not act as a co-conspirator in his scheme by certifying his unemployed status and then his claim was denied. Finally, in November 2003, a sexual harassment complaint was filed against Mr. Sarver by a female employee, charging him with an inappropriate sexual advance. A copy of the memorandum concerning this incident is attached as Exhibit L.

9

28.    The falsity of Mr. Sarver's affidavit is easily demonstrated.  For example, Mr. Sarver states that I bought a house in Florida and made comments about Florida's homestead laws.  That is simply untrue.  I do not own any home in Florida.  Mr. Sarver also states that I have bought a boat and jet-skis.  That is also untrue.  I have never bought a boat or jet-skis and do not currently own either.  Mr. Sarver's remaining statements are also untrue.  All of the records of ITV Direct, DMC and Direct Fulfillment are available for review by the FTC and no improper transactions have occurred in an effort to hide assets, fraudulently transfer assets or otherwise impede the FTC's review of financial information maintained by these companies. Likewise, Mr. Sarver's statements regarding the autoship program are untrue.  At no time have I encouraged the sales staff to fraudulently place customers on autoship and I have personally fired sales representatives for violating the company's clear policies in connection with the autoship program.  ITV Direct operates a dedicated customer service department with representatives available to field calls six days a week, and guarantees complete customer satisfaction.  All customers are entitled to refunds if they are not completely satisfied with the products they have purchased.  I have never stated differently to my employees.

29.    I have also reviewed the declaration of Richard Cushman.  Mr. Cushman is married to my wife's sister, Karen, and they are currently engaged in divorce proceedings.  In my opinion, Mr. Cushman is an extremely unstable person, having been arrested and convicted several years ago for firebombing his then-girlfriend's father's car after she left him.  He has also been arrested and convicted for arson, intimidating a witness and violating a protective order, and arrested for burglary.  Karen Cushman has sought and obtained a restraining order against him after several threats were made by him against her and her family.  Copies of public records relating to these incidents are attached hereto as Exhibit M.  On several occasions after Mr. Cushman was fired by ITV Direct, he has threatened me and other employees of ITV Direct with physical violence.  For example, he threatened to confront me and others at the company's Christmas party on December 19, 2003.  We called the Middleton, Massachusetts police, and after they reviewed his criminal record they assigned not one, but two officers to the party as

10

protection. He has also received a Notice of Trespass prohibiting him from trespassing on ITV Direct's business premises, a copy of which is attached as Exhibit N. On other occasions, Mr. Cushman has stated that he will do whatever it takes to bring down the company and me personally. I have also been told that he has lied to others about me and my company on many occasions.

30.     Mr. Cushman's claim that held the position of "manager" of quality control is untrue. While one of Mr. Cushman's many positions was located in the customer service area, he was only privy to a fraction of the total calls that were handled by ITV Direct's customer service representatives and salespeople. Records indicate that although ITV Direct received thousands of calls per day during Mr. Cushman's employment, he monitered as few as one or two calls per day. Thus, Mr. Cushman is not competent to testify about general practices in the call center. Moreover, as noted above, his testimony in this regard is false, as customer service and sales representatives are subject to the highest standards of quality control, as evidenced by the Contract Genie and similar controls.

31.     I personally have not made any fraudulent transfers of cash or other assets. I do not maintain any foreign or offshore bank accounts, nor have I attempted to secrete or disguise my assets in light of the FTC's investigation. The FTC's contention that I am doing so, based upon the affidavits of two former disgruntled employees, one of whom has a criminal record and has threatened me and my family with physical harm, is simply not true. I am prepared to file whatever certifications and/or financial statements the Court might require in connection with this matter.

32.     Within the last year, DMC and ITV Direct have undertaken significant efforts to improve all aspects of their operations, including sales, management compliance and customer service. In connection with this effort, DMC and ITV Direct have retained Mage, LLC, a group of business advisors who focus primarily on providing private and emerging companies with a broad range of business and organizational services. DMC and ITV Direct have always taken

11

the allegations asserted by the FTC seriously, have sought to address issues as they have been raised, and intend to do so in the future.

33.     The damage to DMC and ITV Direct and their 140 employees by allowing the relief that the FTC seeks would be devastating. The companies have significant business operations that have nothing to do with the conduct challenged by the FTC, and these activities can and will generate revenues that could be utilized to pay any ultimate judgment that the FTC obtains in this action. Neither DMC, ITV Direct nor I have destroyed documents. Also, given Healthy Solutions' and Robert Barefoot's agreements to indemnify DMC and ITV Direct, these claims, against the real wrongdoers in this matter, will be lost. I will certainly agree to conduct the operations of the business in the ordinary course and not make any non-business transfers or transactions.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 4th day of June, 2004 at Beverly, Massachusetts.

_____/s/Donald Barrett_____
DONALD BARRETT

12

E

# DISTRIBUTION AGREEMENT

This Exclusive Distribution Agreement and License ("Agreement") made and effective this 4 day of April 2003, by and between ITV Direct, Inc., a Massachusetts Corporation with a principal place of business at 100 Cummings Center Drive, Suite 506L, Beverly, Ma. 01915 ("Distributor") and Healthy Solutions, LLC, a California Limited Liability Corporation with a principal place of business at 11272 Daylilly St. Fontana, CA. 92337 ("Manufacturer"). Collectively, Distributor and Manufacturer are sometimes hereinafter referred to as the "Parties".

## WITNESSETH:

1.  Manufacturer desires to appoint Distributor, and Distributor desires to accept appointment, as a marketer, distributor and licensee of Manufacturer's product as defined and set forth herein, with exclusive world-wide rights for direct-response telemarketing generated by infomercials.

2.  Manufacturer produces and sells a vegetable/grass/algae food supplement known as "Supreme Greens with MSM", (the "Product") as formulated, packaged and described on **Exhibit A.** (the "Container") attached hereto and incorporated by reference.

3.  Distributor intends to market and sell the product through various means, including direct-response telemarketing generated by infomercials, print, radio and other advertising media and to various markets, including wholesale and retail customers.

**NOW, THEREFORE,** in consideration of the mutual agreements and promises set forth herein and other good and valuable consideration, the Parties agree as follows:

1.  Definitions:

For purposes of this Agreement, the following definitions shall apply:

**"Product"** shall mean only the product listed or defined on **Exhibit "A"** attached hereto and incorporated herein. Notwithstanding the foregoing, during the term of this Agreement, Manufacturer may, but is not obligated to, offer new or additional products not listed herein to Distributor on terms no less favorable than offered to other distributors of Manufacturer, provided that it is understood and agreed that any such new or additional products may only be incorporated into this Agreement by separate negotiation and written amendment between Distributor and Manufacturer.

**"Customer"** shall mean the purchasers from Distributor of any Products purchased by Distributor hereunder.

1

**"Distributor"** refers to ITV Direct, Inc. and any affiliated entity of Distributor that sells or otherwise distributes the Product.

**"Territory"** is "Worldwide"

2. <u>Distributorship Appointment:</u>

Subject to the terms and conditions set forth herein, Manufacturer hereby appoints Distributor, and Distributor hereby accepts such appointment, as Manufacturer's distributor and licensee for the Product in the Territory during the term of this Agreement. Manufacturer will not appoint or license any other distributor to market the Product by means of direct-response telemarketing based on infomercials, and will itself not engage in direct-response telemarketing of the Product based on infomercials. The parties understand and agree that Manufacturer intends to, and will, market, sell and otherwise distribute the Product by means other than direct-response telemarketing generated by infomercials.

3. <u>Distributor's Right to Market Products Using Its Own Name.</u>

Any Product or unit of Products purchased from Manufacturer under this Agreement may be marketed by Distributor with its trademark and/or trade name in addition to Manufacturer's trademark and/or trade name. Notwithstanding the foregoing, in all Distributor infomercials, promotions, advertisements and other literature of what ever name and/or nature, such Product and units thereof may be referred to by Distributor as "Distributor Product".

4. <u>Distributor Rights to sell to Dealers and Retail Purchasers.</u>

The rights hereunder granted to Distributor shall specifically include the right to sell to any other person or entity without restriction or limitation.

5. <u>Competing Products.</u>

Without Distributor's prior written consent, Manufacturer shall not directly or indirectly sell or otherwise distribute any vegetable/grass/algae based products which compete with the Product by means of direct-response telemarketing based on infomercials, nor shall Manufacturer license or otherwise permit others to do so.

6. <u>Referrals.</u>

Manufacturer will refer to Distributor for direct action any orders or inquiries for Product from Customers.

7. Import Licenses and Fees.

Manufacturer will ensure that all necessary import licenses and permits are obtained,
that all customs duties and other charges and fees are paid and that all other actions
required to accomplish the import of the raw materials used in the fabrication and
production of the Product purchased from it by Distributor are taken.

8. Compliance with Laws.

Manufacturer will comply with all applicable laws and regulations in importing and
producing the Product and will not violate any laws or regulations applicable to
Manufacturer or the Product including regulations promulgated by the applicable U.S.
Customs Authority and/or the Department of Commerce.

9. Expenses.

Distributor shall be responsible for all expenses incurred by it in connection with the
implementation and performance of its duties and obligations under this Agreement,
including but not limited to, advertising and promotion expenses; and any and all
sales and other taxes, or charges which may be imposed on Distributor in connection
with its business.

10. Term:

This Agreement commences on the date on which this Agreement is duly executed by
the Parties hereto and ending twelve months therefrom ("Initial Term"). This
Agreement will thereafter automatically renew from year to year unless otherwise
terminated as provided herein.

11. Rights Granted:

Manufacturer hereby grants to Distributor rights, on the terms and conditions
contained herein, to purchase, inventory, promote and resell the Product (as defined
below) in any market, state or country by the use of infomercial, print, radio or any
other media. The selection, frequency, target market and selection of media outlets
are the sole discretion of Distributor. The parties understand and agree that
Manufacturer intends to, and will, market, sell and otherwise distribute the Product by
means other than direct-response telemarketing generated by infomercials.

12. Terms of Sale:

> (a) All sales of Product to Distributor shall be made at the price of six
> dollars and fifty cents ($6.50) per Container, payable in US funds. Such
> price includes all royalties to any person or entity under this Agreement
> or any agreement(s) relating to the Product, or any other person or entity

3

and includes all other costs except those specifically defined in this Agreement.

(b) Distributor shall be responsible for the cost of shipping all orders under 10,000 units, and Manufacturer shall be responsible for the cost of shipping all orders in excess of 10,000 units, from Manufacturer's facilities to Distributor's distribution/warehouse facilities in the United States. Notwithstanding the foregoing, for all orders, regardless of size, Distributor shall pay the premium over standard land rates for orders shipped overnight, airfreight or other expedited means. Distributor may, at its option, select the method of shipping and/or the transportation company employed for such shipping. Notwithstanding the foregoing, risk of loss shall pass to Distributor when Product arrives at Distributor's facilities.

(c) Distributor shall provide, at its sole expense, labels to be affixed to each Container of the Product as shown on **Exhibit B**. attached hereto and incorporated by reference. Manufacturer shall be responsible for affixing labels to the Product. Nevertheless, Distributor may edit, alter or change the label from time to time at its expense, with such expense to include the cost of re-labeling any Product previously labeled with an outdated label.

(d) Manufacturer agrees to properly pack all items for shipment. The Parties agree that Manufacturer will package the Product in boxes of twenty four (24) containers each. However, from time to time Distributor may direct Manufacturer to alter the packaging to accommodate Distributors needs. In such an event, Distributor shall, at its own expense, supply to Manufacturer any additional packaging materials needed to make such packaging changes.

13. Manufacturer's Responsibilities.

Manufacturer shall perform the following duties pursuant to this Agreement:

(a) Manufacturer will use its best efforts to supply Distributor's requirements for the Products on the terms and conditions of this Agreement. During the term of this Agreement, Manufacturer shall be obligated to supply Distributor with its requirements subject to paragraph 14, herein, except as it is prevented from doing so as a result of the occurrence of events beyond its reasonable control, commonly referred to as "Force Majeure".

(b) Manufacturer agrees to properly pack all items for shipment. The Parties agree that Manufacturer will package the Product in boxes of twenty-four (24) containers each. However, from time to time Distributor may direct Manufacturer to alter the packaging to accommodate Distributors needs. In such an event, Distributor shall supply to Manufacturer any additional packaging materials needed to make such packaging changes.

4

(c) Manufacturer shall advise Distributor of its estimated delivery date as soon as is reasonably practicable after receipt of the order.

Notwithstanding the foregoing or anything herein contained to the contrary, if Manufacturer ceases producing Product or substantially reduces their output to Distributor, then they shall offer to transfer, sell and assign to Distributor all of its right, title and interest in and to the Product and any related proprietary or trademark rights and/or property. The price shall be determined by mutual agreement made in good faith between the Parties. In the event that the Parties can not agree in good faith to a purchase price, then this issue shall be referred to arbitration conducted within Boston, Massachusetts, in accordance with the rules and procedures of, and with an arbitrator appointed by, the American Arbitration Association. In any case, Manufacturer shall be obligated to give Distributor six (6) month's written notice prior to ceasing to produce the Product.

14. Ordering:

During the term of this Agreement, Distributor shall issue purchase orders to Manufacturer for the Products, which purchase orders shall state: "This purchase order is placed under the terms and conditions of the Distributor Agreement between Distributor and Manufacturer, dated March __, 2003". All Distributor purchase orders shall be accepted by Manufacturer in writing within three (3) days after receipt by Manufacturer and shall be deemed accepted unless objected to in writing by Manufacturer within said three (3) day period. Distributor agrees to submit all purchase orders to Manufacturer via facsimile transmission during the hours from 9:00 a.m. to 4:00 p.m. Pacific Time, Monday through Friday

(a) Manufacturer shall timely fill all Purchase Orders. For the purposes of this Agreement, timely manner shall mean delivery to Distributor of the complete Purchase Order within twenty eight (28) calendar days from the date of a Purchase Order.

(b) Inspection and acceptance of the Products shall take place at destination. Distributor may reject the Products that fail to meet the Manufacturer's formulation, or are damaged or not packaged in accordance with the terms hereof or defective in any other manner within ten (10) days after receipt. Distributor may, at its option, return rejected Products to Manufacturer for replacement at no additional expense to Distributor and Manufacturer shall pay all freight charges incurred in returning the defective Product and redelivering it to Distributor.

5

(c) Distributor may delay the delivery date or reconfigure the order by delivering a written change order notice to Manufacturer, but shall be obligated to purchase the entire order once placed. Deliveries of Products may be rescheduled without charge if Distributor's change order is received by Manufacturer at least fourteen (14) days prior to the original or the rescheduled date of delivery.

(d) Distributor may cancel any order by notice to Manufacturer within 10 days of the date that the order is placed, provided that Manufacturer shall be entitled to retain the deposit placed with the order as a cancellation charge. Distributor shall have no further liability regarding the cancelled order.

15. Payment:

Distributor will pay fifty percent (50%) of a Purchase Order by wire or certified funds at the time the Purchase Order is placed. Distributor will pay the remaining balance of the Purchase Order upon written notification from Manufacturer that the order is ready for shipping. Such notification will include the packing slip, invoice for the Purchase Order and certificate of analysis. Further, Manufacturer will deliver to Distributor by over night express service a sample of the Product ready for shipment.

16. Marketing:

(a) Distributor shall have the right to name, re-name and package the Product for sale under its own brand.

(b) Distributor will produce and pay all expenses necessary to create a twenty eight (28) minute infomercial to promote and sell the Product (the "Infomercial"). Production and editing of the Infomercial will be completed within forty five (45) days of signing of this Agreement.

1. Manufacturer shall have the obligation to provide, at no cost to Distributor, an expert spokesperson that Distributor may, at its sole discretion use in the Infomercial.

2. The spokesperson will provide expert testimonials including the description of their professional credentials as they relate to the Product.

3. The spokesperson will be available upon reasonable notice by Distributor.

4. For the purposes of this Agreement, Manufacturer designates Alex Guerreo as the spokesperson.

6

(c) From time to time Distributor may modify, alter, edit or re-create the Infomercial. The Infomercial including any subsequent versions shall at all times remain the sole property of the Distributor. Manufacturer shall not acquire any ownership, rights of any kind or nature, intellectual property rights or ownership of any form in the Infomercial under this Agreement. Manufacturer acknowledges that the Infomercial at all times remain the property of Distributor.

(d) Nothing herein contained shall give Manufacturer any right title or interest to any trademarks, service marks, trade names, logos owned or used by Distributor including but not limited to E8 Daily, Today's Health or any other name currently used or used in the future by Distributor or its affiliates.

(e) Upon signing of this Agreement and from time to time, Manufacturer will provide to Distributor written testimonials, marketing reference materials and other representations and assistance about the Product that Distributor may include in its marketing activities including filming of the Infomercial. Distributor relies solely upon the Manufacturer for the accuracy and completeness of such materials and representations.

(f) Distributor is hereby granted the right to reproduce, at its expense, Manufacturer's publicly distributed documentation relating to the Product and to use such documentation in connection with the sale of the Product. Reproductions of Manufacturer trademarks, logos, symbols, etc., shall be true reproductions and shall be done photographically.

(g) During the term of this Agreement, Distributor is hereby granted permission to use Manufacturer's trademarks and trade names in connection with Distributor's sale and advertising of the Product.

(h) The Parties further understand and agree that Manufacturer may market and sell the Product on its own, independently of the provisions of this Agreement, provided, however, that Manufacturer may not use Infomercials or allow its products to be featured in any infomercial other than that of the Distributor as part of its marketing efforts.

17. Re-selling:
Distributor may resell the Product to any person or entity at any price or in any quantity deemed appropriate by Distributor. Manufacturer shall not be entitled to any payment, commission or royalty of any kind as a result of any such re-selling.

18. Insurance:
Manufacturer shall, at its own expense, maintain a policy or policies of comprehensive general liability insurance with respect to the respective activities related to the product, including but not limited to completed operations and general

public liability with the premiums thereon fully paid on or before due date, issued by and binding upon an insurance company qualified to do business in Massachusetts. Such insurance to afford minimum protection of not less than two million dollars ($2,000,000) combined single limit coverage of completed operations and product liability or combination thereof. Distributor shall be listed as an additional insured on Manufacturers policy or policies of comprehensive general liability insurance and Manufacturer shall provide Distributor with current Certificates of Insurance evidencing Manufacturers compliance with this Paragraph. Manufacturer shall obtain the agreement of Manufacturers insurers to notify Distributor that a policy is due to expire at least (10) days prior to such expiration.

19. Non-Competition:

The intent of this Agreement is for Distributor to be a world wide distributor of the Product, with exclusive rights to market, sell and distribute the Product through direct-response telemarketing based on infomercials. Manufacturer agrees that during the term of this Agreement, including any extension thereof, that Manufacturer, its officers, agents, employees or associates will not engage or assist, directly or indirectly with any other party in the marketing or sale of the Product through direct-response telemarketing based on infomercials.

Manufacturer and Distributor acknowledge and agree that each party has a legitimate business interest in protecting its proprietary information from abuse and agrees that the restrictions set forth herein are reasonably necessary to protect such legitimate business interests.

20. Representations and Warranties:

A. Manufacturer represents and warrants and covenants:

    i)    That it has the right to enter into and fully perform this Agreement and to do so will not violate or conflict with any material term or provision of the by-laws of the Manufacturer or any agreement, instrument, statute, rule, regulation, order or decree to which Manufacturer is a party or by which Manufacturer is bound, and this Agreement has been duly authorized by and executed on behalf of, Manufacturer, in accordance with its terms:

    ii)    That all actions performed by Manufacturer in furtherance of this Agreement shall comply with all applicable state, federal rules, ordinances, rules and regulations;

    iii)    The merchantability of the Product and its fitness for the particular purpose for which it is being purchased.

8

iv)    That the Product is produced consistent with its stated formulation and specifications.

v)    That the Product composition and/or formulation does not infringe upon any proprietary or other similar rights.

vi)    Manufacturer also agrees to extend its warranty hereunder to end users of the Product.

B.  Distributor represents and warrants and covenants that:

i)    It has the right to enter into and fully perform this Agreement and to do so will not violate or conflict with any material term or provision of the by-laws of the Distributor or any agreement, instrument, statute, rule, regulation, order or decree to which Distributor is a party or by which Distributor is bound, and this Agreement has been duly authorized by and executed on behalf of, Distributor, in accordance with its terms;

ii)    All actions performed by Distributor in furtherance of this Agreement shall comply with all applicable state, federal rules, ordinances, rules and regulations; and

iii)    It will use its best efforts to market, sell and otherwise distribute the Product through various means, including, inter alia, direct-response telemarketing generated by infomercials.

21. Acts of God :

If the performance of this Agreement or any obligation hereunder, except the making of payments hereunder, is prevented, restricted or interfered with by reason of fire, flood, earthquake, explosion or other casualty or accident; strikes or labor disputes; inability to procure parts, supplies or power; war or other violence; any law, order, proclamation, regulation, ordinance, demand or requirement of any government agency; or any other act or condition whatsoever beyond the reasonable control of the affected party, the party so affected, upon giving prompt notice to the other party, shall be excused from such performance to the extent of such prevention, restriction or interference; provided, however, that the party so affected shall take all reasonable steps to avoid or remove such causes of nonperformance and shall resume performance hereunder with dispatch whenever such causes are removed.

22. Non-circumvention:

Except as otherwise authorized by this Agreement, Manufacturer shall not circumvent Distributor in the marketing, sale or distribution of the Product in any way.


23. Proprietary Information:

Manufacturer acknowledges (i) that the Telemarketing Know-How (as hereafter defined) obtained from Distributor hereunder is commercially valuable proprietary information of Distributor or others, the design and development of which has involved the expenditure of substantial amounts of money and the use of skilled development experts over a long period of time and which affords Distributor a commercial advantage over its competitors: (ii) that such Telemarketing Know-How constitutes trade secrets and confidential business information that is disclosed to Manufacturer for use on the basis of the relationship between Distributor and Manufacturer under this Agreement and is to be used only as may be expressly permitted by the terms and conditions of this Agreement; (iii) that the loss of this competitive advantage due to unauthorized disclosure of such proprietary information would cause great injury and harm. As used in the Agreement, the term "Telemarketing Know-How" means any and all information of any kind whatsoever now possessed by or known to, or hereafter developed or acquired by, Manufacturer relating to (1) the marketing, data collection and sales techniques used by Distributor, and/or marketing information of potential competitive value (e.g. customer information, promotional plans, market data, etc. developed by Distributor) (2) the techniques and methods used by Distributor for fulfilling Product Orders , (3) specific techniques, scripting and methods developed by and used within the call center of Distributor and (4) any techniques and methods developed and implemented by Distributor for selecting media markets or demographic data used in selecting media outlet to run or air the Infomercial.


24. Indemnification:

Manufacturer agrees upon demand to defend, indemnify and hold harmless Distributor, its officers, directors, employees, shareholders and affiliates from any and all claims, lawsuits, actions and proceedings in any court or by any governmental unit arising out of or relating to the Product as manufactured, its contents or impact on the health of any person.

Distributor agrees upon demand to defend, indemnify and hold harmless Manufacturer, its officers, directors, employees, shareholders and affiliates from any and all claims, lawsuits, actions and proceedings in any court or by any governmental unit arising out of or relating to Distributor's market, sales and distribution efforts pertaining to the Product and/or any post-delivery alteration or modification to the Product, including physical damage after Distributor has accepted delivery.

25. Relationship:

Each Party will act as an independent contractor under the terms of this Agreement and not as an agent or other legal representative of the other Party for any purpose, and neither Party has any right or authority to assume or create any obligation of any kind, express or implied, on behalf of the other Party to any other person.

26. Termination:

This Agreement shall terminate upon any of the following events:

      A.  Any bankruptcy, receivership, insolvency, dissolution of the other party.

      B.  Any assignment by the other party for the benefit of creditors.

      C.  Any breach of any provision of this Agreement, or any other agreement between the Parties that remains un-cured for a period of thirty (30) days after written notice provided in accordance with Paragraph 16 below.

27. Notice:

Notice shall be deemed given if sent by U.S. Mail, certified, return receipt requested to:

**Manufacturer:**
Healthy Solutions, LLC
11272 Daylilly St.
Fontana, CA. 92337

**Distributor:**
ITV Direct
100 Cummings Center Drive
Suite #506E
Beverly, Ma. 01915

28. Acknowledgement:

Each party acknowledges that no representation or statement, and no understanding or agreement, has been made, or exists, and that in entering into this Agreement each party has not relied on anything done or said or on any presumption in fact or in law, (1) with respect to this Agreement, or to the duration, termination or renewal of this Agreement, or with respect to the relationship between the parties, other than as expressly set forth in this Agreement; or (2) that in any way tends to change or modify the terms, or any of them, of this Agreement or to prevent this Agreement becoming effective; or (3) that in any way affects or relates to the subject matter hereof. Manufacturer and Distributor also acknowledge that the terms and conditions of this Agreement, and each of them, are reasonable and fair and equitable.

(a)  Manufacturer and Distributor acknowledges and agrees that each party has a legitimate business interest in protecting its proprietary information from abuse and agrees that the restrictions set forth herein are reasonably necessary to protect such legitimate business interests.

### 29. Integration and Modification:

This Agreement terminates and supersedes all prior understandings or agreements on the subject matter hereof. This Agreement may be modified only by a further writing that is duly executed by both parties.

### 30. Assignment:

The rights duties and obligations of Distributor arising under this Agreement may not be assigned without consent of Manufacturer.

### 31. Confidentiality:

The Parties agree that, except as expressly provided in this Paragraph 31, the terms and conditions of this Agreement shall remain confidential and shall not be disclosed to any third party. The Parties may disclose the terms and conditions of this Agreement to their respective employees, attorneys, accountants and tax return preparers on a need to know basis.

### 32. No Implied Waivers:

Except as expressly provided in this Agreement, waiver by either party, or failure by either party to claim a default, of any provision of this Agreement shall not be a waiver of any default or subsequent default.

### 33. Governing Law:

This Agreement shall be construed and enforced in accordance with the laws of the Commonwealth of Massachusetts.

### 34. Severability:

If any term of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, then this Agreement, including all of the remaining terms, will remain in full force and effect as if such invalid or unenforceable term had never been included.

### 35. Headings.

Headings used in this Agreement are provided for convenience only and shall not be used to construe meaning or intent.

### 36. Counter Parts:

This Agreement may be executed in counter parts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the date first above written.

Healthy Solutions                   ITV Direct, Inc.
By its President                     By its President

By: _____        By: _____
Michael Howell                    Donald Barrett
President                        President