```
                UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MASSACHUSETTS

    ITV DIRECT, INC.,
            Plaintiff
    VS                              CIVIL ACTION
                                    04-CV-10421-JLT
    HEALTHY SOLUTIONS, L.L.C. ET AL.,
            Defendants

    CAPPSEALS, INC.,
            Plaintiff-in-Intervention
    VS
    HEALTHY SOLUTIONS, L.L.C. d/b/a
    DIRECT BUSINESS CONCEPTS; ITV
    DIRECT, INC.; and DIRECT
    FULFILLMENT, LLC,
            Intervenor-Defendants

    HEALTHY SOLUTIONS, LLC, d/b/a
    DIRECT BUSINESS CONCEPTS, a
    California corporation; ALEJANDRO
    GUERRERO, an individual,
            Counterclaim Plaintiffs
    VS
    ITV DIRECT, INC., a Massachusetts
    corporation; DIRECT FULFILLMENT,
    LLC, a Massachusetts limited
    liability company, and DOES 1-10,
    inclusive,
            Counterclaim Defendants
```

```
    DEPOSITION OF GREGORY R. GEREMESZ, called by the
Plaintiff, taken pursuant to Rule 30(b)(6) and the
applicable provisions of the Federal Rules of Civil
Procedure, before Ruth E. Hulke, Certified Shorthand
Reporter No. 114893 and Notary Public for the
Commonwealth of Massachusetts, at Seyfarth Shaw, World
Trade Center East, 200 Seaport Lane, Suite 300, Boston,
Massachusetts, on Wednesday, August 18, 2004, commencing
at 9:40 a.m.


APPEARANCES:

    PETER BROOKS, ESQ., of Seyfarth Shaw, World Trade
Center East, 200 Seaport Lane, Suite 300, Boston,
Massachusetts, 02110-2028, on behalf of the Plaintiff

    BECKY CHRISTENSEN, ESQ., of Levin & O'Connor, 384
Forest Avenue, Suite 13, Laguna Beach, California, on
behalf of the Defendant.
```

3

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Gregory Geremesz | 4 | | | |

EXHIBITS

| NUMBER | | PAGE |
|---|---|---|
| 18 | 4-21-04 letter from Seyfarth Shaw | 88 |
| 19 | Letter from Levin & O'Connor | 89 |
| 20 | Barrett e-mails | 143 |
| 21 | Warner e-mails | 161 |
| 22 | Warner e-mails | 162 |

4

PROCEEDINGS

(Witness sworn)

GREGORY R. GEREMESZ, having been duly sworn, testified as follows in answer to direct interrogatories by Mr. Brooks:

Q. Would you state your full name and residential address for the record?

A. My full name is Gregory R. Geremesz. My address is 325 Emerson Street, Upland, California, 91784.

Q. Would you spell your last name?

A. G E R E M E S Z.

Q. Are you presently employed?

A. Yes.

Q. Where are you employed?

A. Health Solutions, Inc.

Q. How long have you been employed there?

A. Oh, since, I would say since its inception in July.

Q. July of?

A. 2003.

Q. What do you do there?

A. I am the vice president.

Q. What do you do?

73

1  to give Mr. Guerrero to do, to appear for the
2  infomercial.
3     Q.  What was that plan?
4     A.  I don't remember what the plan was.
5     Q.  But it was some plan to convince him to do it?
6     A.  Yes.
7     Q.  But you don't remember what the plan was?
8     A.  I don't remember what the plan was, no.
9     Q.  Then what happened?
10    A.  After a series of phone calls with Mr.
11 Guerrero, Mr. Guerrero finally agreed to appear for the
12 infomercial.
13    Q.  Who participated in those discussions with Mr.
14 Guerrero?
15    A.  I did.
16    Q.  And Mr. Howell?
17    A.  No. Just myself.
18    Q.  What do you recall discussing with Mr. Guerrero
19 that convinced him to do the infomercial?
20    A.  You know, I don't know what convinced him. I
21 don't know what was the topic or the specific that
22 actually convinced him to do it.
23    Q.  Did you have any further discussions with Mr.

74

1  Barrett or anyone else at ITV?
2     A.  Once I got the, once I got the okay from Dr.
3  Guerrero he would do it, then I had a discussion with Mr.
4  Barrett.
5     Q.  You called him Dr. Guerrero. Is he a doctor?
6     A.  I know him to be an Oriental medical doctor.
7     Q.  Do you know whether or not he's a licensed
8  Oriental medical doctor in California?
9     A.  I know he has a degree, a master's of science
10 in Oriental medicine.
11    Q.  Do you know whether he has a license?
12    A.  I do not know.
13    Q.  Do you know if there is such a thing in
14 California as a licensed OMD?
15    A.  I do not.
16    Q.  After you convinced Mr. Guerrero to do the
17 infomercial, then what did you do?
18    A.  To the best of my knowledge, I arranged a
19 conversation or a conference call with Mr. Barrett and
20 Mr. Howell.
21    Q.  And Mr. Guerrero?
22    A.  I'm not sure if Mr. Guerrero was on that phone
23 call or not.

75

1     Q.  Tell me what was said during that conversation.
2     A.  I believe what was said is that we've got Mr.
3  Guerrero's okay to move forward and he would be willing
4  to appear on the infomercial.
5     Q.  Did you then discuss some of the business
6  points for that infomercial?
7     A.  Yes. I believe so.
8     Q.  Tell me what was said about that.
9     A.  We talked about price, of what ITV would be
10 willing to pay us for a royalty for that infomercial.
11    Q.  Do you recall what was said about that?
12    A.  I recall that Donald offered to pay $6.50 per
13 bottle of Supreme Greens sold to him.
14    Q.  So that was the price for purchasing the
15 product?
16    A.  Yes.
17    Q.  Is that what you meant by a royalty?
18    A.  Yes.
19    Q.  What other business points were discussed?
20    A.  Time frame of which we were to shoot the
21 infomercial.
22    Q.  What was said about that?
23    A.  I don't recall specifically, but there were a

76

1  couple of dates in mind that I believe Donald had to
2  check to see, you know, if this week was available versus
3  that week, you know, based on his schedule.
4     Q.  Do you remember what month it was you were
5  looking at to shoot the infomercial?
6     A.  I think we were looking at March. I -- Best of
7  my knowledge, I believe we were looking at March at that
8  time.
9     Q.  So does that mean these discussions were taking
10 place in February?
11    A.  I don't remember when the discussions were
12 taking place.
13    Q.  What other business terms do you recall
14 discussing with Mr. Barrett?
15    A.  That's all I can recall as far as the business
16 terms.
17    Q.  Do you know if there were other terms discussed
18 and you just don't recall them today or is that all that
19 was discussed?
20    A.  Those are the only terms that I can recall
21 today.
22    Q.  Do you recall whether or not there was any
23 discussion of ownership of the infomercial?

77

1  A.  I don't recall.
2  Q.  Or ownership of any of the names, Supreme
3  Greens, or of the trademarks or anything like that?
4  A.  I don't recall that either in that -- I don't
5  recall that in that conversation.
6  Q.  Do you have a memory that all of the important
7  business points were agreed upon in this conversation?
8  A.  I have a memory of the price as I shared with
9  you. I don't remember at what point in what conversation
10  some of the business points took place.
11  Q.  We're talking now about a conversation you had
12  with Mr. Barrett after Mr. Guerrero had agreed to do the
13  infomercial.
14  A.  Correct.
15  Q.  My question is after that conversation did you
16  believe that all of the business terms had been agreed
17  upon?
18  A.  No.
19  Q.  Had you reached any agreement with Mr. Guerrero
20  as to the business terms that you would have with him for
21  doing the infomercial?
22  A.  I don't recall whether we had discussed that
23  yet or not.

78

1  Q.  What happened next?
2  A.  After that we started -- Mr. Howell and myself
3  started having, not conversations but -- conversations
4  with Mr. Bernabei and -- conversations with Mr. Bernabei
5  were ongoing, you know, possibly every other day, moving
6  through this entire process.
7  Q.  Can you tell me what the topics were that you
8  discussed with him? Were they business terms or?
9  A.  I don't believe they were business terms.
10  Q.  They were more setting up the infomercial?
11  A.  I believe so.
12  Q.  When was the next time you had a discussion
13  with Mr. Barrett about the business terms?
14  A.  I don't recall how many conversations I had
15  with him. The next conversation I can recall having with
16  him was just prior to flying out to produce the
17  infomercial.
18  Q.  Tell me about that conversation.
19  A.  I called Mr. Barrett and told him that we have
20  not yet received a copy of the signed agreement, and he
21  said he would have it sent over to me immediately, and
22  that was really pretty much the extent of the
23  conversation.

79

1  Q.  So there was a written agreement with ITV?
2  A.  Yes.
3  Q.  And do you recall negotiating any of the terms
4  of that agreement with Mr. Barrett?
5  A.  No.
6  Q.  Who prepared that agreement?
7  A.  ITV's attorney.
8  Q.  Prepared it?
9  A.  I believe so.
10  Q.  And was that agreement reviewed by you before
11  it was signed?
12  A.  Yes.
13  Q.  Did you have an attorney review it?
14  A.  Yes.
15  Q.  Do you recall asking for changes in the
16  agreement?
17  A.  Yes.
18  Q.  So, to your knowledge, was there some
19  negotiation between the attorneys concerning the terms of
20  that agreement?
21  A.  No.
22  Q.  So how were the terms of that agreement
23  negotiated?

80

1  A.  Mr. Howell and myself would have verbal
2  conversations with, I believe it was Mr. Tarmey. And Mr.
3  Howell and myself would have conversations with our
4  attorney who was reviewing the contract.
5  Q.  Who is Mr. Tarmey?
6  A.  I believe him to be -- I don't know
7  specifically what his role was, as an attorney for ITV or
8  as a controller for ITV or something of that nature.
9  Q.  He was with ITV?
10  A.  He was with ITV. He was the one who Donald
11  asked us to speak to in regards to this agreement.
12  Q.  So that's who you talked to about business
13  points?
14  A.  Yes.
15  Q.  Then you talked to your lawyer about those
16  business points?
17  A.  Yes.
18  Q.  And then did you see later drafts of the
19  agreement --
20  A.  Yes.
21  Q.  -- reflecting those discussions?
22  A.  Yes.
23  Q.  Show you what we have previously marked as

81

1  Exhibit 6. Mine doesn't have a sticker on it.
2      MS. CHRISTENSEN: I have it marked as
3  Exhibit 6.
4      MR. BROOKS: I have it here with a sticker on
5  it. Why don't we make sure we work off the right
6  documents.
7      Can you tell me if this is the agreement, the
8  final agreement that was made with ITV?
9      A.  It certainly appears to be.
10     Q.  As I understand your testimony, this agreement
11 went through several different iterations?
12     A.  Yes.
13     Q.  And you were represented by counsel in
14 connection with the negotiation and drafting of this
15 agreement?
16     A.  Yes.
17     Q.  Who was that lawyer?
18     A.  Randy Henderson.
19     Q.  Where is Mr. or Ms. Henderson located?
20     A.  Mr. Henderson is located in Pasadena.
21     Q.  And was hired by you to represent Healthy
22 Solutions. Is that right?
23     A.  Was hired by me to help review this contract.

82

1      Q.  Looking at the agreement, can you tell me any
2  of the different provisions that required revision during
3  the course of negotiation?
4      A.  I don't remember what points needed revision.
5      Q.  Do you remember any of them?
6      A.  Let me see. Off the top of my head, no, I
7  can't remember off the top of my head.
8      Q.  Okay. If you turn to Page 6, Paragraph 16-A,
9  it states, "Distributor," -- which means ITV, right?
10     A.  Um.
11     Q.  -- "shall have the right to name, rename and
12 package the product for sale under its own brand." Have
13 I read that accurately?
14     A.  Yes.
15     Q.  Do you recall any discussion about ITV wanting
16 the right to rename and package the product under its own
17 brand?
18     A.  No, I don't.
19     Q.  Do you remember whether that was the topic of
20 any negotiation or discussion?
21     A.  No.
22     Q.  If you turn to Page 7, Paragraph E, about the
23 middle of the page, it states, I'm going to read part of

83

1  it, "Manufacturer," -- which means Healthy Solutions,
2  right?
3      A.  Yes.
4      Q.  -- "will provide to distributor written
5  testimonials, marketing reference materials, and other
6  representations and assistance about the product that
7  distributor may include in its marketing activities,
8  including filming of the infomercial. Distributor relies
9  solely upon the manufacturer for the accuracy and
10 completeness of such materials and representations."
11 Have I read that accurately?
12     A.  Yes.
13     Q.  Can you tell me what was done by Healthy
14 Solutions to provide ITV with the testimonials, marketing
15 reference materials and other assistance?
16     A.  I believe we provided a testimonial.
17     Q.  A testimonial? Okay. Anything else that you
18 recall was provided?
19     A.  I don't really recall at this point anything
20 else.
21     Q.  Do you recall any discussion about this
22 provision in the agreement during the negotiation of the
23 agreement?

84

1      A.  No, I don't recall.
2      Q.  Did you understand from the agreement that ITV
3  was relying on Healthy Solutions for the accuracy and
4  completeness of the materials and representations that
5  were being made?
6      A.  Could you repeat that, please?
7      Q.  Did you understand from the agreement that ITV
8  was relying on Healthy Solutions for the accuracy and
9  completeness of any of the representations that were
10 being made about the product?
11     A.  No.
12     Q.  So that's something you just didn't read in the
13 agreement?
14     A.  No. I recognize that to be the case with the
15 information that I had given ITV. Not the information
16 ITV had represented. Meaning that -- Does that make
17 sense?
18     Q.  Well, not to me, but.
19     A.  Okay. Let me try it again. What I heard you
20 say was that --
21     MS. CHRISTENSEN: Don't try to recast.
22     Q.  Let me start over.
23     A.  Please.