UNITED STATES DISTRICT COURT
For the District of Massachusetts

| | |
|---|---|
| ITV DIRECT, INC.,              ) <br><br>          Plaintiff,       ) <br>     v.                     ) <br><br> HEALTHY SOLUTIONS, LLC, ET. AL., ) <br><br>        Defendants.     ) <br> _____ ) <br><br> CAPPSEALS, INC.,           ) <br><br>     Plaintiff-in-Intervention,    ) <br><br>     v.                     ) <br><br> HEALTHY SOLUTIONS, LLC, d/b/a ) <br> DIRECT BUSINESS CONCEPTS; ITV ) <br> DIRECT, INC. AND DIRECT      ) <br> FULFILLMENT, LLC.         ) <br><br>     Intervenor-Defendants.   ) <br> _____ ) | C. A. No. 04-CV10421-JLT |

**CAPPSEALS, INC.'S REPLY TO ITV'S OPPOSITION TO CAPPSEAL'S
MOTION FOR SUMMARY JUDGMENT**

**EXHIBIT 2**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | |
| ) | Civ. No. 04-11136-GAO |
| DIRECT MARKETING CONCEPTS, INC., et al., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF FEDERAL TRADE COMMISSION'S**
**MOTION FOR A MODIFICATION OF THE JUNE 23, 2004 PRELIMINARY**
**INJUNCTION AS TO DEFENDANTS DIRECT MARKETING CONCEPTS, INC.,**
**ITV DIRECT, INC., AND DONALD W. BARRETT**
**AND REQUEST FOR EXPEDITED TREATMENT**

## I.    INTRODUCTION

Plaintiff Federal Trade Commission ("FTC" or "Commission") submits this

memorandum in support of its motion to prevent defendants Donald W. Barrett ("Barrett"),

Direct Marketing Concepts, Inc. ("DMC"), and ITV Direct, Inc. ("ITV") from continuing to harm

consumers by disseminating false and unsubstantiated advertising.  Specifically, by continuing to

produce and disseminate new infomercials for dietary supplements such as "Sea Vegg" and

"Renuva" that make false or unsubstantiated health and disease claims, Barrett, DMC, and ITV

(hereafter "Defendants") have not only continued to engage in fraudulent practices, but also have

breached their commitment to this Court that they would no longer run infomercials for

ingestible products.  Defendants' conduct defeats the underlying purposes of the Court's June 23,

2004 Preliminary Injunction as to Defendants Direct Marketing Concepts, Inc., ITV Direct, Inc.,

and Donald W. Barrett ("Preliminary Injunction") and should be halted.

Additionally, Defendants have: 1) continued to use the faux talk show format about which the Court previously expressed substantial concern; 2) failed to ensure that their sales representatives comply with the Preliminary Injunction by providing the required disclosures to consumers before signing them up for continuity packages; and 3) allowed distributors to establish websites that make similar disease claims for their products. Defendants are also actively seeking to expand these distributor networks. In short, despite having had every opportunity over the past nine months to clean up their business practices, Defendants have chosen to continue misleading and defrauding consumers.

Accordingly, the Commission requests that the Court find that the public injury resulting from Defendants' continued deceptive practices warrants further action to protect consumers during the pendency of this litigation. Specifically, the Commission requests that the Court modify the Preliminary Injunction to appoint a receiver over DMC and ITV for the remainder of the litigation.

## II.    STATEMENT OF FACTS

### A.    Background

On June 1, 2004, the Federal Trade Commission commenced this case by filing a complaint alleging that Defendants (and others named in the complaint) were making false and unsubstantiated disease prevention, treatment, and cure claims in advertising for two dietary supplements, Coral Calcium Daily and Supreme Greens; were utilizing a deceptive format in their infomercials for those products; and were billing consumers' credit cards without authorization. The Commission simultaneously moved for a temporary restraining order enjoining DMC, ITV and Barrett from, *inter alia*, representing that any product, program, or

service "can prevent, treat, or cure any disease," from using deceptive formats that represented to consumers that their infomercials were something other than paid advertising, and from selling products through continuity programs without first obtaining consumers' express informed consent.

Defendants' opposition to the Commission's request for preliminary relief ultimately included three affidavits by Barrett (the President of both DMC and ITV), the third of which stated that:

> In light of the FTC's continuing concerns over the Supreme Greens with MSM infomercial and other infomercials involving ingestible products, *ITV determined several weeks ago that it would no longer produce or air any infomercials involving ingestible products.* As of the date of this affidavit, I am unaware of any infomercial for any ingestible product that is being aired by ITV or DMC, and ITV, DMC and *I have no plans to run any such infomercial in the future.*

Declaration of Christina E. Turner, Attachment 20 at ¶ 12 (emphasis added) ("Turner Dec.") (Exhibit A to the Commission's Motion).[1]

In response to the Commission's allegations and supporting evidence that Defendants caused consumers to incur unauthorized charges on their credit or debit cards by enrolling them in autoship (*i.e.*, continuity) programs without their consent, Barrett informed the Court that in late 2003 – after the Commission's investigator had been placed on an autoship program without her prior consent – ITV had implemented a computerized system called "Contract Genie" that

---

[1] Although the Commission did not know it at the time, internal company documents show that this statement raised some eyebrows within ITV. Specifically, one day before Barrett's Supplemental Affidavit was submitted to the Court, an ITV employee wrote to ITV's Director of Operations (who happens to be Donald Barrett's sister), that "[Y]ou might want to be careful about this statement in light of the fact that ITV's Vice President of Business Development is in current negotiations for an ingestible product. Clearly the policy change regarding products of interest to ITV has not been communicated throughout the organization." Turner Dec., Att. 30.

"records each conversation and confirms that the terms of the autoship program are clearly communicated and affirmative assent is obtained." *Id.*, Att. 19 at ¶ 21. The strong implication of his statement was that unauthorized autoships could not occur anymore.

On June 23, 2004, the Court issued the Preliminary Injunction, in which it specifically found that "Defendants have made the claims that Supreme Greens can cure, treat or prevent cancer, diabetes, arthritis and heart disease" and that the Commission "is likely to prevail in demonstrating the falsity and/or lack of substantiation of these claims. . . ." Preliminary Injunction at 11. The Court therefore enjoined Defendants from representing that "Supreme Greens with MSM or any substantially similar product . . . can prevent, treat, or cure any disease unless, at the time the representation is made, the Defendants possess and rely upon competent and reliable scientific evidence that substantiates the representation." *Id.* at 17-18.[2]

With respect to the format of the Supreme Greens infomercial, the Court found that the ad featured Barrett and Supreme Greens developer Alejandro Guerrero "in a setting that mimics a conventional talk show. . .." *Id.* at 2. The Court also concluded that "the airing of the infomercial for Supreme Greens in a talk-show format with only limited disclaimers before and after the broadcast is likely to mislead consumers and constitute a deceptive act or practice in violation of Section 5." *Id.* at 12. Accordingly, it prohibited the Defendants from "creating, producing, selling, or disseminating . . . [a]ny advertisement that misrepresents, expressly or by implication, that it is not a paid advertisement." *Id.* at 18.

---

[2] A "substantially similar product" is defined as any dietary supplement containing one or more of the ingredients contained in the proprietary blend of Supreme Greens with MSM. Preliminary Injunction at 15.

Finally, the Court found that Defendants had caused consumers to incur unauthorized charges on their credit cards by enrolling them without their prior approval in an automatic shipment program (*i.e.*, continuity program or "autoship" program) for a supplement called E-8 Daily when they ordered Supreme Greens. *Id.* at 8.[3] The Court found that "defendants maintain they have taken steps to prevent recurrence of such unauthorized charges." *Id.* The Court enjoined them from selling products through continuity programs without "first obtaining the express, informed consent of consumers" to participate in the program, and ordered them to disclose all material terms of the program. *Id.* at 20-21.

## B.    Overview of Defendants' New Infomercials

Since the issuance of the Preliminary Injunction, Defendants have produced or disseminated at least five new infomercials. Four of those infomercials promote the sale of ingestible products through health claims. Most important, at least three of the four infomercials for ingestible products continue Defendants' practice of making outrageous disease prevention or treatment claims or health benefit claims.[4] Several of the infomercials also use the same faux

---

[3] Since the issuance of the Preliminary Injunction, the Commission has had access to Defendants' database and has discovered that it contains many thousands of records referencing customers complaining about being placed on Defendants' autoship programs without their authorization. Turner Dec., ¶ 40 and Att. 31. Such an astonishing number of complaints makes it very clear that Defendants' unauthorized billing practices were deliberate, and not atypical or random occurrences.

[4] The fourth such infomercial, Dr. Day's Home Juice Bar, began airing in late January 2005, according to the Infomercial Monitoring Service. Turner Dec., ¶¶ 7, 15 and Att. 6. The program promotes three products – Barley Greens, Beta Carrot, and Beta Beet – which come as a powder that is mixed with fluids and drunk, or as a capsule, and purportedly counter the effects of eating conventionally-produced, nonorganic, pesticide-laden food. *Id.* at ¶ 14 and Att. 1 (Dr. Day media file), 11. The infomercial features Barrett and the marketer of these products, Dr. Lorraine Day. Although the infomercial uses similar scare tactics about illness, the direct disease prevention and treatment claims about the product are more vague.

This is not Defendants' first infomercial with Dr. Day. In October 2004, the National

talk show format as the Supreme Greens infomercial, with Barrett "interviewing" his "guest."

        1.      "Sea Vegg" [False claims and deceptive format]

Defendants waste no time making disease treatment and prevention claims in this

infomercial, which also uses the talk show format and provides a toll-free number for consumers

to purchase Sea Vegg, a dietary supplement containing sea vegetation.  Indeed, the claims begin

with Barrett's introduction of his "guest":

> DONALD BARRETT:  This half an hour, again, we're going to be talking about health.  If you're out there and you suffer from cancer, arthritis, diabetes, fibromyalgia, really any chronic degenerative disease, or if you don't want to get a chronic degenerative disease, this is a show you're not going to want to miss.  On our show today we have Scott Kennedy, who's a firm believer that most chronic degenerative diseases can be prevented and reversed from nutrients that come from the ocean.  We have a very controversial show, so stay with us.

Turner Dec., ¶ 6 and Att. 1 (Sea Vegg media file), 2 at 3-4.[5]  The infomercial then states that

eating seaweed has made Mr. Kennedy so healthy that he no longer carries health insurance, that

seaweed's benefits are scientifically proven, that seaweed helped Mr. Kennedy's mother's

multiple sclerosis, and that eating seaweed is the single most important thing people should do if

they want to live a "healthier, happier, disease-free life."  *Id.*, Att. 2 at 33.  According to the

Infomercial Monitoring Service ("IMS"), which monitors 39 national cable stations and reports

the 100 most frequently aired infomercials each month, Sea Vegg (which began running on

---

Advertising Division of the Better Business Bureau – the advertising industry's self-regulatory forum – concluded that an ITV infomercial featuring Barrett and Dr. Day that promoted a videotape by Dr. Day entitled "Cancer Doesn't Scare Me Anymore" made unsubstantiated claims, including the claim that "chemotherapy doesn't work for anybody." Turner Dec., Att. 29.

[5] Notably, Barrett's opening lines in this infomercial are remarkably similar to those he used to open the Supreme Greens infomercial:  "Dr. Guerrero claims that most chronic degenerative diseases -- such as cancer, arthritis, diabetes, even the number one killer out there, heart disease -- can and are being cured and there are natural healing techniques being suppressed in this country.  We have a very controversial show, so stay with us."  Complaint Ex. 6 at 3-4.

February 2, 2005) was ranked number 67 in February 2005, number 28 in March 2005, and number 26 in April 2005. *Id.*, ¶ 9 and Att. 3-5.

2.    "Renuva"  [False claims and deceptive format]

In January 2005, ITV Direct began purchasing air time for a new client: the Renuva Anti-Aging System. Turner Dec., ¶ 13 and Att. 10.[6] The Renuva system consists of two products – a sublingual spray and a powder that is mixed into a beverage and ingested. *Id.*, Att. 9 at 15-16. The infomercial makes numerous claims about Renuva's ability to stimulate the body's production of human growth hormone ("HGH") and about the benefits that result from those increased HGH levels, including increased energy, improved memory and clarity of thought, and thicker hair. *Id.* at ¶ 12 and Att. 8, 9 at 5, 16-17. The Infomercial Monitoring Service reports that the Renuva infomercial was the 53rd most frequently aired infomercial in January 2005, number 19 in February 2005, number 44 in March 2005, and number 39 in April 2005. *Id.* at ¶ 10 and Att. 3-6. Barrett does not appear in this infomercial, which features celebrity George Hamilton and former Olympic gymnast Cathy Rigby. *Id.*, Att. 9 at 7.

3.    "RegenaLife" [Suspect claims and deceptive format]

The RegenaLife infomercial, which appears to have begun running on or about February 26, 2005 (Turner Dec., ¶ 19 and Att. 4), also uses the faux talk show style to promote a multi-ingredient dietary supplement. *Id.* at ¶ 18 and Att. 1 (RegenaLife media file), 13. Barrett opens this infomercial by telling viewers that they are probably going to die from one of several named diseases, unless they follow the advice of his guest:

DONALD BARRETT:  Let's face it, most of us don't eat right, yet we know we

---

[6] Defendants apparently also provide credit card processing services for Renuva orders and ship product to customers. Turner Dec., ¶ 25.

need to. The vast majority of people out there are going to die of some chronic degenerative disease, such as cancer, diabetes, arthritis, even heart disease. These diseases can be directly related to what we eat and what we're exposed to in our environment. . . . The fact of the matter is, folks, most of us are not going to change how or what we eat.

My next guest says there's something out there that's easy, simple and effective that we can do and he can prove it.

*Id.*, Att. 13 at 3-4.

4.    "Aquasana" [Deceptive format]

Finally, ITV's infomercial for the Aquasana water filter system, which IMS first detected running on January 18, 2005 (Turner Dec., ¶ 17 and Att. 6) also uses ITV's standard faux talk show format, including an ominous warning in Barrett's opening statement about the "poisoning of our water supply" and the "controversial" nature of the programming viewers are about to see. *Id.*, Att. 12 at 3. The infomercial then goes on to link the deterioration of the American water system and the rise of disease, and to tout the ability of the Aquasana system to remove chemical contaminants from tap and shower water.

## III.    DEFENDANTS' NEW INFOMERCIALS MAKE FALSE OR UNSUBSTANTIATED HEALTH CLAIMS

### A.    At Least Two of Defendants' New Dietary Supplement Infomercials Make False or Unsubstantiated Disease and/or Health Claims

1.    Sea Vegg

Defendants' infomercial represents that Sea Vegg, a product containing dried seaweed, can prevent or treat serious degenerative diseases, including cancer, arthritis, diabetes and fibromyalgia.[7] The Sea Vegg infomercial includes the following statements:

_____

[7] Trial courts, as finders of fact, may draw reasonable inferences and make factual determinations as to both the express claims and the implied claims that are conveyed by the face

DONALD BARRETT: . . . If you're out there and you suffer from cancer, arthritis, diabetes, fibromyalgia, really any chronic degenerative disease, or if you don't want to get a chronic degenerative disease, this is a show you're not going to want to miss. On our show today we have Scott Kennedy, who's a firm believer that most chronic degenerative diseases can be prevented and reversed from nutrients that come from the ocean. We have a very controversial show, so stay with us.

***

SCOTT KENNEDY: [The drug companies] come right out and say they want to turn cancer into a chronic and manageable disease. No, thank you. I don't want to turn cancer into a manageable disease. I want it out of my life, out of family's life and I want it to go away like it used to be a way and --

DONALD BARRETT: But have you seen that happen? You've been studying the problems for years.

SCOTT KENNEDY: I have seen it --

DONALD BARRETT: Have you seen that happen?

SCOTT KENNEDY: I've seen the Japanese. If anybody just goes online or in the library, they can study it. For some reason, the information is curiously missing from this country.

DONALD BARRETT: You're saying the information is being suppressed in this country?

SCOTT KENNEDY: It's not being given to us by health professionals who are drug-based health professionals. . . .

***

SCOTT KENNEDY: . . . I haven't had a cold, flu or fever in -- since 1992. I stopped carrying health insurance. I have an accident policy. Why? Because my pH is balanced with seaweed. . . .

***

DONALD BARRETT: No health insurance?

---

of an advertisement. *See FTC v. Febre*, No. 94 C 3625, 1996 WL 396117, at *4 (N.D. Ill. July 3, 1996) (magistrate judge recommendation), *adopted by* 1996 WL 556957 (N.D. Ill. Sept. 27, 1996), *aff'd*, 128 F.3d 530 (7th Cir. 1997). *See also Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 652 (1985); *FTC v. Gill*, 71 F. Supp.2d 1030, 1043 (C.D. Cal. 1999), *aff'd*, 265 F.3d 944 (9th Cir. 2001).

SCOTT KENNEDY:  In my lifetime -- in 20 years, everybody's gotten sicker and I've gotten healthier and I'm a proponent for eating seaweed every day in America and we're the only company that does this responsibly, has the science behind it and I've been at it 21 years.

***

SCOTT KENNEDY: . . . [i]n the meantime, all I want to do is get seaweed to your viewers, help people get healthier, like I did my mother and my sisters and my friends and my family and help their pets and help their children.

***

DONALD BARRETT:  If somebody's sick, if they have some chronic degenerative disease, cancer, arthritis, diabetes, fibromyalgia, all the diseases that are running rampant right now --

SCOTT KENNEDY:  Um-hum.

DONALD BARRETT:  -- should they take more than three capsules a day?

SCOTT KENNEDY:  Let me put it in perspective for you.  The Japanese people, as a culture, from studies -- and some of the studies are over here and over here -- eat an average of seven grams a day.  That's over a bottle of this.  So, don't worry about OD'ing.  And if they have diseases or they have something they're concerned with, they should consult their physician.

***

DONALD BARRETT:  Unfortunately, we're running out of time.  We will have you back.  But if there's one thing that somebody can do out there to live a healthier, happier, disease-free life, what would you recommend?

SCOTT KENNEDY:  If there's one thing anyone can do every day that can have the most beneficial impact on their health and the possibility of regeneration it's eating whole marine algae, especially blends of it like we have in our Sea Vegg every single day. ...

DONALD BARRETT:  You sound so confident.

SCOTT KENNEDY:  Well, I've been on it for 20 years and I've seen so much.  I can't even explain what I've seen.  I've got testimonials and letters and tapes. You wouldn't believe what I've heard.  In fact, I thought it was miraculous when it helped my mother's MS.  But what I've seen since then, you wouldn't believe that one type of supplement could do all these things. . . .

Turner Dec., Att. 2 at 3, 10-11, 20, 26, 28, 30, 33-34.

Defendants even go so far as to represent that scientific research establishes Sea Vegg's efficacy in disease prevention:

> DONALD BARRETT: But there's scientific research to back up what you're saying?
>
> SCOTT KENNEDY: I wouldn't be on your show today if I didn't have that research. In fact, the science is king with me. It's not my opinion. I'm just the messenger, and I'm not here to prove that seaweed works. It's already been proven.

*Id.* at 19.

Sea Vegg also purportedly enables users to lose weight effortlessly, by reducing food cravings:

> DONALD BARRETT: Weight loss? Fifty percent of our population is now considered obese --
>
> SCOTT KENNEDY: Um-hum.
>
> DONALD BARRETT: -- by medical standards.
>
> SCOTT KENNEDY: Yes.
>
> DONALD BARRETT: Could this help people lose weight?
>
>                            \*\*\*
>
> SCOTT KENNEDY: The answer is this, when people take Sea Vegg every day, it will normalize their weight and begin to normalize their thyroid. People that are too underweight will gain weight and women that are overweight will begin to lose some pounds and inches right away without even trying.
>
> DONALD BARRETT: So, by taking the Sea Vegg, it will bring you to your -- the weight that you should be at?
>
> SCOTT KENNEDY: Yes, despite your eating habits. Then your cravings will begin to change and your weight will change and sugar -- your cravings for sugar and certain things that aren't good for you –

*Id.* at 32-33. Indeed, the combination of disease prevention and treatment claims and weight loss claims is strongly reminiscent of the Supreme Greens infomercial.

These claims are not substantiated by competent and reliable scientific evidence. The Commission has provided the declaration of Christine Skibola, Ph.D., that expresses the well-supported opinion that the above claims are either false or not supported by reliable scientific evidence. Declaration of Christine Skibola, Ph.D., In Support of The Federal Trade Commission's Motion for a Modification of the June 23, 2004 Preliminary Injunction, ¶ 27 (Exhibit B to the Commission's Motion). Dr. Skibola is a Research Toxicologist in the Molecular Epidemiology and Toxicology Laboratory, which is in the Department of Environmental Health Sciences at the University of California at Berkeley's School of Public Health. *Id.* at ¶ 1. She has conducted research into the health benefits of seaweed and is familiar with the existing research in this area. *Id.* at ¶¶ 15, 19, 22-23. Although seaweed is a nutritious food that contains fiber, minerals, and other beneficial nutrients, Dr. Skibola states that there is no reliable scientific evidence to support the strong claims in the Sea Vegg infomercial – namely that any varieties of seaweed, including those in Sea Vegg, treat or prevent cancer, fibromyalgia, diabetes or arthritis or cause weight loss. *Id.* at ¶¶ 20-25.

Indeed, the limited epidemiological studies – which in and of themselves do not prove treatment efficacy or prevention – suggest mixed results, with some finding that seaweed consumption is associated with lower rates of colorectal and endometrial cancers, but other studies finding that it is associated with higher rates of prostate and stomach cancer. *Id.* at ¶ 21. As for weight loss, in one reported 2-year study, no meaningful weight loss was observed in twenty-four moderately overweight women who took a kelp-lecithin-vitamin supplement for over two years. *Id.* at ¶ 25. At best, there are some studies of seaweed finding *limited* positive health benefits. *Id.* at ¶ 20. According to the Commission's expert, therefore, there is no reliable, scientific evidence supporting Defendants' claims for Sea Vegg.

2.    Renuva

The infomercial presents Renuva, a system of ingestible products, as the solution to the

problem of aging:

> MALE ANNOUNCER: [N]ow, you can experience more energy and the
> phenomenal wonders of increasing your levels of HGH.
>
> Introducing the Renuva System, a revolutionary two-part system that could turn
> back the clock five, 10, even 15 years or more on the way you look and feel,
> guaranteed.  And it's so easy.

Turner Dec., ¶¶ 11, 12 and Att. 8, 9 at 14-15.  The problem, according to the infomercial, is that

our body's production of growth hormone drops substantially in adulthood, causing our bodies to

age:

> **ON SCREEN:  Hgh**
> **Master Hormone**
>
> MALE ANNOUNCER:  Because it affects virtually every cell in your body, it has
> been called the master hormone.
>
> **ON SCREEN:  Hgh is Vital**
> **- Energy**
> **- Cell Repair**
> **- Brain function**
> **- Muscle growth**
> **- Bone strength**
> **- Healing**
> **- Metabolism**
>
> ***
>
> MALE ANNOUNCER:  Unfortunately, in our twenties, our level of HGH begins
> to plummet so that by age 60, we've lost 80 percent or more.  And with this loss,
> the things we hate about aging start to happen, loss of energy, sagging skin,
> weight gain, loss of sex drive, motivation, memory.

Id., Att. 9 at 30-31.  The ad goes on to tout the proven benefits of human growth hormone:

> **ON SCREEN:  Research on Hgh**
> **Most studies mentioned were conducted with medically prescribed injectible**
> **HGH.**

- **Increased Energy and Stamina**
- **Decreased Weight and Body Fat**
- **Restored Muscle Mass**
- **Reduction of Aches and Pains**
- **Improved Quality of Sleep**
- **Thicker Skin, Fewer Wrinkles**
- **Increased Calmness, Less Stress**
- **Improved Memory**
- **Increased Sexual Drive**
- **Faster Recovery from Exercise**
- **Improved Cholesterol Levels**
- **Enhanced Metabolism**
- **Better Ability to Concentrate**
- **Improved Vision**
- **Improved Immune System**

*Id.* at 31-32. The Renuva system purportedly provides those same benefits:

> GEORGE HAMILTON: [W]hen you take the nutrition base of the Renuva
> Generator and add that to the activating process of Renuva Infuser, you get what
> could be the simplest, most effective, non-prescription way to experience the
> wonders of increased HGH levels ever developed.
>                                   \*\*\*
> **ON SCREEN:  Dr. Alfred Garbutt, D.C.**
> **Chiropractor/Clinical Nutritionist**
> **Special TV Offer**
> **Renuva**
> **1-800-555-5555**
> DR. ALFRED GARBUTT, D.C.:  This system is real.  You know, like you said,
> there's science behind it that really backs up how it works.
>
> DR. DOUG FRIESEN:  People can literally look forward to a 10 to 20-year
> change of how they look and how they feel.

*Id.* at 35-36.  And celebrity hosts George Hamilton and Cathy Rigby and consumer

testimonialists speak glowingly about their experiences using Renuva:

> GEORGE HAMILTON: . . . It just makes you feel terrific. I feel like a racing
> machine, a lean, mean racing machine.
>                                   \*\*\*
> CATHY RIGBY:  I don't think I've ever felt better in my life.  I really feel the
> difference in my body.  I really feel the difference.  It's great to feel good.  It's
> great to feel great at 50.

***

KAREN SCOTT:  A huge difference in my life.

FRANK BAKER:  One of the most important things I've ever done.

CYNTHIA DOWNEY:  Energy.

PATTI NICKLAUS:  Sleeping better.

DANIEL TREVOR:  Thinking is so much more clear.

LINDA MARTIN:  My memory is a lot better.

AL BEARD:  Body's more fit.

KATHY BORNSTEIN:  My hair is thicker.

PETER MYERS:  Look younger.

TERRY LAWLER:  Lost the pot belly.

***

BRUK VANDEWEGHE:  Immediately, the first thing that I noticed is that I had a lot more energy.  I also slept a lot better, which made me a lot more motivated to go work out. . ..  My skin has gotten a lot clearer.  I've been a lot more mentally focused.  I found that I wasn't getting as sick as often as other people around me. Usually, I get colds really easily, and since I've been on the Renuva System, I don't get sick as much.

*Id.* at 5, 16-17, 44-45.

Again, as is the practice of Barrett, DMC and ITV, these claims are not supported by

competent and reliable scientific evidence.  According to Mary Lee Vance, M.D., a Professor of

Medicine and a Professor of Neurosurgery at the University of Virginia Medical School, in order

to show that a product or treatment increases the body's growth hormone ("GH") levels,

qualified experts would require a double-blind, placebo-controlled clinical trial of human

subjects that measured serum GH and insulin-like growth factor-1 ("IGF-1"), the "effector" of

GH action.  Declaration of Mary Lee Vance, M.D., In Support of The Federal Trade

Commission's Motion for a Modification of the June 23, 2004 Preliminary Injunction, ¶ 12 (Exhibit C to the Commission's Motion).[8] Additionally, to show that a product or treatment produces benefits such as increased energy and stamina, decreased weight and body fat, increased muscle mass, reduced aches and pains, improved quality of sleep, younger, thicker skin, and fewer wrinkles, improved memory, and increased sex drive, experts would require a long term, double-blind, placebo controlled clinical trial of an adequate number of human subjects based on the listed outcome measures. *Id.* at ¶ 13.

Dr. Vance is not aware of any clinical trial evidence showing that a product containing the ingredients in either Renuva product, when used by healthy adults, will increase GH or IGF-1 levels and/or produce increased energy and stamina, decreased weight and body fat, increased muscle mass, reduced aches and pains, improved quality of sleep, younger, thicker skin, and fewer wrinkles, improved memory, or increased sex drive. *Id.* at ¶¶ 16-17. Indeed, as explained in more detail in her Declaration, there are a few small studies on the benefits of *injected* GH that show mixed results at best. *Id.* at ¶¶ 9, 17. Studies of the effect of injected GH administration cannot be compared to GH that is ingested orally, however, because growth hormone is broken down (degraded) by gastric acid, and thus oral GH or purported GH stimulants supposedly contained in Renuva would not be expected to be effective. *Id.* at ¶ 10. Thus, as is the case with Sea Vegg, Defendants claims for Renuva are not substantiated by reliable scientific evidence.

---

[8] Dr. Vance is an expert in the areas of endocrinology, including growth hormone (GH) secretion and the analysis of clinical trials to evaluate potential mechanisms to increase GH levels in adults. Vance Dec., ¶ 3.

**B.    Defendants' Infomercial for the Ingestible RegenaLife Product Also Makes Suspect Disease and Health Claims**

Because of the time required to locate and hire experts and the fact that the Regenalife infomercial just started running in March 2005, the Commission has submitted expert declarations addressing only the Sea Vegg and Renuva infomercials.  The Commission has concerns, however, about the validity of the disease prevention or treatment claims made for this latest dietary supplement, a cocktail consisting of, among other things, noni, wolfberry extract, raspberry, clove, kale, spinach, garlic, broccoli, beet, and alfalfa.  Turner Dec., Att. 13 at 22. Notably, as discussed below, Barrett takes a particularly commanding role in this infomercial and repeatedly asks his "guest" questions relating directly to disease treatment.

In the infomercial, Dr. Duarte tells Barrett how he transformed himself from a sickly child who faced a lifetime of taking various medications to a healthy adult.  *Id.* at 4-5.  He then goes on to assert that conventional medicine kills nearly 800,000 people each year – more than die from either cancer or heart disease – so there is a need for "reliable alternatives that people can use for themselves that are cost-effective."  *Id.* at 7.  In other words, his dietary supplement product will help prevent people from getting the diseases that will force them to turn to dangerous conventional medicine.  Furthermore, a superscript that says **"Can the body be healed using all-natural supplements?"** appears on screen throughout most of the infomercial. *Id.*, Att. 1 (RegenaLife media file), 13 *passim*.  Barrett repeatedly steers the discussion to disease issues by asking Dr. Duarte questions such as "Now, Dr. Duarte, is there any research out there that Regenalife can actually help people with chronic degenerative diseases?" and "Dr. Duarte, here's the question, if I start taking RegenaLife, am I going to feel a difference?  Because I don't feel sick now."  *Id.*, Att. 13 at 15, 17.  Again, it is difficult to believe that competent and reliable

scientific could substantiate that Regenalife can actually cure or prevent serious, chronic diseases.

## IV.    DEFENDANTS ARE ALSO ENGAGING IN OTHER BUSINESS PRACTICES THAT ARE PERMEATED BY FRAUD

In addition to their continued dissemination of false or unsubstantiated health claims for dietary supplements, Defendants have also continued since the issuance of the Preliminary Injunction to engage in other conduct that misleads or otherwise injures consumers.[9]

### A.    Continued Use of Misleading Talk Show Format

Despite the Court's clear concern about their use of a format that "mimics a conventional talk show," Defendants' newly-produced infomercials for Sea Vegg, Aquasana, and RegenaLife all use that same format, with Barrett "interviewing" his "guest," much as the host of a conventional talk show would do. Indeed, Barrett actually refers to this format as "Larry King Live" style – an obvious reference to the well known talk show host. Turner Dec., ¶ 35 and Att. 26. Defendants' inclusion of a few additional disclaimers in these latest infomercials does not alter the misleading nature of their programming.

Barrett further strengthens this misleading impression by telling viewers that they are about to see a "controversial show" about a health topic of tremendous importance and by introducing as his "guest expert" on that topic a person who is actually the marketer of the product being promoted. For instance, the Aquasana infomercial opens with the following

---

[9] The Commission could have asked the Court to find Defendants in contempt of the Preliminary Injunction's formatting and autoship requirements but ultimately decided – because a finding of contempt would not have addressed all the ways in which Defendants continue to injure consumers – to ask the Court to address all of Defendants' fraudulent practices comprehensively through the instant motion seeking an order modification to appoint a receiver.

statement:

> DONALD BARRETT:  Hello, my name is Donald Barrett, and welcome back to a
> very controversial edition of ITV.  Today we're going to be talking about the
> poisoning of our water supply.  On our show today, you'll learn why our drinking
> and bathing water is causing millions of Americans to become sick and riddled
> with disease.. . . We have a very controversial show.  Stay with us.
>
> **ON SCREEN: Today's Guest:  Charles Strand, Water Quality Expert**
> **Is Our Drinking Water Poisoning Our Society?**
>
> DONALD BARRETT:  Charles, thanks for being my guest.
>
> CHARLES STRAND:  Thanks for having me.

*Id.*, Att. 12 at 3-4.  In fact, Charles Strand is the President of Sun Water Systems, Inc., the

company that markets the Aquasana filter system.  *Id.* at ¶ 37 and Att. 28.

Defendants used the same approach in the Sea Vegg infomercial:

> DONALD BARRETT:  On our show today we have Scott Kennedy, who's a firm
> believer that most chronic degenerative diseases can be prevented and reversed
> from nutrients that come from the ocean. We have a very controversial show, so
> stay with us.  Scott Kennedy, welcome to the show.
>
> SCOTT KENNEDY:  Nice to be here, Donald.  Thank you very much for having
> me.

*Id.*, Att. 2 at 4.  Kennedy is the applicant of the trademark for Sea Vegg and the registrant of the

trademark for Farmasea (the company that owns the Sea Vegg product).  *Id.*, ¶ 36 and Att. 27, 16.

These tactics, as the Court previously found with respect to the Supreme Greens

infomercial, are likely to mislead consumers about the fundamental nature of Defendants'

programming.  Indeed, consumers do not expect advertisements to be controversial; controversy

– and guests – are for conventional talk shows, not for selling questionable disease cures.

Finally, as he did with Supreme Greens, *see* Complaint, Ex. 6 at 29, Barrett adds one

additional element to this illusion of independent programming by telling consumers that he has

worked out a special deal for ITV viewers who are interested in the product touted by his

"guest":

> DONALD BARRETT: We only have a minute left, but if you're watching right now and you'd like some more information on the Aquasana water filtration unit, whether it's the shower unit or the countertop water filter, pick up the phone and call the number on the screen. As always on ITV, we've worked out a special arrangement with our guest, so when you do call, mention ITV and you will receive a substantial savings off the regular price of the units. . . . It's been a very exciting edition on ITV, I want to thank you for being on our show.

> CHARLES STRAND: Thanks, Donald.

> DONALD BARRETT: My name is Donald Barrett and we'll see you on another edition of ITV. Thanks for being with us.

Turner Dec., Att. 12 at 33-34.

> DONALD BARRETT: If you're watching right now and you'd like some more information on Dr. Alex Duarte or the Regenalife product that he's been talking about, pick up the phone and call the number on the screen. As always on ITV, we've worked out a special arrangement with our guest, so when you do call, mention ITV and you will receive a substantial savings off the regular price of the product.

> And for a limited time we're making available Dr. Duarte's special health reports. There's actually five of them in there and you'll get them when you order Regenalife. So, pick up the phone and give us a call.

> Now, Dr. Duarte, is there any research out there that Regenalife can actually help people with chronic degenerative diseases?

*Id.*, Att. 13 at 14-15.

### B.    Failure to Supervise Sales Representatives' Compliance with the Preliminary Injunction's Continuity Program Requirements

The Preliminary Injunction enjoined Defendants from selling products through continuity

programs without "first obtaining the express, informed consent of consumers" to participate in

the program, and set forth in clear and unambiguous terms all of the information that Defendants'

sales representatives needed to give consumers before signing them up for continuity programs.

Preliminary Injunction at 20-21. Defendants have failed, however, to ensure that their sales representatives comply with these mandates, as evidenced by four recent undercover telephone calls made by FTC investigator Christina Turner.

On March 2, 2005, Ms. Turner made an undercover call to ITV using the phone number shown during the Sea Vegg infomercial. Turner Dec., ¶ 20 and Att. 14. During that call, Ms. Turner (using an undercover name[10]) reluctantly agreed to purchase three bottles of Sea Vegg after being told by ITV's sales representative that she could not purchase just a single bottle (*i.e.*, a one-month supply) at its regular price of $79.95. *Id.*, Att. 14 at 6-7. Without any further information or request for her permission to do so, the sales representative then enrolled her in a continuity program under which she would receive three bottles of Sea Vegg every three months:

> JAMIE: [I]nstead of one bottle for $80, I'll send you three bottles for $99.95.
>
> REDACTED: Okay, that sounds better.
>                    ***
> JAMIE: All right, if you don't mind holding just a few seconds, I'll be right back with your confirmation.
>
> **(Brief pause -- music playing while on hold.)**
>
> JAMIE: Okay, sorry for the delay. The total with the shipping and handling is $111.90 and --
>
> REDACTED: Okay.
>
> JAMIE: -- just allow two to three weeks to be safe. That's the three-month supply of the Sea Vegg and then starting in about three months, you'll receive your monthly resupply of the Sea Vegg, the three bottles for just $99.85 every three months. You can cancel or change that at any time by calling customer service, 1-800-215-0063. That number will be right inside your package as well. That's going to [REDACTED].

---

[10] To preserve the Commission's ability to retain the undercover credit identity and credit card utilized by Ms. Turner during this call, we have redacted the identifying information.

*Id.* at 8-9.[11]

ITV also violated the Court's specific requirement that consumers be informed "clearly and conspicuously" of all material terms and conditions of the continuity program. Specifically, although assuring Ms. Turner that she was protected by Scott Kennedy's "90-day moneyback guarantee" if she purchased a three month supply – rather than the single bottle she wanted – ITV failed to tell her its return policy states that "When returning an order consisting of more than one of the same item/product, you will be refunded for one trial item (i.e. open item) and all other *unopened* items." *Id.*, ¶ 21 and Att. 15 (emphasis added).[12] In other words, if Ms. Turner bought three bottles and used the product for 45 days, she presumably would receive a refund only for two bottles (the opened "trial bottle" and the unopened bottle); if she tried the product for 75 days (and thus opened all three bottles), she would be refunded for only one bottle (the opened "trial bottle"). And this assumes that ITV would not deny her refund request completely, in reliance on the provision of its return policy that states that in order to receive a refund, consumers must call Customer Satisfaction and ask for an RA within 30 days and then return the product within 10 days of the issuance of the RA. *Id.*, Att. 15.[13]

ITV also demonstrated that it has not taken adequate steps to endure than its sales

---

[11] According to John Maihos, ITV's Human Resources manager, the commission system Defendants have put in place for Sea Vegg is different than that which they have traditionally used: instead of receiving only a single, commission for signing a customer up on a continuity program, sales representatives get multiple, recurring commissions for Sea Vegg autoship customers. Turner Dec., ¶ 41 and Att. 32 at 179-80. By instituting such a system, ITV might have increased the incentive for sales representatives to sign consumers up for autoship plans.

[12] The Sea Vegg website – which is registered to ITV – says the same thing. Turner Dec., Att. 16.

[13] The Commission believes that RA is an abbreviation for a term like "Return Authorization."

representatives are complying with the Preliminary Injunction when Ms. Turner called the toll-

free numbers shown in the infomercials for Dr. Day's Home Juice Bar and Renuva. The sales

representatives who signed Ms. Turner up for both continuity programs did ask her whether she

wanted the "re-supply program," but both failed to expressly tell her that her credit card would be

charged automatically each month, as opposed to receiving an invoice for each shipment after it

arrived. Turner Dec., ¶¶ 24-25 and Att. 17 at 10, Att. 18 at 7-8. The Preliminary Injunction

expressly requires ITV to provide such autoship consumers with "a description of the billing

procedure to be employed" in connection with the autoship programs. Preliminary Injunction,

Part IV(d).[14]

### C.    ITV Distributors are Also Making Suspect Health and Disease Claims

Finally, the Commission has recently discovered that Defendants are apparently allowing

their own distributors to market Supreme Greens, Coral Calcium, Sea Vegg, and other ITV

products using strong health and disease claims. Specifically, the website for DMN Industries,

Inc., www.dmnnow.com, features pictures that clearly have been reproduced from ITV

infomercials: they show, among others, Donald Barrett with Scott Kennedy (Sea Vegg) and Alex

Guerrero (Supreme Greens) in their respective infomercials, and Kevin Trudeau sitting with Bob

---

[14] Ms. Turner also placed three additional undercover Sea Vegg orders in March 2005.
Turner Dec., ¶ 23. In one of those calls, ITV sales representative's violated the autoship
provision of the Preliminary Injunction by failing to inform her specifically that her credit card
would be billed upon the shipment of her order each month – just as occurred in the Renuva and
Dr. Day's Juice Bar calls. *Id.* In another call, Ms. Turner declined the autoship option offered by
the sales representative; in the remaining call, she was not offered an autoship option. In that
call, however, ITV's sales representative signed Ms. Turner to purchase a full year's supply of
Sea Vegg ($299 plus shipping), without specifically asking her whether that was what she
wanted. *Id.* Although the sales representative ultimately did allow Ms. Turner to purchase a
three-month supply, after she repeatedly insisted that she did not want to spend that much money,
*id.*, this incident – together with the others discussed above – indicates inadequate supervision of
sales representatives by ITV's management.

Barefoot during the infomercial Barrett produced for Coral Calcium Daily that the Commission

challenged in its complaint. Turner Dec., Att. 33. It also features other products previously sold

by Defendants: a diet product called Alka Slim, and a Vitamin E supplement called E8. *Id.*

The health claims made on the dmnnow.com website for these products include the

following examples: that "sea plants can transform your health" and "strengthen and detoxify,"

and that "many people believe Sea Vegetation acts as [a] miraculous healing agent" (on the pages

promoting Sea Vegg); and that more than 150 diseases, including cancer, heart disease, diabetes,

fibromyalgia, and arthritis "have been linked to acidity and lack of calcium in the body fluids"

(on the page promoting coral calcium). *Id.*

DMN Industries, Inc. is a Massachusetts corporation whose sole officer and director is

David M. Noone. Turner Dec., ¶ 43 and Att. 34. Dave Noone is an ITV distributor who has

ordered thousands of bottles of various products from ITV for resale. *Id.*, Att. 35. Defendants'

willingness to allow their own distributors to engage in these practices is further evidence of the

need for a receiver. Morever, the Commission is particularly concerned that ITV is expanding its

distributor network by inviting would-be Sea Vegg distributors to contact Jason Bernabei, ITV

and DMC's Vice President of Business Development. Turner Dec., ¶ 45 and Att. 33, 36. Such

an expansion can only lead to more deception and harm to consumers.

## V.    MODIFICATION OF THE PRELIMINARY INJUNCTION IS NECESSARY AND APPROPRIATE

### A.    The Preliminary Injunction Should Be Modified By Appointing a Receiver Based Upon New Events and the Need to Protect the Public From Defendants' Deceptive Business Practices

In evaluating whether and how to exercise their inherent power to modify a preliminary

injunction, courts primarily consider the events precipitating the request and the purpose of the

preliminary injunction. *See FTC v. Austin Galleries of Illinois, Inc.,* 1988-2 Trade Cas. ¶ 68,340 at 59,920, 1988 WL 118840, at *2 (N.D. Ill. Nov. 2, 1988) ("[I]n deciding whether to grant the FTC's motion for modification of the injunction, we will consider the events that prompted its motion and will tailor our decision to protecting the public with the least disruption possible to defendants' business."); *B.R.G. Autoland Jeep-Eagle, Inc. v. Chrysler Credit Corp.,* 799 F. Supp. 1250, 1258 (D. Mass. 1992) (Nelson, J.) (The court has "'complete power over interlocutory orders made therein and should be able to revise them when it is 'consonant with equity' to do so.'") (quoting 7 James W. Moore, *Moore's Federal Practice,* ¶ 60.15[4], pp. 60-124 - 60-125 (2d ed. 1992).[15] *See also Movie Systems, Inc. v. MAD Minneapolis Audio Distributors,* 717 F.2d. 427, 430 (8th Cir. 1983) ("In modifying a preliminary injunction, a district court is not bound by a strict standard of changed circumstances but is authorized to make any changes in the injunction that are equitable in light of subsequent changes in the facts or the law, or for any other good reason."); *Loudner v. United States,* 200 F. Supp.2d 1146, 1148 (D.S.D. 2002); *Basic Research, L.L.C. v. Cytodyne Technologies, Inc.,* No. 2:99-CV-343K, 2000 WL 33363261, at *11 (D. Utah Dec. 20, 2000).[16]

---

[15] Some courts have used a different standard in deciding motions for modifications of preliminary injunctions, evaluating whether there has been a "change of circumstances" such that the original preliminary injunction was "inequitable." *Favia v. Indiana Univ. of Penn.,* 7 F.3d 332, 340 (3rd Cir. 1993). Notably, in *Austin Galleries,* the court held that the "change in circumstances" standard, applicable to "private applicants," has "little relevance in a statutory enforcement action seeking to protect the public from fraud." 1988-2 Trade Cas. ¶ 68,340 at 59,920, 1988 WL 118840, at *2. The Commission's motion meets either standard.

[16] Although a modification of the preliminary injunction does not require a showing that the Defendants are likely violating the FTC Act, it is worth noting that the dissemination of the Sea Vegg and Renuva infomercials likely violates Sections 5 and 12 of the FTC Act. To prevail under Sections 5(a) and 12, the FTC must demonstrate that "first, there is a representation, omission, or practice that second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material." *FTC v. Pantron I Corp.,* 33 F.3d 1088, 1095 (9th Cir. 1994), *citing Cliffdale Associates, Inc.,* 103 F.T.C. 110, 164-

The appointment of a receiver is a remedy that is clearly available to courts of equity. *See, e.g., SEC v. Keller*, 323 F.2d 397, 403 (7th Cir. 1963) ("The district court was vested with inherent equitable power to appoint a trustee-receiver under the facts of this case. The prima facie showing of fraud and mismanagement, absent insolvency, is enough to call into play the equitable powers of the court."); *see also FTC v. Seasilver USA, Inc.*, CV-S-03-0676-RLH(LRL) (D. Nev.) (appointing receiver in case involving fraudulent claims for dietary supplement where receiver continued operating business during pendency of receivership) (decision attached as Exhibit 1 to Memorandum in Support of Plaintiff's Motion for Temporary Restraining Order [Dkt. #3]).

The primary purposes of the Preliminary Injunction entered against Barrett, ITV and DMC were to prevent Defendants from harming consumers by disseminating false and unsubstantiated advertising claims and enrolling consumers in continuity plans without their informed consent. Clearly, it has not worked. The appointment of a receiver is now necessary to carry out the Court's intent.

The Commission recognizes that the Court denied its previous request for appointment of a receiver for DMC and ITV, concluding that the accounting and restriction on asset dissipation that it included in the Preliminary Injunction would be sufficient to ensure the enforceability of any judgment eventually entered against Defendants. Preliminary Injunction at 14. The Commission is not suggesting that the issue before the Court now is the secretion of assets,

---

65 (1984); *FTC v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001). The Commission's two new expert declarations demonstrate that Defendants' claims for Sea Vegg and Renuva are unsubstantiated, and those health claims are, without question, likely to influence consumers' purchase or use of those products. *See generally* Memorandum in Support of Plaintiff's Motion for Temporary Restraining Order at 16-19 [Dkt. #3].

although as noted below, Defendants continue to use corporate assets to air new, deceptive

infomercials. Rather, Defendants' current dissemination of several new deceptive or highly

dubious infomercials – despite Barrett's express representation to the Court that he would not

market ingestibles – is the primary reason why the Commission believes that the appointment of

a receiver is necessary to achieve the purposes of the Preliminary Injunction: to protect

consumers from Defendants' violative business practices and thereby prevent continuing

consumer injury.

The Commission believes that Defendants' dissemination of new, misleading

infomercials alone constitutes more than sufficient grounds for the Court to modify the

Preliminary Injunction and appoint a receiver over DMC and ITV for the rest of this litigation,

and that, as discussed *infra*, appointment of a receiver is the least disruptive means of protecting

consumers. However, Defendants' continuing fraudulent practices extend beyond the airing of

deceptive claims and include the continued use of the talk show format that the Court specifically

found to be misleading, lax oversight of sales representatives, and expansion of a deceptive

distributor network.[17] Together, these actions provide further evidence that ITV and DMC are

permeated by fraud and will continue to harm consumers as long as current management remains

at the helm; a receiver must take charge and rein in Defendants' fraudulent practices.

---

[17] The Commission does not know how widespread the problems are associated with ITV placing consumers on continuity plans without their consent. Thus, the Commission has not alleged contempt of the Preliminary Injunction, and does not seek to ban Defendants' autoship program outright. The experiences of our investigator show, however, that despite the Court's clear instructions, some consumers continue to incur economic injury as a result of the Defendants' zeal to enroll them in autoship programs – programs that are presumably quite lucrative. Additional supervision of Defendants' business practices – the kind a receiver would provide – is thus needed.

**B.    A Receiver Is Also Needed to Stop Mounting Consumer Injury and Prevent Defendants from Spending Corporate Assets on Fraudulent Infomercials**

Defendants are spending substantial resources to repeatedly air the new, unsubstantiated Sea Vegg and Renuva infomercials. Both infomercials have ranked high in IMS' list of most frequently aired infomercials for the past few months, demonstrating that Defendants – in addition to causing further consumer harm – are spending substantial resources to purchase media time that otherwise would be available for consumer redress at the conclusion of this litigation. The appointment of a temporary receiver would prevent Defendants from continuing to use their assets to fund fraudulent behavior, without disrupting legitimate business activities.

Further, Defendants have been uncooperative in providing full disclosure about some of their spending habits. Parts VIII and IX of the Preliminary Injunction limit DMC, ITV and Barrett to spending for reasonable and necessary expenses. DMC paid American Express $52,625 in October 2004, and $56,806 in December 2004. Turner Dec., ¶ 29 and Att. 22. The Commission has been trying to obtain the underlying credit card statements from Defendants since November 2004, but has been unable to obtain simple credit card statements since that time. *Id.* at ¶ 28 and Att. 21.[18]

---

[18] The Commission first raised this issue in November 2004. Turner Dec., Att 21. In response to the Commission's numerous follow-up communications, counsel for Defendants informed the Commission on January 24, 2005, that neither company maintained any American Express accounts. *Id.* The Commission clarified its request on January 31, 2005 by informing Defendants that the Commission sought, and was entitled to obtain, copies of American Express billing statements "regardless of the person or entity in whose name the account may be, for which DMC or ITV has made payment in excess of $5,000." *Id.* Despite numerous follow up requests for these documents, however, Defendants have yet to provide them to the Commission. Additionally, Donald Barrett paid more than $40,000 to American Express in March 2005 and the Commission has just learned that he paid $30,488 to American Express in April 2005. *Id.* at ¶ 30 and Att. 22.

**C.**    **Barrett's Lack of Trustworthiness Demonstrates the Need for His Removal from Management of DMC and ITV, and for the Appointment of a Receiver**

Barrett has demonstrated his lack of trustworthiness at least twice in this case. First, as noted *supra*, after telling the Court last June that he "[had] no plans" to run any infomercials for ingestible products in the future, he started running or buying air time and providing other services for infomercials for at least four such products by January 2005.

Second, Barrett represented to the Court that he never purposely ran the original Supreme Greens infomercial after replacing it with an edited version in response to the Commission's October 2003 notification of its concerns about that program. Indeed, in response to the Commission's motion for a temporary restraining order, Barrett represented to the Court that it was the FTC that informed him that the original Supreme Greens infomercial was running in April 2004. He stated:

> Based upon the FTC's concerns, the edited [Supreme Greens] tape was rolled out first in national markets, with local markets to follow. . . . ITV Direct sought to substitute the edited tape for the original tape as quickly as feasible.
>
> ***
>
> On April 7, 2004, the FTC called to state that it continued to have concerns over the Supreme Greens with MSM infomercial and that it believed that the original infomercial was running in certain media markets. We then investigated the matter, determined that certain stations were airing the original infomercial, and immediately notified all media outlets to cease running any of the Supreme Greens versions.

Turner Dec., Att. 19 at ¶¶ 19, 24. The clear implication of Barrett's statement is that those airings of the original infomercial were neither intended by, nor known to, ITV. In fact, ITV had deliberately switched back to the original Supreme Greens infomercial by at least early February, a move that boosted revenues according to ITV's Vice President for Media, who emailed Barrett on February 7, 2004 to say "I was going over the results of the Supreme Green shows that ran this Friday. I was so excited to see the results go up because we switched back to [the] original

version Supreme Greens." *Id.* at ¶ 33 and Att. 23-24. Two weeks later, Barrett himself wrote to all ITV managers that "We should now be using the original version Supreme Greens (SGRN)." *Id.*, Att. 25. Simply stated, Barrett is not trustworthy as the guardian to carry out this Court's orders.

### D.    Appointment of a Receiver Will Protect Consumers and Is the Appropriate Remedy

The public interest would be greatly served by the relief requested by the Commission. There is a strong public interest in protecting consumers from fraudulent health-related products.[19] Yet Barrett has demonstrated that he is either unwilling or incapable of resisting the urge to make unsubstantiated health and disease claims for dietary supplements and there is every reason to believe he will continue to disseminate such claims so as long as he is permitted to do so. He and his companies have also shown their willingness to injure consumers in other ways. Absent appointment of a receiver, Defendants will likely continue to use Barrett's time-tested faux talk show format, provide inadequate supervision of sales representatives, and allow deceptive distributor networks to flourish. In short, these enterprises are permeated by such fraud that continued misconduct is likely unless the current management is replaced and a receiver is put in charge.[20] *See, e.g., SEC v. Bowler*, 427 F.2d 190, 198 (4th Cir. 1970) (Court of Appeals

---

[19] Courts have frequently found that "the public has a particularly strong interest in an accurate description of health and medical products." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 841 (9th Cir. 2002) (citation omitted); *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 129 F. Supp. 2d 351, 597 (D.N.J. 2000), *aff'd*, 290 F.3d 578, 597 (3d Cir. 2002) ("there is a strong public interest in the prevention of misleading advertisements, and this interest is particularly strong where over-the-counter drugs are concerned") (citation omitted); *Abbott Lab. v. Mead Johnson & Co.*, 971 F.2d 6, 19 (7th Cir. 1992) (costs to the public "are even higher when, as here, important health concerns are involved").

[20] Nor can Barrett's partner, Robert Maihos, be allowed to run these enterprises. Mr. Maihos, as the co-owner and an officer and director of both DMC and ITV, who has stated under

reverses district court's decision to not appoint receiver where "it is obvious, as here, that those who have inflicted serious detriment in the past must be ousted"); *SEC v. S&P National Corp.*, 360 F.2d 741, 750-51 (2d Cir. 1966) ("[T]he primary purpose of the appointment [of a receiver] was promptly to install a responsible officer of the court who could bring the companies into compliance with the law, 'ascertain the true state of affairs . . . and report thereon' to the court and public shareholders and preserve the corporate assets.").

The Commission recognizes that the appointment of a receiver will change how Defendants conduct their business. It should not, however, disrupt any legitimate business activity that may exist. For instance, Defendants will still be able to market Sea Vegg as a source of vitamins and minerals – the receiver would not, however allow them to promote it as a cancer preventative and treatment. Nor can there be any serious objection to a receiver based on the notion that the receiver would discontinue business practices that injure consumers.

Moreover, any other alternatives short of appointment of a receiver would actually require greater restrictions on ITV's and DMC's business operations. Absent appointment of a receiver, the only way to protect consumers adequately would be to prohibit Defendants from making <u>any</u> health claims – not just misleading claims, prohibit the faux talk-show format, and prohibit the use of any continuity programs.[21] In short, the Commission's requested relief provides the most protection to consumers with the least disruption to Defendants' legitimate business activities. Barrett has had ample time to clean up the business activities of DMC and ITV, and has clearly

---

oath that he is in charge of the companies' day-to-day operations, clearly has condoned the practices at issue.

   [21] Defendants may argue that expansion of product coverage in Section I of the Preliminary Injunction would be adequate protection. We strongly disagree. Defendants have shown themselves to be incorrigible and incapable of resisting the urge to prey on consumers' fears and vulnerabilities.

decided that it is more profitable to continue to defraud consumers and prey on those who are coping with, or afraid of, serious illnesses, diseases and other conditions.  It is time for a receiver to make sure that this fraudulent activity stops.[22]

## VI.    CONCLUSION

For the reasons set forth above, the Commission respectfully requests that the Court modify the Preliminary Injunction and appoint a receiver over DMC and ITV.  A proposed Order with findings of fact and conclusions of law is attached.

Respectfully submitted,

_____
DANIEL KAUFMAN
KIAL S. YOUNG (BBO # 633515)
EDWARD GLENNON
Federal Trade Commission
600 Pennsylvania Avenue, NW, NJ-3212
Washington, DC  20580
(202) 326-2675,  -3126 (voice)
(202) 326-3259 (fax)
dkaufman@ftc.gov or eglennon@ftc.gov

ATTORNEYS FOR PLAINTIFF

Dated May 25, 2005

---

[22] The Commission also has submitted a memorandum in which we recommend a highly qualified receiver for the Court's consideration, Craig R. Jalbert of Verdolino & Lowey, P.C.