25

1    that?

2        A    Yeah.

3        Q    Do you know what that $5,000 is related to?

4        A    No, not at this time.  Right here, with this one

5    sheet here, no.

6        Q    How could you determine what that $5,000 --

7        A    I would look into the general ledger as one

8    source.

9        Q    What other sources would you need to look at?

10       A    Well, if that wasn't sufficient information, I'd

11   look at the, I'd look at the invoice.

12       Q    Mr. Callahan, does ITV Direct own any patents?

13       A    I do not know.  I have not recorded any costs to

14   purchase any development of any patent.

15       Q    Do you know who would know if ITV Direct owns any

16   patents?

17       A    No.

18       Q    There's no one at ITV Direct that would be able to

19   confirm or deny that?

20       A    I don't know that.  I don't know who would know of

21   their existence, and I don't know who, you know -- an

22   officer of the company, yeah, but you know, to my knowledge,

23   there has never been, you know, and we don't own any patents

24   because they would have had to have been paid for, and I

25   have had (unintelligible) flow through me for this billing,

26

1    so therefore, I would say they don't own any patents.

2        Q    What about any trademarks; do you know if ITV owns

3    any trademarks?

4        A    I do not, no.

5        Q    Do you know who would know at ITV Direct as to

6    whether or not it owns trademarks?

7        A    No, but again, if they had flowed through, you

8    know, the books that I managed anyway, it would have had to

9    for billings and, you know, I don't have any that I've ever

10   seen.

11       Q    How about copyrights; does ITV Direct own any of

12   those?

13       A    Not to my knowledge, no.

14       Q    Do you know who at ITV Direct would know whether

15   it owns any copyrights?

16       A    No, other than an officer.

17           MR. SILVERMAN:  Your Honor, if I could take a

18   break for just a moment, I'd like to follow up on the issue

19   I raised at the very outset of the hearing that has to do

20   with the subpoenas that were issued for the officers of the

21   company.

22           THE COURT:  Okay.

23           MR. SILVERMAN:  I understand that Mr. Callahan

24   might not know some of the answers to the questions that

25   I've imposed; however, that was the reason why we issued the

27

1    subpoenas to have the officers here who would have been able

2    to testify as to whether or not this intellectual property

3    --

4            THE COURT:  You subpoenaed the officers, and they

5    did not appear; is that --

6            MR. BROOKS:  They weren't served with subpoenas,

7    your Honor.  Apparently, they were left off with somebody --

8    some other employee of the company.

9            THE COURT:  I thought the company didn't have any

10   employees.

11           MR. BROOKS:  The subpoenas were served -- there's

12   another company, Direct Marketing Concepts, which does have

13   employees that occupies the same premises.  My understanding

14   is that the subpoenas were left off with an employee of

15   Direct Marketing Concepts.

16           THE COURT:  So they knew about it?

17           MR. BROOKS:  Excuse me?

18           THE COURT:  They knew about it?

19           MR. BROOKS:  I don't know if they knew about it.

20   I got an employee for an employee.  Rule 45 says service of

21   a subpoena has to be in hand.  They weren't served in hand,

22   and they're not here because they haven't been served.

23           THE COURT:  If we need to --

24           MR. SILVERMAN:  Your Honor?

25           THE COURT:  -- continue this, we'll continue it.

28

1          MR. SILVERMAN:  I have the subpoenas.

2          THE COURT:  Yeah, but if it wasn't served --

3          MR. SILVERMAN:  Well, your Honor, they were

4    accepted by the general counsel at ITV who identified

5    himself as such to the processor.

6          MR. BROOKS:  That's simply not accurate, your

7    Honor, from my conversation with their counsel.  He got a

8    telephone call that there was a process server down in the

9    lobby.  He went down, identified himself.  The process

10   server said, here, handed him the subpoenas and left, so.

11          (Pause.)

12          THE COURT:  All right.  I'll accept this --

13          MR. SILVERMAN:  In any event, your Honor --

14          THE COURT:  -- and we'll deal with it at the end

15   of the hearing on how you want to proceed.  Have you deposed

16   them already?

17          MR. SILVERMAN:  We have deposed Mr. Callahan --

18          THE COURT:  Right.

19          MR. SILVERMAN:  -- your Honor.

20          THE COURT:  How about the principals?

21          MR. SILVERMAN:  They've been -- we have not

22   deposed the principals, your Honor.  There have been several

23   events in the case that have superseded further depositions.

24   We do have a separate proceeding going on that is directly

25   against Direct Marketing Concepts, the other company that

29

1    Mr. Brooks just mentioned, on the theory that the assets

2    were probably transferred and/or funneled to DMC to avoid

3    this judgment, but --

4              THE COURT:  And that's not pending in this action?

5              MR. SILVERMAN:  That is pending before Judge

6    Tauro, your Honor.

7              MR. BROOKS:  Separate case, your Honor.

8              THE COURT:  A separate issue.

9              MR. BROOKS:  Yeah.

10             THE COURT:  Okay.

11             BY MR. SILVERMAN:

12       Q    Mr. Callahan, does ITV Direct have any accounts

13   receivable; does anyone owe ITV any money?

14       A    Until this time --

15       Q    Yes.

16       A    -- today?  I would have to refresh my memory.

17       Q    What document would help refresh your memory?

18       A    A general ledger (unintelligible).

19       Q    Does ITV Direct have any pending claims against

20   any entities?

21       A    A legal claim or?

22       Q    Sure.  Let's start with legal claims?

23       A    I don't know.

24       Q    You don't know?

25       A    No.  I don't handle legal matters.  To my

30

1    knowledge, no.

2        Q    Who would know at ITV Direct?

3        A    One of the officers, I would think.

4        Q    Are you familiar with the lawsuit that ITV

5    initiated against the Federal Trade Commission in September

6    of 2005?

7        A    I am not.

8        Q    Are you familiar with the lawsuit that ITV

9    initiated against a company called The Electronic Retailing

10   Association in February of this year?

11       A    ITV Direct initiated a lawsuit?

12       Q    Yes.

13       A    No.

14       Q    Are you familiar with it?

15       A    No.

16           (Pause.)

17           BY MR. SILVERMAN:

18       Q    Mr. Callahan, I've put before you what is a docket

19   sheet, a civil action cover sheet and a complaint in the

20   matter ITV Direct versus The Electronic Retailing

21   Association; do you see that, Mr. Callahan?

22       A    Yes, for the first time.

23       Q    And at the back of the package, there's also a

24   document that is the first amended complaint and demand for

25   jury trial in the same action?

31

1        A    Okay.  I see that, yeah.

2        Q    And you'll see, at the very top of that document,

3    there's a stamp that indicates that that document was filed

4    on February 27, 2006; do you see that?

5        A    No, not yet.  The, the second to the last page --

6    second sentence --

7        Q    That document right there.

8        A    Yes.  February 27th file date of '06, I see it.

9        Q    And can you identify for me who the plaintiff is

10    in that action?

11        A    ITV Direct Con. (phonetic).

12        Q    And this is the first time that you, that you're

13    aware of this lawsuit; correct, Mr. Callahan?

14        A    Yes.

15        Q    And you're not aware of this lawsuit because

16    you've never seen any expense for the initiation of this

17    lawsuit; correct?

18        A    No.  I don't know if that's the reason I'm not

19    aware of it.

20        Q    Well, if ITV Direct --

21        A    But I can tell you that I haven't seen any

22    expenses that I can identify after February 27th or before

23    related to this case.

24        Q    So, the legal services involved in initiating this

25    case have not been paid by ITV Direct over the last year;

32

1 correct?

2     A    I have not paid legal expense related to this

3 case, yes, that would be, that would be correct, yes.

4     Q    And, Mr. Callahan, earlier you stated that over

5 the last year, there's been absolutely no business activity

6 by ITV Direct; correct?

7     A    Yeah.   There's been no, no benefit for that.  We

8 haven't incurred expenses, so maybe I should clarify that.

9 In addition, you know, just because an expense is not

10 recognized does not mean that it will not be recognized in

11 the future, the difference between accrual or a cash basis

12 where you would recognize that when you take it.

13     Q    And presumably, you're hoping that the expense for

14 your services gets recognized at some point; correct?

15     A    Of course, yeah.

16     Q    Because it has not yet been paid?

17     A    Do you know that; is that a question?

18     Q    Well, that's what you testified to earlier,

19 Mr. Callahan.

20     A    On the, on July 27th or July 26th, there was no

21 recognition of my expense.

22     Q    Do you have any reason to think it's been

23 recognized since that time?

24     A    Yes.

25     Q    So, there's an updated financial that would

33

1    identify the cost that ITV has incurred for your services?

2        A    No.    I don't know that.    I don't know that to be

3    true.    There's not -- there haven't been new financials

4    printed out for ITV Direct, you know, since this date here.

5    You know?

6        Q    Mr. Callahan, you stated that ITV does not hold

7    any inventory; correct?

8        A    That's correct.    ITV Direct does not hold any

9    inventory.

10        Q    And over the last year, ITV has not generated any

11    revenue from any activity; correct?

12        A    I would, I would say, no, (unintelligible) put

13    before the activity before January 1st of this year, but I

14    would say, no, that there has been no revenue.

15        Q    And you stated that ITV's business was purchasing

16    media; correct?

17        A    Primary business was planning and directing and

18    placing media, yes.

19        Q    ITV does not actively sell any products; correct?

20        A    ITV Direct does not sell products, that's correct.

21        Q    Can you explain to me why, in a document filed

22    with this court in February of 2006, earlier this year, ITV

23    represented, and I quote from Paragraph 10, on Page 3 of the

24    amended complaint, "ITV is engaged in the business of

25    advertising and selling consumer products, including dietary

34

1    supplements through feature length promotions known as

2    informercials"?

3         A    What was the front part of the question?

4         Q    Well, Mr. Callahan, can you explain how it is that

5    you, as the account, believe that ITV does not conduct any

6    business besides purchasing media, has not conducted any

7    business over the last year of any substance, but yet it is

8    filing papers with this court representing that it is

9    actively advertising and sell products?

10        A    I, I don't know what you have before you, but I

11   don't know how that can be, if that's accurate.

12        Q    Mr. Callahan, you know what I have before me.

13   It's the document --

14        A    No.  I don't --

15        Q    -- that I presented to you?

16        A    -- what page.  What page were you quoting from,

17   please?

18        Q    If you'd take a look at the first amended

19   complaint, and actually, I refer you to Paragraph 5, on

20   Page 2.  This is in the back of the pile that I gave you.

21        A    On the back of the pile, Page 5.  Sorry.

22             (Pause.)

23             What's --

24        Q    Page 2, Paragraph 5.

25        A    Oh.

*APEX Reporting*
(617) 426-3077

                                                              35

1       Q     This is a document that was filed by your counsel,

2    Mr. Brooks.  It states, "ITV is engaged in the business of

3    advertising and selling consumer products, including dietary

4    supplements, through feature length promotions known as

5    informercials.  Among other products, ITV sells a popular

6    dietary supplement known as C-Veg."

7       A     Okay.  Once again, the question is?

8             THE COURT:  What is it, what do we have here,

9    complaint and an amended complaint?

10            MR. SILVERMAN:  Yes, your Honor.  What we've done

11   is --

12            THE COURT:  I've got it.  I'm sorry.

13            BY MR. SILVERMAN:

14      Q     That's news to you; correct, Mr. Callahan?

15      A     No.  Can you just restate -- I'm (unintelligible)

16   Could you restate the question, please.

17      Q     Do you dispute the statements in this amended

18   complaint, Mr. Callahan?

19      A     Regarding Page 2, No. -- Paragraph 5?  ITV Direct

20   does not sell any product.

21      Q     So that would be a misrepresentation; correct,

22   Mr. Callahan?

23            (Pause while witness reviews document.)

24      A     It's not accurate, according to my understanding,

25   no.

36

1    Q    And you're the ITV representative that's here to
2    testify about the business activities of ITV Direct;
3    correct?
4    A    Yes.
5    Q    And it seems, Mr. Callahan, that you're not very
6    familiar with ITV's business activities; is that fair to
7    say?
8    A    No.
9    Q    Mr. Callahan, you're aware of the fact that ITV
10   Direct appealed the judgment obtained by Cappseals in this
11   case; correct?
12   A    Yeah.
13   Q    Is it fair to say that that appeal involved
14   significant work by the attorneys for ITV Direct?
15   A    Of course, yes.
16   Q    Is it fair to say that they didn't perform those
17   services for free; right?
18   A    Yeah.
19   Q    I've put before you, Mr. Callahan, what is a
20   docket and the appeal to the First Circuit in the underlying
21   case.  If I could direct your attention to the second to the
22   last page?
23   A    Okay.
24   Q    You'll see on that second to the last page an
25   entry dated January 5, 2006, motion filed by appellant, ITV

37

1    Direct; do you see that, Mr. Callahan?

2         A    Yes.

3         Q    And later on, further down the page, on

4    January 31, 2006, opposition filed by appellant, ITV Direct;

5    do you see that?

6         A    Yes.

7         Q    And the very next entry, February 6, 2006, case

8    argued, and it indicates that Attorney Robertson appeared

9    for the appellant, ITV Direct; do you see that?

10        A    Um-hum.

11             (Pause.)

12        Q    Mr. Callahan, you're aware that ITV opposed this

13   supplementary process hearing; correct?

14        A    No.

15        Q    I'll represent to you that --

16        A    You mean today?

17        Q    Today.

18        A    No, I was not aware of that.

19        Q    I'll represent to you, and I think the Court can

20   take judicial notice of the fact that an opposition to this

21   hearing --

22             THE COURT:  Well, and I see that counsel's here as

23   well.  Okay.

24             BY MR. SILVERMAN:

25        Q    Mr. Callahan, is it fair to say that the services,

*APEX Reporting*
(617) 426-3077

38

1    the legal services, performed by counsel on behalf of ITV

2    Direct were not performed for free?

3        A    That's correct.

4        Q    Fair to say that Mr. Brooks expects to be paid for

5    his services?

6        A    Absolutely, yes.

7        Q    Are the attorneys for ITV Direct owed any unpaid

8    invoices for legal services?

9        A    I would (unintelligible) yes, sure.

10        Q    So they have not been paid for any of the legal

11    services involved with the PO of the underlying decision in

12    this case, the initiation of the action against The

13    Electronic Retailing Association?

14        A    I don't know that.  I don't know that to be true.

15    You asked if they'd been, if their, if they're unpaid for

16    any.  I don't know.  You're listing off specific matters.  I

17    don't know if they have been paid or if they were unpaid --

18        Q    Well, Mr. Callahan --

19        A    -- at this time.

20        Q    -- all of the services that I've identified so far

21    in terms of legal work is all work that's been performed in

22    2006; correct?

23        A    January, January 5th was the first reference, two

24    days into the new year.  Could it be possible that it was

25    performed in another year?

39

1    Q    I'm sorry?

2    A    You stated that it was all 2006 activity and I'm
3    saying your first reference point of a motion by the
4    appellant, ITV Direct, was two days into the new year.
5    Could it have been possible it wasn't 2006?

6    Q    Well, Mr. Callahan, I've identified work that was
7    performed in 2006, and what I'm asking you is, do you know
8    if the attorneys for ITV have been paid for those services?

9    A    I don't know at this point, no, and this would not
10   be a basis for recording of transactions for services, this
11   docket with an activity note on January 5th.

12        THE COURT:  Do you know whether ITV Direct has
13   been billed for these services?

14        THE WITNESS:  I'm sorry.  I didn't hear the --

15        THE COURT:  Do you know if ITV Direct has been
16   billed for legal services performed in 2006?

17        THE WITNESS:  No, I don't know --

18        THE COURT:  Okay.

19        THE WITNESS:  -- right now.

20        BY MR. SILVERMAN:

21   Q    But, Mr. Callahan, it's fair to say that,
22   certainly, ITV Direct has not made any payments out of the
23   accounts that you identified for any of their services;
24   correct?

25   A    To my knowledge, no.  There hasn't been -- you

40

1    know, there's been under $2,000 in cash for about a year,

2    no, and they haven't been able to pay anybody.

3        Q    So, ITV has not paid for any legal services, and

4    it's not capable of paying for any legal services; correct?

5        A    No.   I don't know --

6            THE COURT:   Do you know if anybody's paying the

7    lawyers for this activity?

8            THE WITNESS:   Currently, no.  I, I know that I

9    haven't paid any bill for ITV Direct for quite a while.

10           THE COURT:   Okay.

11           BY MR. SILVERMAN:

12       Q    So, there should be, presumably, significant bills

13   that have been issued by Mr. Brooks' firm that have gone

14   unpaid; correct?

15       A    Bills, yes.  Significant, I, I can't say

16   significant, but yes, bills.

17       Q    And those would appear in the financials of ITV

18   Direct as accounts payable; correct?

19       A    Not necessarily, depending upon the basis of the

20   financials, if they were cash or accrual.

21           THE COURT:   Where do the bills go; who gets the

22   bills?

23           THE WITNESS:   They do cycle through me.

24           THE COURT:   All right.  Have you --

25           THE WITNESS:   So I have --

41

1          THE COURT:  -- seen any bills --

2          THE WITNESS:  I haven't seen a bill for quite a

3   while from any vendors because we're not currently

4   transacting.

5          THE COURT:  Have you see any bills for legal

6   services in 2006?

7          THE WITNESS:  Not that I recall, no.

8          BY MR. SILVERMAN:

9     Q    Are you aware as to whether or not the services

10  performed -- strike that.  Mr. Callahan, you understand that

11  this case is about the fact that ITV did not pay for the

12  last six shipments of Supreme Greens that was manufactured

13  by Cappseals under Purchase Order 1101; correct?

14    A    Without identifying the Purchase Order 1101, yes,

15  that's my understanding.

16    Q    Well, Mr. Callahan, I believe that -- are the

17  joint stipulations, have I already presented you with those?

18         MR. BROOKS:  They're right here.

19    A    No.  I just don't recall the number, but yes, I

20  understand (unintelligible)

21    Q    Mr. Callahan, I've put before you a document

22  entitled Joint Stipulation of Fact, and those are the

23  stipulations that were agreed upon between the parties; do

24  you see that document?

25    A    Um-hum.

42

1    Q    Mr. Callahan, I refer you to Paragraph 5 of that

2  document; do you see that?

3    A    Um-hum.

4    Q    That paragraph states that, on around December 31,

5  2003, ITV Direct received Invoice No. 21 from Direct

6  Business Concepts indicating that ITV owed $300,000 --

7  $300,078; do you see that?

8    A    Yes.

9    Q    Paragraph 8, ITV received Invoice No. 22

10  indicating that it owed $185,472; do you see that?

11    MR. BROOKS:  Your Honor, I don't really mean to

12  object, but this has already gone to judgment.  I'm not

13  quite sure why we're asking questions about the underlying

14  issues in the case, what's already gotten judgment.

15    THE COURT:  Just in the interest of time, the

16  objection is sustained.  I can read this, if you want to

17  just point out certain things.

18    MR. SILVERMAN:  Well, your Honor, I'll skip

19  forward to a related question.

20    (Pause.)

21    BY MR. SILVERMAN:

22    Q    Mr. Callahan, I've put before you a document

23  labeled ITV00291 that is entitled Direct Marketing Concepts

24  Find Report; do you see that?

25    A    Yes.

43

1      Q    Mr. Callahan, if you take a look at the

2  information at the top of the page, each line item has a

3  type of bill, a date, a number, the name of who it's coming

4  from --

5      A    Um-hum.

6      Q    -- the related PO number and then amount; do you

7  see that?

8      A    Um-hum, and then an additional notation, yes, I

9  see it.

10     Q    And what is the additional notation?

11     A    No column label, but it says, not paid on

12  (unintelligible)

13     Q    And there are six entries, the first six entries

14  at the top of the page, that are labeled as Not Paid;

15  correct?

16     A    Yes.

17     Q    And those six entries correspond exactly with the

18  invoices in the stipulation and the amount of those

19  invoices; correct?

20     A    I don't know.  I don't have that --

21          MR. BROOKS:  Your Honor --

22     A    -- before me.  I--

23          THE COURT:  Is this disputed?

24          MR. BROOKS:  No.  It's already gone to judgment.

25  I mean, the judgment is that ITV owes $1.1 million, or

44

1    whatever it is.

2             THE COURT:  And you agree that it's these six

3    invoices?

4             MR. SILVERMAN:  Yeah.

5             THE COURT:  Okay.

6             BY MR. SILVERMAN:

7        Q    Now, Mr. Callahan, right below those six unpaid

8    entries, the entries marked Not Paid --

9        A    Um-hum.

10       Q    -- do you see an entry dated December 19, 2003; do

11   you see that?

12       A    Um-hum.

13       Q    Invoice No. 20; do you see that?

14       A    Yes.

15       Q    And, again, it says Purchase Order 1101; do you

16   see that?

17       A    Yes.

18       Q    That's for $300,024; correct?

19       A    Yes.

20       Q    Purchase Order 1101 is the contract that forms the

21   debt underlying in this case.  You understand that; correct?

22       A    (No verbal response.)

23            MR. SILVERMAN:  I think that's already --

24            THE COURT:  I think it's agreed.

25       A    Okay.  I don't know it by reference to those PO

45

1    numbers.

2           THE COURT:   Counsel has stipulated that it's this

3    PO, 1101.

4           MR. BROOKS:   Your Honor, can I raise an issue?   I

5    think we're going into an area that I was anticipating, and

6    I just want to highlight it now.   There is this related

7    action by Cappseals against Direct Marketing Concepts that's

8    pending before Judge Tauro.   It's not the case that's before

9    you today.   That is an action in which Cappseals claims that

10   Direct Marketing Concepts is liable for the debt of ITV, the

11   issue that's before you today.

12          It appears now that we're getting into those

13   issues that are before Judge Tauro.   We're bringing in

14   business records of Direct Marketing Concepts, presumably,

15   to try to show that Direct Marketing concepts is liable for

16   this debt.

17          I would suggest to you that, having brought an

18   independent action before Judge Tauro, we had the final

19   pretrial conference on November 2nd.   Summary judgment was

20   denied.   That case will go to trial, and the liability of

21   Direct Marketing Concepts will be determined by Judge Tauro

22   after a trial.

23          I don't think it's appropriate for this court to

24   be hearing evidence and perhaps being asked to make a

25   decision about the liability of Direct Marketing Concepts

46

1  when that issue is pending before Judge Tauro in another

2  action.

3        My understanding of the issue before you today is

4  supplementary process.  The issue is the assets and income

5  of ITV that's available to satisfy the judgment, and I'm

6  just concerned that we're going to start to try another

7  case, and I'm going to have hours of cross-examination to

8  establish that Direct Marketing's a separate corporation,

9  what its business purpose is --

10        THE COURT:  Let me find out from counsel where you

11  intend to go with this.

12        MR. SILVERMAN:  Thank you, your Honor.  First and

13  foremost, your Honor, this is not a business record for

14  Direct Marketing Concepts.  As you can see the document is a

15  document Bates labeled ITV00311.

16        This is a document that was produced from the

17  records of ITV, and it was an invoice that was received by

18  ITV, and the purpose of this line of questioning, your

19  Honor, is to demonstrate that ITV continues to be a thriving

20  company, as always, is using accounts other than the

21  accounts identified by Mr. Callahan to pay its debts and

22  obligations.

23        The fact that it chooses to park its money and

24  funnel this money into accounts with a name other than ITV

25  does not mean that it can avoid its debt obligations to

APEX Reporting
(617) 426-3077

47

1    Cappseal.

2        MR. BROOKS:  That, your Honor, I guess, just

3    proves the point that I just made, which is that's the

4    subject matter of Judge Tauro's action.

5        THE COURT:  Do you expect me to, at the end, if

6    you got what you were -- do you intend to ask for an order

7    that assets standing in the name of another company be used

8    to pay this debt?

9        MR. SILVERMAN:  Your Honor, this is identical, if

10   I may explain.

11       THE COURT:  Can you answer that?

12       MR. SILVERMAN:  I intend to ask you to order

13   Direct -- ITV Direct to pay the judgment using the funds

14   that it controls.  There may be accounts that are maintained

15   under the name of a different entity, but it's ITV's

16   accounts, and that's the point of this line of questioning.

17       They've used it to pay their own bills, including

18   the bills that we've already discussed, the legal fees, for

19   fees incurred by Mr. Callahan.  They have zero dollars in --

20       THE COURT:  Are they in Direct Marketing's

21   accounts?

22       MR. SILVERMAN:  They are, your Honor, and if I

23   may, this is identical to the case of Aetna v Rockheld in

24   which there was a father who was receiving his paycheck, and

25   he was taking it, and he was putting it into an account in

48

1    the name of his son.

2             THE COURT:  My question is though, why is this not

3    the issue that Judge Tauro's going to be deciding?

4             MR. SILVERMAN:  Because, your Honor, we're not

5    necessarily discussing here his fraudulent conveyance and

6    alter ego, but what we're discussing and what I'm aiming my

7    questions at is money that is controlled by ITV and

8    consistently controlled by ITV --

9             THE COURT:  Why is that different than a

10   fraudulent conveyance if they took their assets and put it

11   in somebody else's name?

12            MR. SILVERMAN:  Because it's still their assets,

13   your Honor.  They're still using those assets to pick and

14   choose the bill that they want to pay.

15            THE COURT:  I have to tell you, and I haven't read

16   the complaint that you've brought with Judge Tauro, but it

17   seems to me that if Judge -- I'm not saying that you're

18   wrong legally as to where you end up in your ability to

19   obtain the funds, but I am concerned that we're trying the

20   same case in two places, and I'm very concerned about that,

21   actually, because we have very limited witnesses here.

22            MR. SILVERMAN:  Well, your Honor, I'm going to

23   limit my questions strictly to the payment of ITV's bills

24   and the money that it uses.

25            THE COURT:  Let's assume that Direct Marketing

49

1  pays their bills, that checks issued by Direct Marketing are

2  used to pay bills incurred by ITV, and that's where you're

3  going; right?

4           MR. SILVERMAN:  That is where I'm going.

5           THE COURT:  All right.  Why isn't that part of

6  your claim in Judge Tauro's action, the pending action, that

7  says Direct Marketing is responsible for the debts of ITV?

8           MR. SILVERMAN:  Well, it might be a subset of our

9  claim in that case, your Honor.  However, in this case, we

10  have a judgment against ITV.

11           ITV continues to control assets, continues to use

12  that control to pay bills, to pay invoices.  It's generating

13  money; it's selling product; it's advertising product; and

14  it's directing money into its bank account.

15           THE COURT:  And it's doing it under the name of

16  business, Direct Business, or it's doing it under its own

17  name?

18           MR. SILVERMAN:  Your Honor, we really haven't

19  gotten there.  The fact is, they're directing and funneling

20  their money into accounts to avoid the payment of this

21  judgment, but they still control those funds, and they're

22  using their discretion to decide what bills are and are not

23  paid.

24           THE COURT:  I don't know what Direct Business is.

25  I mean, you're in the middle of another lawsuit with Direct