UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ITV DIRECT, INC., <br><br> Plaintiff, <br><br> v. <br><br> HEALTHY SOLUTIONS, LLC, ET. AL., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) |
| CAPPSEALS, INC., <br><br> Plaintiff-in-Intervention <br><br> v. <br><br> HEALTHY SOLUTIONS, LLC., D/B/A DIRECT BUSINESS CONCEPTS; ITV DIRECT, INC. AND DIRECT FULFILLMENT, LLC. <br><br> Intervenor-Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) C. A. No. 04-CV10421-JLT (DEIN, J) |

**CAPPSEALS, INC.'S REPLY TO THE ITV PARTIES'
OPPOSITION TO CAPPSEALS' MOTION FOR SANCTIONS
UNDER 28 U.S.C. § 1927 AND THE INHERENT POWERS OF THE COURT**

**EXHIBIT 3**

ME1 952710v.1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CAPPSEALS, INC., <br><br> Plaintiff, <br><br> v. <br><br> DIRECT MARKETING CONCEPTS, INC., ITV DIRECT, INC., DIRECT FULFILLMENT, LLC, DONALD BARRETT, and ROBERT MAIHOS, <br><br> Defendants. | CIVIL ACTION NO. 05-11907-JLT |

## AFFIDAVIT OF ANDREW P. PRAGUE

I, Andrew P. Prague, upon personal knowledge, do depose and state as follows:

1. I am the principal of Prague and Company, P.C., Certified Public Accountants. I am and have been a certified public accountant, as licensed by the Commonwealth of Massachusetts (Registration No. 9189) and licensed by the Commonwealth of Massachusetts since November 7, 1985. I am also an attorney admitted to practice law in Massachusetts since December 19, 1983.

2. My formal education includes a BS in Accounting from Bentley College, a JD from New England School of Law and an LLM in Taxation from Boston University.

3. I am, and for the last 16 years have been, the sole principal of Prague and Company, P.C., Certified Public Accountants (and predecessor sole proprietorships), with offices at Twenty Walnut Street, Wellesley, Massachusetts. Prior to establishing my firm, I was a Supervisor in the Tax Department of the public accounting firm of Coopers and Lybrand now

B0440966v1

known as PriceWaterhouseCoopers in Boston, Massachusetts. I have extensive experience in the area of general ledger accounting and tax preparation. My firm prepares in excess of 200 business tax returns annually including C Corporations and S Corporations and annually performs dozens of audits, reviews, and compilations. I have extensive knowledge and experience with general ledgers and QuickBooks accounting software (utilized by the defendants ITV Direct, Inc. ("ITV") and Direct Marketing Concepts, Inc. ("DMC")) having used it almost every business day for the last ten years. At least 75% of the firm's business client's use QuickBooks. Over the past 20 years, I have completed numerous forensic accounting services involving closely held business in a variety of fields.

4. I have been retained by the plaintiff, Cappseals, Inc., to assess and provide opinions on some of the statements and conclusions made by Wayne Callahan in his affidavit of December 2, 2005, a copy of which is annexed hereto as Exhibit A, some of the statements and conclusions made by Donald Barrett in his affidavit of December 2, 2005, a copy of which is annexed hereto as Exhibit B, and more generally, to summarize certain aspects concerning the structure, business operations, profits and salaries with respect to the C-Corporation ITV and S-Corporation DMC. In connection therewith, I have reviewed what financial records of ITV and DMC which I understand were produced in the context of this and/or related litigation. These documents include but are not limited to:

 a. A Balance Sheet for ITV signed by Robert A. Maihos, Vice President of ITV, for 2003 (Bates no. ITV 00010) (annexed hereto as Exhibit C).

 b. A Statement of Profit & Loss for ITV signed by Mr. Maihos for 2003 (Bates no. ITV00011) (annexed hereto as Exhibit D).

  c. A U.S. Corporation Income Tax Return for ITV for 2003 (and related Schedules and Attachments), dated September 15, 2004, signed by both Mr. Maihos and Leo H. Bonarrigo CPA (Bates no. ITV00018-00030) (annexed hereto as Exhibit E).

  d. A Balance Sheet for ITV for 2004 (Bates no. ITV00013) (annexed hereto as Exhibit F).

  e. A Profit & Loss Statement for ITV for 2004 (Bates no. ITV00014) (annexed hereto as Exhibit G).

  f. A U.S. Corporation Income Tax Return for ITV for 2004 (and related Schedules and Attachments), dated September 12, 2005, signed by Leo H. Bonarrigo CPA (Bates no. ITV00031-00050) (annexed hereto as Exhibit H).

  g. A Massachusetts Annual Report for Domestic and Foreign Corporations for ITV for 2004, dated March 15, 2004 (Bates no. ITV00051) (annexed hereto as Exhibit I). A review of the Massachusetts Secretary of States web site indicates that both the 2003 and the 2004 annual reports for ITV Direct, Inc. have not been filed with the Massachusetts Secretary of State.

  h. A Massachusetts Business or Manufacturing Corporation Excise Return for ITV for 2004 (and related Schedules and Attachments), dated September 11, 2005, signed by Leo H. Bonarrigo CPA (Bates no. ITV00052-00064) (annexed hereto as Exhibit J).

  i. A print-out of the QuickBooks ITV General Ledger for ITV's asset, liability and equity accounts, covering the period March 2003 through September 30, 2005 (Bates no. ITV00188-ITV00393) (portions of which are annexed hereto as Exhibit K).

  j. A print-out of the QuickBooks ITV General Ledger for ITV's income and expense accounts covering the period January 2005 through September 30, 2005 (Bates no. ITV00394-

ITV00470) (portions of which are annexed hereto as Exhibit L). I was not provided with the income and expense portion of the General Ledger for March 2003 through December 31, 2004.

    k.    A U.S. Income Tax Return for an S Corporation for DMC for 2003 (and related Schedules and Attachments), dated September 14, 2004, signed by Leo H. Bonarrigo CPA (Bates no. DMC01993-02004) (annexed hereto as Exhibit M).

    l.    A U.S. Income Tax Return for an S Corporation for DMC for 2004 (and related Schedules and Attachments), dated September 14, 2005, signed by Leo H. Bonarrigo CPA (Bates no. DMC02005-02013) (annexed hereto as Exhibit N).

    m.    An incomplete printout of the QuickBooks DMC General Ledger covering the period June 13, 2001 to December 31, 2004 (Bates no. DMC01396-01992) (portions of which are annexed hereto as Exhibit O). Exhibit O is incomplete because it appears to be missing a substantial portion of the cost of goods sold accounts as well as all of the operating expense accounts.

    n.    A printout of the QuickBooks DMC General Ledger covering the period January 1, 2005 through November 30, 2005 (Bates no. DMC02127-02807) (portions of which are annexed hereto as Exhibit P).

    5.    All of the financial records that I have reviewed have been prepared under the accrual method of accounting. Under the accrual method of accounting, income is reported in the time period that the income is earned by selling products or providing services whether or not payment has been received. Consistently deductions are claimed in the time period that the inventory is sold or the benefit of the services performed by the vendor is received, whether or not the goods or services have been paid for.

B0440966v1

6. A Comparison of the 2003 and 2004 Tax Returns for ITV and DMC and the General Ledger entries for the period 2003 through September 30, 2005 (for ITV) and 2003 through November 30, 2005 (for DMC), indicate that ITV and DMC have the same shareholders, Donald Barrett and Robert Maihos, and share the same office address.

7. The 2003 and 2004 Tax Returns and General Ledger entries for 2003-September 30, 2005 of ITV ("ITV Financial Records") show that during that time ITV had no salaried employees or compensated officers.

8. The ITV Financial Records show that ITV had no material or significant assets and no material or significant liabilities in 2003 through September 30, 2005. The records reveal that from its inception to July 20, 2005, ITV's sole material and significant business function was to receive lumps sum transfers of money from DMC on a periodic, sometimes daily basis, and to issue checks and/or other forms of payment to television, radio, and other forms of media for the purpose of making media purchases. This is characterized in the ITV Financial Records as "Media Buys". Please see Exhibit D, F and L starting at ITV00394. These Media Buys were made on the same day or shortly after the lump sum transfers were made by DMC to ITV. ITV characterized the transfers it received from DMC as revenue, and the Media Buy expenditure as "cost of goods sold." Outside of DMC, ITV had no other material source of Revenue and engaged in no material activity other than acting as a conduit or as an agent for DMC to purchase media. ITV was totally dependent on DMC for virtually all of its revenue and its very business existence.

9. The ITV Financial Records show that ITV never operated at a substantial loss during the period 2003 through September 30, 2005, nor did it make any substantial profits. Please see Exhibit D, ITV00011, and Exhibit G, ITV00014. ITV had a loss of $1,468.53 in 2004

B0440966v1

and income of $39,549.00 in 2003. Although incomplete the records suggest that the first nine months of 2005 show approximately a $120,000 loss on $9,991,216.75 of revenue transferred from DMC, see Exhibit L, ITV00394 - ITV00463, this is because it was simply a pass-through for DMC for the purpose of making Media Buys. In other words, DMC transferred the money to ITV, and ITV made the purchases. As stated, the ITV Financial Records demonstrate that this "pass-through" functioned was abandoned by ITV and DMC on or around July 20, 2005 (Exhibit L, ITV00463) subsequent to which time, DMC, as its General Ledger entries show, began directly making the Media Buys itself. See e.g. Exhibit P, DMC02595.

10.    The 2003 and 2004 Tax Returns and General Ledger entries for 2003 through November 30, 2005 of DMC ("DMC Financial Records") show that DMC was in the business of acquiring various health supplement products, selling and/or distributing such products, the production and sale of infomercials and other advertising materials for the sale of such products, and related business activities. This is apparent from the description of the business in the tax returns (Exhibit M, DMC01993 and Exhibit N, DMC02005), and the consistent and specific journal entries and categorization of accounts in the tax returns, balance sheets, income statements and general ledgers. For example, only DMC and not ITV, incurred expenses for credit card processing fees associated with the purchase of its products. Only DMV and not ITV made purchases of products and carried an inventory of products purchased by DMC and unsold at a given date. Only DMC and not ITV provided refunds to customers for products purchased by certain customers of DMC. Only DMV and not ITV had accounts payable for products purchased and sold by DMC for which payment was still owed by DMC. Only DMC and not ITV had substantial expenses for call center equipment and employees for taking and processing orders for the sale of its products.

B0440966v1

11. In 2003, DMC recorded approximately $34.4 million in revenue, and from that amount compensated its two shareholders, Messrs. Maihos and Barrett a total of $780,000, and distributed to Messrs. Maihos and Barrett an additional $844,217. See Exhibit M, DMC01993 and DMC01995. In 2004, DMC recorded approximately $33.8 million in revenue, and from that amount compensated its two shareholders Messrs. Maihos and Barrett $1,024,000 and distributed to Messrs. Maihos and Barrett $1,388,653. See Exhibit N, DMC02005 and DMC02007. In short, Messrs. Maihos and Barrett received over $4 million in the two years of DMC's operation. These amounts were received not only in the form of cash payments, but the payment by DMC of what appear to be personal or non business related payments for such as items as jewelry, clothing and furniture and non DMC income taxes. See Exhibit O, DMC01934 - DMC01944.

12. The DMC Financial Records show that in 2003 and 2004, DMC purchased by means of checks the Supreme Greens product from Healthy Solutions d/b/a Direct Business Concepts ("Healthy Solutions"), recorded the Supreme Greens product cost and sold the Supreme Greens product, recognizing the sales as revenue. See Exhibit O, DMC01437 and DMC01985-DMC01986. Moreover, DMC recognized amounts owed to Healthy Solutions as an indebtedness or "account payable" on its books and records. See Exhibit O, DMC01747 and DMC01781.

13. Mr. Barrett states in his affidavit that DMC's purpose is to "search[] out products and people that it believes will work well together in an infomercial, and provid[e] the administrative services in connection with selling such products via infomercials." Mr. Barrett says that ITV's purpose is to "purchas[e] the media and produc[e] the infomercials for future products located by DMC." The DMC and ITV Financial Records belie Mr. Barrett's assertions. As stated, ITV, through July 20, 2005, acted as a pass through or conduit for which Media Buys,

B0440966v1

utilized by DMC in the operation of its business, were purchased, using funds provided by DMC. ITV did nothing else. DMC, on the other hand, purchased product, sold the product, produced the infomercials, engaged in many other related activities and profited from these activities. Mr. Barrett does not include in his description of the two entities which entity was responsible for or engaged in the actual purchasing and selling of the health supplement product. It is clear, however, that those functions were performed solely by DMC.

14.  Mr. Barrett states in his affidavit that ITV purchased media for the promotion of Supreme Greens with funds that were loaned to it by DMC. (See paragraphs 4 and 5 – "[t]he business plan and forecast for ITV anticipated that ITV would repay all amounts *owed* to DMC during the course of running the infomercial program.") This statement is flatly contradicted by the DMC and ITV Financial Records. They do not show any evidence of loans or liability on the part of ITV to DMC with respect to the transfers. ITV's accrual basis books and records as prepared by ITV contain no substantial liabilities to any party including DMC. If such liabilities exist they would be recorded on the financial books and tax returns of ITV, said financial books and tax returns being prepared on the accrual basis. To the contrary, the transfers were characterized as "revenue" by ITV and "cost of goods sold" by DMC. These inter-corporate or related party transfers, and the manner in which they were characterized, indicate that, contrary to Mr. Barrett's statement, the two corporations were operated as one business.

15.  Mr. Barrett suggests in his affidavit that ITV suffered a "significant loss" in its business, caused in part by the FTC's and FDA's alleged actions with regard to Supreme Greens. However, the DMC and ITV Financial Records indicate that the combined ITV/DMC business enjoyed significant profits in 2003 and 2004.

B0440966v1

16. Mr. Barrett states that the purchase orders that were issued by DMC to Healthy Solutions for the Supreme Greens product was a "mistake". However, this is belied by the fact that ITV never recorded in its books and records the purchase of the Supreme Greens product, the indebtedness owed to Healthy Solutions, and the subsequent sale of the Supreme Greens product to customers. To the contrary, during all material times, DMC recorded in its books and records the purchase of the Supreme Greens product, the indebtedness owed to Healthy Solutions, and the subsequent sale of the Supreme Greens product to its customers. See Exhibit O, DMC01437, DMC01985-DMC01986, DMC01747 and DMC01781.

17. Mr. Callahan, who according to his own affidavit was associated with Leo H. Bonarrigo, CPA and served as outside accountant to both DMC and ITV, repeats almost verbatim the statements made by Mr. Barrett with respect to ITV's obligations to DMC with respect to funds used to purchase media, and the alleged losses sustained by ITV (addressed in paragraphs 13 and 14 above). For the same reasons stated above, Mr. Callahan's statements are completely false, and are expressly contradicted by the accounting records which he has testified in his affidavit he "processed and maintained since each company's inception"(Paragraph 4).

18. Mr. Callahan testifies in his affidavit:

> As security for the advances of funds provided to ITV, the value of the inventory of Supreme Greens product was carried on the books of DMC. Again, the expectation was that this inventory would be moved to the books of ITV once DMC had recovered its advanced funds and overhead expenses. That never occurred.

These statements are ludicrous on their face and absurd after a review of Mr. Callahan's own financial records. First, I am aware of no "accepted accounting procedure or standard' (from paragraph 2 of Mr. Callahan's affidavit) that permits listing as inventory products which serve as "collateral" or "security" for a loan to be carried as an asset on the books of the lender. Second, the Balance Sheets, General Ledger and the Tax Returns clearly indicate that no loan or other

B0440966v1

liability existed as between ITV and DMC. Third, not only did DMC purchase the products (like it did its other health supplement products), DMC identified the purchase as an indebtedness on its books and records the amounts owed to Healthy Solutions.

   19.   Mr. Callahan testifies in his affidavit sales of the Supreme Greens product were made by ITV. This is false. The DMC Financial Records indisputably show that ITV sold no product, including the Supreme Greens product. My review of the financial records leads me to conclude that DMC has recorded the sales of Supreme Greens on its books and tax returns.

   20.   For the period of 2003 through September 30, 2005 ITV incurred $10,000 of legal and professional fees. See Exhibit D, ITV00011, Exhibit G, ITV00014, and Exhibit L, ITV00468. For 2003, DMC incurred $580,967 of legal and professional expenses. See Exhibit M, DMC 02004. For 2004, DMC incurred $1,095,965 of legal and professional expenses. See Exhibit N, DMC 02012.

   Signed under the pains and penalties of perjury this 13th day of December, 2005.

                                                    _____
                                                    Andrew P. Prague